ACCEPTED
05-18-00647-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
6/4/2018 2:40 PM
LISA MATZ
CLERK

**Part 4 of 5**

No. 05-18-00647-CV

In the Court of Appeals

Fifth District of Texas at Dallas

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

6/4/2018 2:40:01 PM

LISA MATZ
Clerk

**In re JOHN CALCE**
*Relator*

# RECORD FOR PETITION FOR WRIT OF MANDAMUS

Relator John Calce submits this record of trial court proceedings in support of his petition for writ of mandamus.

## Index of Documents

| # | Date | Description | Record Pages |
|---|------|-------------|--------------|
| 1 | 6/26/16 | Plaintiff's Original Petition | 001-023 |
| 2 | 7/31/17 | John Calce's Original Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 024-172 |
| 3 | 11/22/17 | John Calce's First Amended Counterclaim Against Centurion Logistics LLC and Centurion Pecos Terminal LLC | 173-321 |
| 4 | 11/22/17 | John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 322-393 |

| 5 | 11/27/17 | John Calce's Supplemental Evidence in Support of Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 394-405 |
|---|---|---|---|
| 6 | 12/8/17 | Plaintiff's Response to John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 406-858 |
| 7 | 12/12/17 | John Calce's Reply Brief in Support of Amended Motion for Partial Summary Judgment Regarding Counterclaim Against Centurion Logistics LLC | 859-865 |
| 8 | 12/15/17 | Notice of Trial Setting | 866 |
| 9 | 5/2/18 | Plaintiffs' Second Amended Petition | 867-903 |
| 10 | 5/21/18 | Order Denying John Calce's Amended Motion for Partial Summary Judgment Regarding Counterclaim Againt Centurion Logistics LLC | 904-905 |

# <u>Declaration of Chase J. Potter</u>

STATE OF TEXAS         §
COUNTY OF DALLAS    §

My name is Chase J. Potter. My date of birth is May 12, 1986. My address is 901 Main Street, Suite 6000, Dallas, Texas 75202. I hereby declare under penalty of perjury as follows:

1.    I am over eighteen years of age and am fully competent to make this declaration. I am an attorney licensed by the Supreme Court of Texas and am counsel for Relator John Calce in this case.

2.    The factual statements contained within this instrument are within my personal knowledge and are true and correct.

3.    The copies of pleadings, motions, and other documents included in this Record for Petition for Writ of Mandamus are true and correct copies of these documents as filed in the trial court.

Executed in Dallas County, Texas, on June 4, 2018.

*/s/ Chase J. Potter*
Chase J. Potter, Declarant

otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means Texas Capital Bank, National Association, and its successors and assigns.

**Borrower.** The word "Borrower" means BALLENGEE INTERESTS, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Grantor.** The word "Grantor" means Centurion Pecos Terminal LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Deed of Trust.

**Lender.** The word "Lender" means Texas Capital Bank, National Association, its successors and assigns.

**Note.** The word "Note" means the promissory note dated September 16, 2014, **in the original principal amount of $1,500,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property. The word "Rents" shall also mean all "Rents" as defined in Chapter 64 of the Texas Property Code.

**Trustee.** The word "Trustee" means John Hudgens, whose address is 2000 McKinney Avenue, Suite 700, Dallas, TX 75201 and any substitute or successor trustees.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

CENTURION PECOS TERMINAL LLC

By: _____
John V. Calce, Manager of Centurion Pecos
Terminal LLC

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF __TX__ )
                 ) SS
COUNTY OF __Dallas__ )

SANDRA T. JOHNSON
MY COMMISSION EXPIRES
September 22, 2014

This instrument was acknowledged before me on __September 16__, 20__14__ by John V. Calce, Manager of Centurion Pecos Terminal LLC, a member on behalf of Centurion Pecos Terminal LLC, a limited liability company.

_____
Notary Public, State of Texas

VOL 1109 PG 0173

MR.596

BALLENGEE00002065.06

LaserPro, Ver. 14.3.10.003 Copr. D+H USA Corporation 1997, 2014. All Rights Reserved. - TX M:\CFI\LPL\G01.FC TR-17190

VOL 1109 PG 0174

MR.597

BALLENGEE00002065.07

BEING A TRACT OF LAND LOCATED IN SECTION 76, BLOCK 4, H&GN SURVEY, REEVES COUNTY, TEXAS, AND BEING A PART OF A CALLED 496.76 GRID (496.87 SURFACE) ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 905, PAGE 155, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.), AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE NORTHWEST CORNER OF SAID SECTION 76, THE SOUTHWEST CORNER OF SAID SECTION 75, THE NORTHEAST CORNER OF SECTION 77 AND THE SOUTHEAST CORNER OF SECTION 78, SAID 5/8" IRON ROD SET ALSO BEING IN THE INTERSECTION OF COUNTY ROAD NO. 408 AND COUNTY ROAD NO. 404;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 76 AND SECTION 75, A DISTANCE OF 2639.85 FEET TO A POINT IN THE EAST LINE OF SAID 496.76 ACRE TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "5358 TRUJILLO" BEARS S 58°03'46" W, A DISTANCE OF 0.63 FEET, ALSO FROM WHICH A 1/2" IRON ROD FOUND AT THE NORTHEAST CORNER OF SAID SECTION 76, BLOCK 4, BEARS N 58°03'46" E, A DISTANCE OF 2639.85 FEET;

THENCE S 32°08'23" E, WITH THE EAST LINE OF SAID 496.76 ACRE TRACT, A DISTANCE OF 3187.68 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF SAID 496.76 ACRE TRACT BEING 100' NORTH OF THE CENTERLINE OF THE TEXAS & PACIFIC RAILROAD;

THENCE S 69°42'22" W, WITH THE SOUTH LINE OF SAID 496.76 ACRE TRACT AND 100' NORTH OF AND PARALLEL WITH THE CENTERLINE OF SAID TEXAS & PACIFIC RAILROAD, A DISTANCE OF 2697.40 FEET TO A POINT IN SAID COUNTY ROAD NO. 408, THE WEST LINE OF SAID SECTION 76 AND THE EAST LINE OF SECTION 77, BLOCK 4, FROM WHICH A 60D NAIL FOUND BEARS S 69°42'22" W, A DISTANCE OF 0.37 FEET, ALSO FROM WHICH A 1/2" IRON ROD FOUND FOR THE SOUTHWEST CORNER OF SAID SECTION 76, BLOCK 4, BEARS S 32°08'13" E, A DISTANCE OF 2657.42 FEET;

THENCE N 32°08'13" W, WITH THE WEST LINE OF SAID 496.76 ACRE TRACT AND WITH THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 77, A DISTANCE OF 2643.29 FEET TO THE **PLACE OF BEGINNING AND CONTAINING 176.659 ACRES OF LAND.** THIS DESCRIPTION IS BASED ON THE LAND TITLE SURVEY AND PLAT MADE BY ROBERT L. YOUNG, REGISTERED PROFESSIONAL LAND SURVEYOR NO. 5400 ON JUNE 20, 2014. ALL BEARINGS RECITED HEREIN ARE CORRELATED TO THE TEXAS STATE PLANE COORDINATE SYSTEM, CENTRAL ZONE (4203), NAD83 (NA2011). SEE THE ACCOMPANYING SURVEY MAP ATTACHED HERETO AND MADE A PART HEREOF.

VOL 1109 PG 0175



MR.598

BALLENGEE00002065.08

# Exhibit "K"

MR.599

## ASSIGNMENT OF CONTRACT

THIS ASSIGNMENT ("Assignment") is made on this _15th_ day of September, 2014 ("Effective Date") by and between CENTURION LOGISTICS, LLC, a Texas limited liability company whose address is 17950 Preston Road, Suite 1080, Dallas Texas 75252, hereinafter ("Assignor"), and CENTURION PECOS TERMINAL LLC, a Texas limited liability company whose address is 17950 Preston Road, Suite 1080, Dallas Texas 75252, hereinafter ("Assignee").

### WITNESSETH:

WHEREAS, Assignor entered into that certain purchase contract with Montane Industries, LLC, a Texas limited liability company (the "Seller") dated February 12, 2014, as may be amended (the "Contract") to purchase approximately 176.6 acres of land located in Reeves County, Texas which land is more particularly described on Exhibit A attached hereto and incorporated herein by reference (the "Property");

WHEREAS, pursuant to Section 23(d) the Contract, Assignor has the right, without having to obtain any prior approval from Seller, to assign the Contract provided that any assignee assume all of Assignor's obligations and liabilities under the Contract;

WHEREAS, Assignor warrants and represents that the Contract is in full force and effect and the rights set forth therein are free of lien, encumbrance or adverse claim;

WHEREAS, Assignor desires to assign the Contract to Assignee and Assignee desires to accept such assignment together with all of Assignor's rights, obligations and liabilities under the Contract.

NOW THEREFORE, for and in consideration of ten and no/100 dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee hereby agree as follows:

1. **Assignment**. As of the Effective Date, Assignor hereby assigns all of Assignor's rights, title, interests, duties, obligations, and liabilities under the Contract to Assignee.

2. **Assumption**. Assignee hereby assumes Assignor's rights, title, interests, duties, obligations, and liabilities under the Contract and agrees to perform all remaining duties and obligations of Assignor under the Contract from and after the Effective Date. Assignee further agrees to indemnify and hold Assignor harmless from any claim or demand of Seller resulting from non-performance of the Contract by Assignee, and Assignee shall be responsible for all payments to be made remaining under the Contract or under any other agreements established pursuant to the Contract, if any.

3. **Binding Effect**. Assignor and Assignee agree that this assignment and the provisions herein contained shall be binding upon and shall inure to the benefit of Assignor and Assignee and each of their successors and assigns.

4. **Effective Date**. This Assignment shall become effective as of the Effective Date and shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

5. **Counterparts**. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same document.

Assignment of Contract – Centurion Logistics, LLC

BALLENGEE00002067 MR 600

**IN WITNESS WHEREOF**, Assignor and Assignee have caused this Assignment to be executed as of the Effective Date.

**ASSIGNOR:**

CENTURION LOGISTICS, LLC,
a Texas limited liability company



By: _____
Name: Marc Marrocco
Title: Manager

STATE OF TEXAS §
§
COUNTY OF DALLAS §

This instrument was acknowledged before me on the _15th_ day of September, 2014 by Marc Marrocco, Manager of CENTURION LOGISTICS, LLC, a Texas limited liability company and he possesses the requisite authority to sign this Assignment on behalf of said entity.

[SEAL]

```
DALA ROWNTREE
Notary Public, State of Texas
My Commission Expires
August 05, 2018
```

_____
Notary Public in and for the State of Texas

My Commission Expires:


**ASSIGNEE:**

CENTURION PECOS TERMINAL LLC
a Texas limited liability company

By: _____
Name: John V. Calce
Title: Manager

STATE OF TEXAS §
§
COUNTY OF _Dallas_ §

This instrument was acknowledged before me on the _15th_ day of September, 2014 by John V. Calce, Manager of CENTURION PECOS TERMINAL LLC a Texas limited liability company and possesses the requisite authority to sign this Assignment on behalf of said entity.

[SEAL]



```
DALA ROWNTREE
Notary Public, State of Texas
My Commission Expires
August 05, 2018
```

_____
Notary Public in and for the State of Texas

My Commission Expires:


Signature Page to Assignment of Contract – Centurion Logistics, LLC

MR_601
BALLENGEE00002067.02

## EXHIBIT A

### Property

**BEING A TRACT OF LAND LOCATED IN SECTION 76, BLOCK 4, H&GN SURVEY, REEVES COUNTY, TEXAS, AND BEING A PART OF A CALLED 496.76 GRID (496.87 SURFACE) ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 905, PAGE 155, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.), AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:**

**BEGINNING** AT A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE NORTHWEST CORNER OF SAID SECTION 76, THE SOUTHWEST CORNER OF SAID SECTION 75, THE NORTHEAST CORNER OF SECTION 77 AND THE SOUTHEAST CORNER OF SECTION 78, SAID 5/8" IRON ROD SET ALSO BEING IN THE INTERSECTION OF COUNTY ROAD NO. 408 AND COUNTY ROAD NO. 404;

**THENCE** N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 76 AND SECTION 75, A DISTANCE OF 2639.85 FEET TO A POINT IN THE EAST LINE OF SAID 496.76 ACRE TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "5358 TRUJILLO" BEARS S 58°03'46" W, A DISTANCE OF 0.63 FEET, ALSO FROM WHICH A 1/2" IRON ROD FOUND AT THE NORTHEAST CORNER OF SAID SECTION 76, BLOCK 4, BEARS N 58°03'46" E, A DISTANCE OF 2639.85 FEET;

**THENCE** S 32°08'23" E, WITH THE EAST LINE OF SAID 496.76 ACRE TRACT, A DISTANCE OF 3187.68 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF SAID 496.76 ACRE TRACT BEING 100' NORTH OF THE CENTERLINE OF THE TEXAS & PACIFIC RAILROAD;

**THENCE** S 69°42'22" W, WITH THE SOUTH LINE OF SAID 496.76 ACRE TRACT AND 100' NORTH OF AND PARALLEL WITH THE CENTERLINE OF SAID TEXAS & PACIFIC RAILROAD, A DISTANCE OF 2697.40 FEET TO A POINT IN SAID COUNTY ROAD NO. 408, THE WEST LINE OF SAID SECTION 76 AND THE EAST LINE OF SECTION 77, BLOCK 4, FROM WHICH A 60D NAIL FOUND BEARS S 69°42'22" W, A DISTANCE OF 0.37 FEET, ALSO FROM WHICH A 1/2" IRON ROD FOUND FOR THE SOUTHWEST CORNER OF SAID SECTION 76, BLOCK 4, BEARS S 32°08'13" E, A DISTANCE OF 2657.42 FEET;

**THENCE** N 32°08'13" W, WITH THE WEST LINE OF SAID 496.76 ACRE TRACT AND WITH THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 77, A DISTANCE OF 2643.29 FEET TO THE **PLACE OF BEGINNING AND CONTAINING 176.659 ACRES OF LAND.** THIS DESCRIPTION IS BASED ON THE LAND TITLE SURVEY AND PLAT MADE BY ROBERT L. YOUNG, REGISTERED PROFESSIONAL LAND SURVEYOR NO. 5400 ON JUNE 20, 2014. ALL BEARINGS RECITED HEREIN ARE CORRELATED TO THE TEXAS STATE PLANE COORDINATE SYSTEM, CENTRAL ZONE (4203), NAD83 (NA2011). SEE THE ACCOMPANYING SURVEY MAP ATTACHED HERETO AND MADE A PART HEREOF.

Exhibit A to Assignment of Contract – Centurion Logistics, LLC

MR-602

BALLENGEE00002067.03

Exhibit "L"

MR.603

After recording return to:
Centurion Logistics, LLC
c/o Marc Marrocco
1875 Laws Street
Dallas, Texas 75202

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>**GENERAL WARRANTY DEED**</u>

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF REEVES | § | |

THAT **MONTANE INDUSTRIES, LLC**, a Texas limited liability company ("*Grantor*"), for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to the undersigned paid by Grantee (as hereinafter defined), the receipt and sufficiency of which is hereby acknowledged, has GRANTED, SOLD AND CONVEYED, and by these presents does hereby GRANT, SELL AND CONVEY, with general warranty covenants, unto **CENTURION PECOS TERMINAL LLC**, a Texas limited liability company ("*Grantee*"), whose mailing address is 17950 Preston Road, Suite 1080, Dallas, Texas 75252, all of that certain lot, tract or parcel of land lying and being situated in Reeves County, Texas, and being more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein (the "*Property*"), together with all buildings, structures, paving, curbing, trees, plants, shrubs, and other building improvements and landscaping of every kind and nature presently situated on, in, or under, or hereafter erected or installed on the Property, together with all of Grantor's right, title and interest in all rights, tenements, hereditaments, easements, licenses, rights-of-way, privileges, and rights of ingress and egress applicable to the Property, and appurtenances pertaining thereto and strips and gores.

MR 604

BALLENGEE00002072

This conveyance is made and accepted subject to all matters of recording against the Property. Ad valorem real property taxes for the current year have been prorated through the date of this instrument, with Grantor and Grantee each paying its pro rata share. Grantee assumes and promises to pay taxes for 2014 and subsequent years.

TO HAVE AND TO HOLD the Property, subject to the Permitted Exceptions, together with all and singular the rights and appurtenances thereto in anywise belonging unto said Grantee, its successors and assigns, forever, and Grantor does hereby bind itself, its successors and assigns to warrant and forever defend all and singular the Property, subject to all matters of record against the Property, unto said Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

[Signature page immediately follows.]

BALLENGEE000002072.02

IN WITNESS WHEREOF, the Grantor has executed the within instrument as of September 19, 2014.

"GRANTOR":

**MONTANE INDUSTRIES, LLC**
a Texas limited liability company

By: TexSand Holdings, LLC
a Texas limited liability company,
its Manager

By: _____
Name: Farrell Arcenaux
Title: Manager

STATE OF TEXAS      )
                         )    ss
COUNTY OF Dallas  )

On this ___15___ day of __September__, 2014 before me, the undersigned Notary Public in and for said State, personally appeared Farrell Arcenaux known or identified to me to be the Manager of TexSand Holdings, LLC, a Texas limited liability company, the Manager of MONTANE INDUSTRIES, LLC, a Texas limited liability company, that executed the instrument and acknowledged to me that he executed the same for and on behalf of said limited liability company and limited partnership.

_____
Notary Public
My Commission Expires on 7-16-2017

[NOTARY SEAL]

DANIEL ROESSNER TSAKONAS
MY COMMISSION EXPIRES
July 16, 2017

BALLENGEE00002072.03    MR.606

## Exhibit A

BEING a tract of land located in Section 76, Block 4, H&GN Survey, Reeves County, Texas, and being a part of a called 496.76 GRID (496.87 Surface) acre tract of land as described in a Deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

BEGINNING at a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8 inch iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

THENCE North 58 degrees 03 minutes 46 seconds East, with the common line of said Section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2 inch iron rod found with cap stamped "5358 TRUJILLO" bears South 58 degrees 03 minutes 46 seconds West, a distance of 0.63 feet, also from which a 1/2 inch iron rod found at the Northeast corner of said Section 76, Block 4, bears North 58 degrees 03 minutes 46 seconds East, a distance of 2639.85 feet;

THENCE South 32 degrees 08 minutes 23 seconds East, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8 inch iron rod set with cap stamped "TRANS TEXAS SURVEYING" for the Southeast corner of said 496.76 acre tract being 100 feet North of the centerline of the Texas & Pacific Railroad;

THENCE South 69 degrees 42 minutes 22 seconds West, with the South line of said 496.76 acre tract and 100 feet North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears South 69 degrees 42 minutes 22 seconds West, a distance of 0.37 feet, also from which a 1/2 inch iron rod found for the Southwest corner of said Section 76, Block 4, bears South 32 degrees 08 minutes 13 seconds East, a distance of 2657.42 feet;

THENCE North 32 degrees 08 minutes 13 seconds West, with the West line of said 496.76 acre tract and with the common line of said Section 76 and said Section 77, a distance of 2643.29 feet to the PLACE OF BEGINNING and CONTAINING 176.659 acres of land.

Inst No. 14-03864
DIANNE O. FLOREZ
COUNTY CLERK
2014 Sep 24 10:09 AM
REEVES COUNTY, TEXA
VG                    DEPUTY

Exhibit "M"

MR.608

**UNSECURED PROMISSORY NOTE**
(the "Note")

$1,500,000.00                                                     September 16, 2014

FOR VALUE RECEIVED, Centurion Pecos Terminal, LLC, a Texas limited liability company ("*Maker*"), promises to pay to the order of Ballengee Interests, LLC (and together with its successors or assigns, "*Payee*"), in lawful money of the United States of America, the principal sum of One Million Five Hundred Thousand Dollars ($1,500,000.00), together with interest on the unpaid principal balance at an annual rate equal to eight percent (8.0%), in the manner provided below. Interest shall be calculated on the basis of a year of 365 or 366 days, as applicable, and charged for the actual number of days elapsed on the unpaid principal balance.

1.     PAYMENTS

1.1     PRINCIPAL AND INTEREST

The outstanding principal balance of this Note, and all accrued but unpaid interest thereon, shall be due and payable in full on September 1, 2017 or upon the earlier maturity hereof, whether by acceleration or otherwise. If the principal amount of the Note is not paid in full on or before such date, then the Note shall thereafter commence to accrue interest on the unpaid principal balance at the annual rate of interest specified above plus ten percent (10.0%).

1.2     MANNER OF PAYMENT

All payments of principal and interest on this Note shall be made by wire transfer or direct deposit of immediately available funds to an account specified in writing by Payee, or in such other manner as specified in writing by Payee. If any payment of principal or interest on this Note is due on a day that is not a Business Day, such payment shall be due on the next succeeding Business Day, and such extension of time shall be taken into account in calculating the amount of interest payable under this Note. "*Business Day*" means any day other than a Saturday, Sunday or legal holiday on which banking institutions in the State of Texas are authorized or required by law to be closed. All payments by the Maker under this Note shall be made without set-off, defense or counterclaim and be free and clear and without any deduction or withholding for any taxes or fees of any nature whatsoever, unless the obligation to make such deduction or withholding is imposed by law.

1.3     APPLICATION

Unless Payee, in its sole discretion, elects to apply payments differently, all payments on this capital end note shall be applied in the following order of priority: (a) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon) for which either Maker shall be obligated or Payee shall be entitled pursuant to the provisions of this Note, (b) the payment of accrued but unpaid interest hereon, and (c) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the direct order of maturity.

1.4     PREPAYMENT

Maker may, without fee, premium or penalty, at any time and from time to time, prepay all or any portion of the outstanding principal balance due under this Note, provided that each such prepayment is accompanied by accrued interest on the amount of principal prepaid calculated to the date of such prepayment. Any partial prepayments shall be applied to installments of principal in inverse order of their maturity. Payments shall be first applied to accrued and unpaid interest accrued at the time of such payment and then to principal.

2.     DEFAULTS

2.1     EVENTS OF DEFAULT

The occurrence, at any time and from time to time, of any one or more of the following events with respect to Maker shall constitute an event of default hereunder ("*Event of Default*"):

(a)     If Maker shall fail to pay the full principal balance of the Note, together with all accrued interest thereon, on or before September 1, 2017, Maker shall fail to perform any covenant, obligation, undertaking or agreement under this Note, or any



EXHIBIT

5

MR 6 9

representation or warranty made by Maker in this Note, or made by Maker in any statement or certificate furnished by Maker, is untrue in any material respect as of the date of the issuance or making thereof.

(b)     If, pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency, creditors' rights or relief of debtors (a *"Bankruptcy Law"*), Maker shall (i) be adjudicated bankrupt or insolvent or commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) apply for or consent to the appointment of a trustee, receiver, assignee, liquidator or similar official, or file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any Bankruptcy Law; (iv) make an assignment for the benefit of its creditors; (v) admit in writing its inability to pay its debts as they become due; or (vi) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding, or take corporate action for the purpose of effecting any of the foregoing.

(c)     If a court of competent jurisdiction or other competent authority enters an order, judgment or decree under any Bankruptcy Law that (i) is for relief against Maker in an involuntary case; (ii) appoints a trustee, receiver, assignee, liquidator or similar official for Maker or substantially all of Maker's properties; or (iii) orders the liquidation of Maker, and in each case the order, judgment or decree is not dismissed within sixty (60) days.

(d)     A breach of any covenant in Section 3 hereof by Maker.

Maker shall notify Payee in writing promptly upon becoming aware of the occurrence of any Event of Default.

## 2.2    DEFAULT RATE; LATE CHARGE

Upon the occurrence (and during the continuation) of any Event of Default, at the option of Payee and without notice to Maker, all accrued and unpaid interest, if any, shall be added to the principal balance under the Note, and the entire principal balance, as so adjusted, shall bear interest thereafter until paid at an annual rate equal to the lesser of (i) the per annum rate that is ten percent (10%) in excess of the above-specified interest rate, or (ii) the maximum rate of interest allowed to be charged under applicable law, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein. All such interest shall be paid at the time of, and as a condition precedent to, the curing of any such Event of Default.

If any payment required to be made under this Note is received by Payee more than five (5) days after the date when due, Maker agrees that a late charge equal to five per cent (5%) of such late payment shall be immediately due and payable by Maker to Payee, and that such amount is reasonably estimated to compensate Payee for the additional administrative expense, cost and other damages to be incurred by Payee in the administration and processing of this Note.

## 2.3    REMEDIES

Upon the occurrence of an Event of Default, Payee may, at its option, (i) declare the entire unpaid principal balance of this Note, together with all accrued interest thereon and all other amounts payable hereunder, to be immediately due and payable regardless of any prior forbearance, without presentment, demand, protest notice of intent to accelerate, notice of acceleration, or any other notice of any kind, **ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED, ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING**; and (ii) exercise any and all rights and remedies available to it under applicable law, either by suit in equity or by action at law, or both. Maker shall pay all costs and expenses incurred by or on behalf of Payee in connection with this Note, including, without limitation, all costs and expenses arising in connection with Payee's exercise or enforcement of any or all of its rights and remedies under this Note, including reasonable attorneys' fees.

## 3.    COVENANTS

Except with the prior written consent of Payee, from and after the date hereof and continuing so long as any amount remains unpaid on the Note, the Maker covenants and agrees with Payee that (a) Maker shall comply with all laws, ordinances or governmental rules and regulations to which it is subject, (b) Maker shall from time to time execute and deliver to Payee such documents or instruments as Payee at any time may reasonably request in connection with the Note, (c) Maker shall keep proper books of record and account in accordance with generally accepted accounting principles, (d) Maker shall pay any interest due on any note guaranteed by Payee to secure funding of this Note to any third party as directed by Payee (e) Maker shall enter into a deed of trust, deed in lieu of foreclosure or any other instrument requested by Payee to secure Payee's guarantee(s) relating to any assets or real property acquired by Payee with the proceeds of this Note.



MR.610

4.      CONFIDENTIALITY

The parties each covenant and agree that, except as consented to by the parties, neither they nor any of their respective officers, directors, employees, agents or representatives, will disclose the existence or terms of this Note or any of the other party's confidential information to any third party, except (i) as required by law or regulation (including securities regulations), or (ii) to a party's accountants, lawyers, employees, advisors and representatives in connection with evaluating the transactions contemplated herein or (iii) unless already in the receiving party's possession when such confidential information is disclosed or otherwise independently developed by such receiving party without the use of such confidential information.

6.      MISCELLANEOUS

6.1     WAIVER

The rights and remedies of Payee under this Note shall be cumulative and not alternative.  To the maximum extent permitted by applicable law, (a) no claim or right of Payee arising out of this Note can be discharged by Payee, in whole or in part, by a waiver or renunciation of the claim or right unless in a writing signed by Payee; (b) no waiver that may be given by Payee will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on Maker will be deemed to be a waiver of any obligation of Maker or of the right of Payee to take further action without notice or demand as provided in this Note. Maker and each surety, endorser, guarantor and other party ever liable for payment of any sums of money payable upon this Note, jointly and severally, waive presentment, demand, protest, notice of protest and non-payment or other notice of default, notice of acceleration and intention to accelerate or other notice of any kind, and agree that their liability under this Note shall not be affected by any renewal or extension in the time of payment hereof, or in any indulgences, or by any release or change in any security for the payment of this Note, and hereby consent to any and all renewals, extensions, indulgences, releases or changes, regardless of the number of such renewals, extensions, indulgences, releases or changes.  This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, modification, or change is sought.

**MAKER AND PAYEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF THIS NOTE OR THE ACTS OR FAILURE TO ACT OF OR BY PAYEE IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS NOTE.**

6.2     NOTICES

All notices, waivers and other communications required or permitted by this Note shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties):

Payee:

Ballengee Interests, LLC
3838 Oak Lawn Avenue, Suite 1120
Dallas, Texas 75219

Maker:

Centurion Pecos Terminal, LLC
17950 Preston Road, Suite 1080
Dallas, Texas 75252



## 6.3 SEVERABILITY; USURY SAVINGS

If any provision in this Note is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Note will remain in full force and effect. Any provision of this Note held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

It is the intention of the Maker and the Payee to conform strictly with applicable usury laws. Accordingly, if the transactions contemplated hereby would be usurious under applicable law then, in that event, notwithstanding anything to the contrary in any agreement entered into in connection with or as security for this Note, it is agreed as follows: (a) the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Note or under any of the other aforesaid agreements or otherwise in connection with this Note shall under no circumstances exceed the maximum amount permissible under such laws, and any excess shall be credited on this Note by the Payee (or if this Note shall have been paid in full, refunded to the Maker); (b) if determination of the rate of interest for determining whether the loans hereunder are usurious shall be made by amortizing, prorating, allocating and spreading, in equal parts during the full stated term of such loans (including any renewals of the term hereof) all interest at any time contracted for, charged or received from the Maker in connection with such loans, and any excess shall be canceled, credited or refunded as set forth in clause (a) above; and (c) in the event that maturity of this Note is accelerated by reason of an election by the Payee resulting from any Event of Default or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the maximum permissible amount, and excess interest, if any, provided for in this Note or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore prepaid, shall be credited on this Note (or if this Note shall have been paid in full, refunded to the Company). Unless changed in accordance with law, the applicable rate ceiling under Texas law shall be the indicated (weekly) rate ceiling from time to time in effect as provided in Texas Revised Civil Statutes Annotated, Finance Code, Chapter 303, as amended.

## 6.4 GOVERNING LAW; PARTIES IN INTEREST

This Note will be governed by and construed under the laws of the State of Texas without regard to conflicts-of-laws principles that would require the application of any other law. In the event of a dispute involving this Note or any other instruments executed in connection herewith, the undersigned irrevocably agrees that the exclusive venue for such dispute shall lie in any court of competent jurisdiction in Dallas County, Texas. As used herein, the term "Payee" shall be deemed to include its successors, legal representatives and assigns, whether by voluntary action or by operation of law. This Note shall not be assigned or transferred by Payee without the express prior written consent of Maker, other than by operation of law. Subject to the preceding sentence, this Note will be binding in all respects and inure to the benefit of Maker and Payee and their successors and assigns, whether by voluntary action of the parties, by operation of law or otherwise and all persons claiming by through or under them.

## 6.5 ENTIRE AGREEMENT

THIS NOTE CONTAINS THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF AND ALL PRIOR AGREEMENTS WHETHER WRITTEN OR ORAL RELATED HERETO WHICH ARE NOT CONTAINED HEREIN ARE SUPERSEDED AND TERMINATED HEREBY, AND THIS NOTE MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

IN WITNESS WHEREOF, Maker, intending to be legally bound hereby has executed and delivered this Promissory Note as of the date first stated above.

Centurion Pecos Terminal, LLC

By: John V. Calce, its President

4

MR.612

Exhibit "N"

MR.613

FIRST AMENDED AND RESTATED

COMPANY AGREEMENT

OF

CENTURION PECOS TERMINAL LLC

a Texas Limited Liability Company

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER ANY SECURITIES LAWS, AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED ABSENT SUCH REGISTRATION OR AN EXEMPTION THEREFROM. THE TRANSFER OF MEMBERSHIP INTERESTS IS FURTHER RESTRICTED BY <u>ARTICLE X</u> OF THIS AGREEMENT.

MR.614

# TABLE OF CONTENTS

Page

ARTICLE I   DEFINITIONS .................................................................................................1
    1.1.    Defined Terms ...................................................................................................1
    1.2.    Construction.......................................................................................................5

ARTICLE II   ORGANIZATIONAL MATTERS .....................................................................6
    2.1.    Formation...........................................................................................................6
    2.2.    Name.................................................................................................................6
    2.3.    Registered Office and Agent; Principal Office................................................6
    2.4.    Term..................................................................................................................7
    2.5.    Purposes............................................................................................................7
    2.6.    Powers...............................................................................................................7
    2.7.    Company Property .............................................................................................7
    2.8.    Consent to Admission of Members ...................................................................7
    2.9.    Status of Managers and Members......................................................................7
    2.10.    Certificates of Membership Interests...............................................................7
    2.11.    No State Law Partnership .................................................................................8

ARTICLE III   CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS...............................8
    3.1.    Initial Capital Contributions ............................................................................8
    3.2.    Additional Capital Contributions......................................................................8
    3.3.    Capital Accounts...............................................................................................8
    3.4.    No Right to Return of or Interest on Capital Account .....................................8
    3.5.    Member Loans ..................................................................................................8

ARTICLE IV   ALLOCATIONS AND DISTRIBUTIONS.......................................................8
    4.1.    Allocation of Profit or Loss .............................................................................8
    4.2.    Distributions of Distributable Cash .................................................................8
    4.3.    Withholding ......................................................................................................9
    4.4.    Limitation on Distributions...............................................................................9
    4.5.    No Right to Partition or Distributions in Kind ...............................................10
    4.6.    Recovery of Erroneous Distributions .............................................................10

ARTICLE V   MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS...............10
    5.1.    Management and Control of Company Business .............................................10
    5.2.    Resignation, Removal, and Replacement of Managers ..................................10
    5.3.    Actions of the Board of Managers...................................................................12
    5.4.    Limitations on Board of Managers' Authority ...............................................12
    5.5.    Delegation of Authority; Officers....................................................................13
    5.6.    Reliance ..........................................................................................................13
    5.7.    Compensation and Expenses of Members and Managers ...............................13
    5.8.    Standards of Manager and Member Conduct ..................................................14

ARTICLE VI   LIABILITY AND INDEMNIFICATION.........................................................14

6.1. Limitation of Liability ......................................................................................14
6.2. Indemnification by Company ...........................................................................15
6.3. Conduct Not Protected ....................................................................................15
6.4. Insurance .........................................................................................................15
6.5. Survival ...........................................................................................................15

ARTICLE VII BOOKS AND RECORDS; REPORTS.................................................16
7.1. Maintenance of and Access to Books and Records .........................................16
7.2. Fiscal Year ......................................................................................................16
7.3. Financial and Operating Reports .....................................................................16
7.4. Tax Reports .....................................................................................................16
7.5. Transmission of Communications ...................................................................16

ARTICLE VIII TAX MATTERS................................................................................17
8.1. Tax Classification ...........................................................................................17
8.2. Company Returns ............................................................................................17
8.3. Tax Elections ..................................................................................................17
8.4. Consistent Reporting.......................................................................................17
8.5. Tax Proceedings ..............................................................................................17
8.6. Information and Documents to Company.........................................................18
8.7. Survival ...........................................................................................................18

ARTICLE IX MEETINGS AND VOTING OF MEMBERS .....................................18
9.1. Meetings..........................................................................................................18
9.2. Voting .............................................................................................................19

ARTICLE X TRANSFER OF MEMBERSHIP INTERESTS.....................................19
10.1. Limitation on Transfers ..................................................................................19
10.2. Permitted Transfer of Membership Interest.....................................................19
10.3. Right of First Refusal; Tag-Along Rights; Triggering Events ........................20
10.4. Conditions to Permitted Transfers of Membership Interests ...........................21
10.5. Effective Date; Distributions ..........................................................................21
10.6. Transferor's Obligations .................................................................................22
10.7. Assignee's Rights and Obligations .................................................................22
10.8. Effect and Consequences of Prohibited Transfer ...........................................22

ARTICLE XI ADMISSION OF NEW MEMBERS ...................................................23
11.1. Substituted Members ......................................................................................23
11.2. Additional Members .......................................................................................23
11.3. No Required Capital Contributions .................................................................23

ARTICLE XII WITHDRAWAL OR REMOVAL OF MEMBERS ...........................23
12.1. Withdrawal of Members ..................................................................................23
12.2. Removal of Members.......................................................................................24
12.3. Status of Former Member ...............................................................................24

ARTICLE XIII WINDING UP AND TERMINATION .............................................24

13.1. Events Requiring Winding Up ................................................................................24
13.2. Winding Up Procedures ......................................................................................25
13.3. Continuation Without Winding Up .....................................................................25
13.4. Liquidation of Assets and Application and Distribution of Proceeds...................26
13.5. Certificate of Termination ................................................................................26
13.6. Reinstatement.....................................................................................................26

ARTICLE XIV  VALUATION ......................................................................................26
14.1. Fair Value of Company Property .......................................................................26
14.2. Purchase Price of Membership Interest ..............................................................27
14.3. Valuation of Membership Interests.....................................................................27

ARTICLE XV  GENERAL PROVISIONS.....................................................................27
15.1. Amendments .....................................................................................................27
15.2. Notice................................................................................................................27
15.3. Governing Law; Consent to Jurisdiction ............................................................28
15.4. Waiver...............................................................................................................28
15.5. Entire Agreement ..............................................................................................28
15.6. Successors and Assigns .....................................................................................28
15.7. Third-Parties .....................................................................................................28
15.8. Severability .......................................................................................................28
15.9. Construction......................................................................................................28
15.10. Execution of Agreement ...................................................................................28
15.11. Further Assurances ...........................................................................................29

MR.617

# FIRST AMENDED AND RESTATED
# COMPANY AGREEMENT
# OF
# CENTURION PECOS TERMINAL LLC

This First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC (this "Agreement") is made and entered into effective as of November ___, 2014 (the "Effective Date"), by the persons identified on the signature page(s) hereof.

## RECITALS

WHEREAS, the Company was formed pursuant to a Certificate of Formation filed with the Secretary of State of the State of Texas (the "Certificate of Formation") effective on September 12, 2014 (the "Formation Date"); and

WHEREAS, the members of the Company as of the Formation Date entered into the Company Agreement (as herein defined); and

WHEREAS, in each case on and as of the Effective Date, in accordance with the Company Agreement and prior to the execution of this Agreement, sequentially,

       (a)    contemporaneously (i) CAM Oil and Natural Gas, LLC, a Louisiana limited liability company, without any reservation of any right, title, or interest therein, assigned all of its Membership Interest to Stampede (as herein defined) (the "Membership Interest Assignment"), (ii) in connection with the Membership Interest Assignment, Centurion (as herein defined), acting in its capacity as a Member, (1) pursuant to Section 10.2(a)(i) of the Company Agreement approved such transfer, and (2) waived all of its rights set forth in Section 10.3 of the Company Agreement in connection with such transferred Membership Interests, (iii) the Manager (as herein defined) so named in the Certificate of Formation determined that the Membership Interest Assignment satisfied the conditions set forth in Section 10.4 of the Company Agreement, and (iv) such Manager, pursuant to and in accordance with Section 11.1 of the Company Agreement, approved the admission of, and admitted, Stampede as a Substituted Member (as herein defined);

       (b)    The Manager so named in the Certificate of Formation resigned as Manager pursuant to and in accordance with Section 5.2(a) of the Company Agreement; and

       (c)    the Majority-in-Interest (as herein defined) elected Centurion and Stampede as replacement Managers pursuant to and in accordance with Section 5.3 of the Company Agreement; and

WHEREAS, the parties hereto desire to hereby (i) amend and restate the Company Agreement with this Agreement, and (ii) provide for the regulation and management of the affairs of the Company according to this Agreement and the Code (as herein defined).

NOW, THEREFORE, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    Defined Terms. The following definitions, and the definitions set forth in Appendix A to this Agreement, apply to the terms used in this Agreement for all purposes.

MR.618

"Additional Capital Contribution" means the sum of cash and the Fair Value of any property contributed to the Company with respect to a Membership Interest as permitted under this Agreement, but does not include an Initial Capital Contribution.

"Additional Member" means a person who acquires a Membership Interest from the Company in exchange for a Capital Contribution and is admitted to the Company as a Member pursuant to Section 11.2 after the Effective Date.

"Affiliate" means a person who directly or indirectly Controls, is Controlled by, or is under common Control with the person in question.

"Agreement" means this First Amended and Restated Company Agreement, as it may be amended, supplemented, or restated from time to time.

"Assignee" means (a) a person to whom a Membership Interest has been transferred by a Member or Assignee in a Permitted Transfer, or in a Prohibited Transfer that the Company is required by law to recognize, but who has not become a Member, and (b) a former Member as described in Section 12.3.

"Board of Managers" means all of the Managers acting together. The Board of Managers as of the Effective Date is comprised of Centurion and Stampede.

"Capital Contribution" means the sum of the Initial Capital Contribution and Additional Capital Contributions, if any, with respect to a Membership Interest.

"Centurion" means Centurion Logistics LLC, a Texas limited liability company, and a Member of the Company as of the Effective Date.

"Certificate of Formation" means the Certificate of Formation identified in the recitals to this Agreement, as such certificate may be corrected, amended, or restated.

"Certificate of Membership Interest" means a certificate representing a Member's Membership Interest in a form approved by the Board of Managers.

"Code" means the Texas Business Organizations Code.

"Company" means the limited liability company formed pursuant to the Certificate of Formation.

"Company Agreement" means that certain written agreement, dated as of the Formation Date by and between the members of the Company as of such date, providing for the regulation and management of the affairs of the Company.

"Change of Control" means with respect to a Member, that the owners of such Member (as existing as of the date hereof) shall (i) cease to own, directly or indirectly, 51.0% of the outstanding ownership interests of such Member, or (ii) cease to own or exercise voting control over 51.0% of the outstanding voting interests of such Member.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

MR.619

"Damages" means any expense or loss (including any court costs, judgment or settlement payment, penalty, fine, tax, and reasonable attorney's fees or other dispute resolution costs) paid or incurred in connection with or as a consequence of any Proceeding, net of any insurance or other recoveries received by the Indemnified Person with respect to the foregoing.

"Distributable Cash" means the cash and cash equivalents held by the Company from operations reasonably determined by the Board of Managers to be available for distribution to the Members after payment of the Company's debts, expenses, and other obligations, and after establishment and maintenance of such cash reserves as the Board of Managers determines should be retained for the reasonable current and future needs of the Company's business.

"Effective Date" is defined in the introduction to this Agreement.

"Entity" means any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization, or other business entity.

"Fair Value" means, with respect to an asset, its Fair Value determined according to Section 14.1.

"Fiscal Year" is defined in Section 7.2.

"Formation Date" is defined in the recitals to this Agreement.

"Indemnified Person" means (a) a Member or Assignee; (b) a Manager, (c) a Liquidator (if any); (d) any Affiliate of the Company, a Member or Assignee, a Manager, or a Liquidator; and (e) any governing person, officer, employee, agent, or owner of the Company, a Member or Assignee, a Manager, a Liquidator, or any Affiliate of any of the foregoing. A person is an Indemnified Person whether or not such person has the status required to be an Indemnified Person at the time any Proceeding is made or maintained as described in Article VI or at the time any amendment to this Agreement is proposed under Section 15.1, provided such person had the status required to be an Indemnified Person at the time of the relevant actions referenced in the Proceeding.

"Index Rate" means the rate specified in Section 302.002 of the Texas Finance Code.

"Initial Capital Contribution" means the sum of any cash and the Fair Value of any property contributed to the Company by a Member with respect to a Membership Interest in connection with the original issuance of the Membership Interest by the Company as set forth on Exhibit A.

"I.R.C." means the Internal Revenue Code of 1986.

"Liquidator" is defined in Section 13.2(b).

"Majority-in-Interest" means one or more Members owning collectively more than 50% of the Percentage Interests owned by all Members entitled to vote on the particular issue.

"Manager" means the person or persons designated as manager of the Company in the Certificate of Formation and any person or persons who become a replacement Manager pursuant to Section 5.3.

MR.620

"Mandatory Distribution" means any distribution that a Member is entitled to receive and as to which the Member has attained the status of a creditor under Section 101.207 of the Code.

"Member" means any person identified as a member on Exhibit A, and any other person who becomes a member of the Company pursuant to this Agreement, who has not ceased to be a Member. "Members" means all persons that are Members, collectively.

"Membership Interest" means a Member's or Assignee's economic interest in the Company. The term includes the Member's or Assignee's right to receive allocations of profits and losses and distributions as described in Article IV, and other rights and obligations under this Agreement or the Code of an Assignee who has not been admitted as a Member, but does not include any right to participate in management or any other right reserved under this Agreement or the Code exclusively to a Member.

"Offering Member" is defined in Section 10.3(c)(i).

"Percentage Interest" means, as to any Member or Assignee, the percentage interest set forth on Exhibit A.

"Permitted Transfer" means any transfer of a Membership Interest that is described in Section 10.2.

"Person" or "person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person," as and where the context so permits or requires.

"Proceeding" means (a) any threatened, pending, or completed action or other proceeding, whether civil, criminal, administrative, arbitrative, or investigative; (b) an appeal of any such proceeding; and (c) an inquiry or investigation that could lead to any such proceeding.

"Prohibited Transfer" means any transfer of a Membership Interest that is not a Permitted Transfer.

"Redemption Notice" is defined in Section 10.3(c)(i).

"Redemption Option" is defined in Section 10.3(c)(i).

"Stampede" means Stampede Energy, LLC, a Louisiana limited liability company.

"Stampede Capital Contribution Balance" means, with respect to Stampede, the total Capital Contribution of Stampede less the cumulative distributions of cash by the Company to Stampede in return of Stampede's Capital Contribution pursuant to Section 4.2(a)(ii). For purposes of calculating the Stampede Capital Contribution Balance, no deduction shall be made for any tax distributions made to Stampede, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"Stampede Preferred Return" means, with respect to Stampede an amount equal to an 8% cumulative compounded annual return on the amount of Stampede's unreturned total Capital Contribution accrued as of any date of determination. The Stampede Preferred Return will be calculated by treating all distributions of the Stampede Preferred Return pursuant to Section 4.2(a) as first being a

MR.621

payment of any undistributed accumulated annual return as of the distribution date and then being a repayment of any and all of Stampede's Capital Contributions as of the distribution date.

"Stampede Preferred Return Balance" means, with respect to Stampede, the cumulative accrued Stampede Preferred Return less the cumulative distributions of cash by the Company to Stampede in payment of the Stampede Preferred Return pursuant to Section 4.2(a)(i). For purposes of calculating the Stampede Preferred Return Balance, no deduction shall be made for any tax distributions made to Stampede, whether pursuant to Section 4.2(b) of this Agreement or otherwise.

"Substituted Member" means a person who is admitted as a Member pursuant to Section 11.1 with respect to the transfer of an existing Membership Interest.

"Treasury Regulations" means the Treasury regulations promulgated under the I.R.C.

"Triggering Event" means the first to occur of (a) the date of a Prohibited Transfer, including any transfer to (i) a Member's trustee in bankruptcy, (ii) a purchaser at any creditor's or court sale, (iii) a Member's spouse pursuant to a decree of a divorce court, or (iv) the guardian of an incompetent Member, (b) the date of death of an individual Member, (c) the date of a Change of Control or termination of a Member that is not an individual; (d) the removal of a Member pursuant to Section 12.2; or (e) the voluntary election of a Member that is not an individual to liquidate all or substantially all of its assets and/or dissolve.

"Triggering Event Closing" is defined in Section 10.3(c)(ii).

"Triggering Event Purchase Price" means, in the case of a Membership Interest to be purchased pursuant to Section 10.3(c), the "fair market value" (as defined in this paragraph) of the Membership Interest as of the date of the Triggering Event, determined assuming an arms length sale of all of the Company's assets to a third party (as a going concern and not as a liquidation) for fair market value and the application of the proceeds of the sale according to Section 13.4. The Triggering Event Purchase Price will be determined (a) if there is in effect as of the date of the Triggering Event a valid Certificate of Fair Market Value in substantially the form attached as Schedule A executed by all Members, by reference to the fair market value for such Membership Interest as set forth in such Certificate of Fair Market Value, and (b) if there is no such Certificate of Fair Market Value effective with respect to the Triggering Event, (i) by agreement of the Company and the Offering Member or the Offering Member's successor in interest, as applicable, or (ii) if no such agreement is reached within 30 days after the issuance of the Redemption Notice, by an independent appraiser chosen mutually by the Company and the Offering Member or the Offering Member's successor in interest, as applicable; provided, however, that in determining the fair market value of a Member's Membership Interest, such appraiser shall take into account the Stampede's Capital Contribution Balance and the Stampede Preferred Return Balance and shall increase or decrease Triggering Event Purchase Price of each Member's Membership Interest accordingly. Any fair market value agreed by the Members in a Certificate of Fair Market Value shall be effective until the earlier of (A) 90 days from the date set forth in any such Certificate of Fair Market Value, or (A) the date that a new Certificate of Fair Market Value has been executed by all of the Members.

1.2. Construction. In this Agreement, unless a clear contrary intention appears:

(a)     the singular number includes the plural number and vice versa;

MR.622

(b)    reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually;

(c)    reference to any gender includes the other gender and the neuter;

(d)    reference to any agreement or other document means such agreement or other document as amended or modified and in effect from time to time;

(e)    reference to any statute, regulation, or other legal requirement means such legal requirement as amended, modified, codified, replaced, or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any legal requirement means that provision of such legal requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement, or reenactment of such section or other provision;

(f)    "hereunder," "hereof," "hereto," and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or other provision hereof;

(g)    "including" (and with its correlative meaning "include") means including without limiting the generality of any description preceding such term;

(h)    "or" is used in the inclusive sense of "and/or";

(i)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(j)    references to agreements or other documents refer as well to all addenda, exhibits, schedules, or amendments thereto.

## ARTICLE II
## ORGANIZATIONAL MATTERS

2.1.    Formation. The Company was formed pursuant to the Certificate of Formation effective as of the Formation Date.

2.2.    Name. The Company's name is as set forth in the Certificate of Formation. The Board of Managers may change the Company name at any time without the approval of any Member by filing a certificate of amendment to the Certificate of Formation. The Board of Managers shall provide notice of any such change to all Members. The Company's business may be conducted under its name and/or any other name or names deemed advisable by the Board of Managers. The Board of Managers shall cause to be executed and filed of record all assumed or fictitious name certificates for the Company as are required by law.

2.3.    Registered Office and Agent; Principal Office.

(a)    The street address of the initial registered office of the Company in Texas and the name of the initial registered agent of the Company are as set forth in the Certificate of Formation. The Board of Managers may change the Company's registered office or registered agent at any time by filing

MR.623

a Change of Registered Agent and/or Registered Office as provided in the Code. The Board of Managers shall provide notice of the change to all Members.

(b)     The address of the principal office of the Company in the United States where records are to be kept or made available under Section 101.501 of the Code shall be as determined by the Board of Managers. The Board of Managers may change the Company's principal office in the United States at any time upon notice to the Members. The Company shall keep at its registered office and make available to a Member on reasonable request the street address of the Company's principal office in the United States.

2.4.     Term. The Company will continue until terminated in accordance with Article XIII.

2.5.     Purposes. The purpose for which the Company is organized is for the development and operation of the Project and the transaction of any and all lawful business for which limited liability companies may be organized under the Code.

2.6.     Powers. Subject to any limitations in this Agreement, the Company may exercise the power to do any and all acts reasonably related to its purposes.

2.7.     Company Property.

(a)     All Company property shall be owned in the name of the Company and not in the name of any Member. No Member or Assignee will have any interest in such Company property solely by reason of the Member's status as a Member.

(b)     The Board of Managers shall cause all funds of the Company to be deposited or invested in an account or accounts in the name of the Company. No funds other than the funds of the Company may be deposited therein. The funds in such accounts shall be used exclusively for the business of the Company (including distributions to the Members) and may be withdrawn only by persons approved by the Board of Managers.

2.8.     Consent to Admission of Members. Each person executing this Agreement consents to the admission as members in the Company all of the other persons who are Members as of the date such person executes this Agreement.

2.9.     Status of Managers and Members. Except as otherwise provided by this Agreement, each Manager has the status, rights, and obligations of a manager in a limited liability company as set forth in the Code, and each Member has the status, rights, and obligations of a member in a limited liability company as set forth in the Code.

2.10.     Certificates of Membership Interests. If provided by the Board of Managers, each Member's Membership Interest may be represented by a Certificate of Membership Interest. Each such Certificate of Membership Interest, if any, shall be numbered and registered in the records of the Company as they are issued, and shall be signed by two officers of the Company. The holder of any Certificate of Membership Interest shall promptly notify the Company of any loss or destruction of the certificate, and the Company shall cause a replacement certificate to be issued to the holder upon receipt of satisfactory evidence of the loss, destruction, or mutilation or the certificate and satisfaction of other reasonable conditions established by the Board of Managers.

MR.624

2.11. No State Law Partnership. The Members intend that the Company is not a partnership or joint venture, and that no Manager or Member is a partner or a joint venturer of any other Manager or Member, for any purposes other than income tax purposes. No provision of this Agreement may be construed to suggest otherwise.

## ARTICLE III
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

3.1. Initial Capital Contributions. Each Member's Initial Capital Contribution is set forth on Exhibit A.

3.2. Additional Capital Contributions. No Member shall be required to make Additional Capital Contributions. No Member has the right or is permitted to make any other Additional Capital Contributions unless (a) the Board of Managers approves such Additional Capital Contribution after notice to all Members of (i) the amount of the Additional Capital Contribution to be made, (ii) the effect of the Additional Capital Contribution on each Member's Percentage Interest, and (iii) other material information relevant to the proposed Additional Capital Contribution, and (b) all Members are afforded an opportunity to participate in the Additional Capital Contribution according to their relative Percentage Interests.

3.3. Capital Accounts. The Company shall establish a separate Capital Account for each Member and Assignee. The Capital Accounts shall be maintained according to the provisions of Appendix A.

3.4. No Right to Return of or Interest on Capital Account. No Member may demand or receive the return of its Capital Contribution or any portion of its Capital Account, except as provided in this Agreement and the Code. Neither any Manager nor any Member has any personal liability for the repayment of any Capital Contributions of any Member. No interest will accrue or be paid with respect to the Capital Contributions or Capital Account of any Member.

3.5. Member Loans. The Company may borrow money from one or more Members to the extent the Board of Managers deems appropriate to the conduct of the Company business on terms that comply with the requirements of Section 5.8(b)(iii) (relating to related party transactions). The amount of any loan made to the Company by a Member will not constitute a Capital Contribution or otherwise affect such Member's Capital Account or Membership Interest.

## ARTICLE IV
## ALLOCATIONS AND DISTRIBUTIONS

4.1. Allocation of Profit or Loss. Company profits and losses shall be allocated among the Members and Assignees in accordance with the provisions of Appendix A. The Members are aware of the income tax consequences of the allocations made by Appendix A and agree to be bound by the provisions of Appendix A in reporting their shares of Company income and loss for income tax purposes.

4.2. Distributions of Distributable Cash.

(a) Except as otherwise provided in Section 4.2(b) (relating to distributions to pay taxes), Section 4.3 (relating to withholding), Section 4.4 (relating to limitations on distributions), or

MR.625

Section 13.4 (relating to liquidating distributions), Distributable Cash shall be distributed to the Members as follows:

> (i)     first, to Stampede in payment of the Stampede Preferred Return until the Stampede Preferred Return Balance has been reduced to zero;

> (ii)    next, to Stampede in payment of Stampede's Capital Contribution until the Stampede Capital Contribution Balance has been reduced to zero; and

> (iii)   finally, to the Members according to their Percentage Interests.

The Board of Managers may provide for a record date with respect to distributions.

> (b)     To the extent the Board of Managers determines that any Member or Assignee has an unfunded tax liability as a result of allocations of Company tax items for any tax year, then, to the extent the Company has funds legally available for the payment of distributions to Members, the Board of Managers shall make a special tax distribution to all such Members and Assignees pro rata according to their relative unfunded tax liabilities in the minimum amount necessary to pay any such unfunded tax liabilities. For this purpose, a Member or Assignee is deemed to have an unfunded tax liability for a tax year to the extent (i) the cumulative amount distributed to the Member or Assignee under Section 4.2(a) and advanced to the Member or Assignee under this Section 4.2(b) (and not previously recovered) from the inception of the Company through the end of the such tax year exceeds (ii) the Member's or Assignee's tax liability with respect to such Member's or Assignee's cumulative allocable share of Company tax items for all periods from the inception of the Company through the end of such tax year. Unless the Board of Managers determines otherwise, the taxes due for each Member and Assignee shall be calculated by assuming that the Member or Assignee is an individual taxed at the highest tax rate applicable to the type of income involved. Any such tax distribution shall, to the extent it exceeds the amount the Member or Assignee would otherwise be entitled to receive under Section 4.2(a), be treated as an advance against, and shall be recovered from, amounts subsequently distributable under Section 4.2(a). No interest shall be charged on any such tax distributions, and no Member or Assignee shall be personally liable for the repayment to the Company or the Members of any such tax distribution. The Board of Managers may make special tax distributions during the tax year in accordance with the principles of this Section 4.2(b) to the extent necessary to fund payments by Members and Assignees of estimated tax payments.

4.3.    Withholding.  The Company shall withhold from distributions, or pay on behalf of a Member or Assignee, all amounts that the Board of Managers determines the Company is required to withhold or pay on behalf of such person (including federal and state income tax withholding). All amounts so withheld from distributions are deemed to have been distributed to the person otherwise entitled to receive the amount so withheld. To the extent an amount is paid by the Company on behalf of a Member or Assignee but not withheld from a distribution, the amount paid constitutes a loan to such Member or Assignee. Such loan bears interest at the Index Rate and is repayable on demand or, at the election of the Board of Managers, is repayable out of distributions to which such Member or Assignee would otherwise be entitled.

4.4.    Limitation on Distributions.

> (a)     The Company may not make a distribution to a Member or Assignee if it would render the Company insolvent, determined in accordance with Section 101.206 of the Code. A Member

MR.626

or Assignee who receives a distribution in violation of Section 101.206 of the Code is not required to return the distribution except as required in Section 101.206 of the Code.

(b) The Members shall look solely to the assets of the Company for any distributions, including liquidating distributions. If the assets of the Company remaining after the payment or discharge, or the provision for payment or discharge, of the Company liabilities are insufficient to make any distributions, no Member has any recourse against the separate assets of any other Member.

4.5. No Right to Partition or Distributions in Kind. No Member has any right, and waives any right that it might otherwise have, to cause any Company property to be partitioned and/or distributed in kind. Except as provided in Section 13.4(d) (relating to liquidating distributions), the Company may not make any distributions in kind.

4.6. Recovery of Erroneous Distributions. If the Company has, pursuant to any clear and manifest accounting or similar error, distributed to any Member an amount in excess of the amount to which the Member is entitled pursuant to this Agreement, the Member shall reimburse the Company to the extent of such excess, without interest, within 30 days after demand by the Company.

ARTICLE V
MANAGEMENT; ACTIVITIES OF MANAGERS AND MEMBERS

5.1. Management and Control of Company Business.

(a) Subject to the limitations set forth in this Agreement, the Board of Managers has exclusive authority to manage and conduct the Company's business. The Board of Managers shall do all things appropriate to carry out the Company's purpose and the transactions contemplated by this Agreement. Except as otherwise provided in this Agreement, all actions that the Board of Managers may take and all determinations that the Board of Managers may make pursuant to this Agreement may be taken and made in the absolute discretion of the Board of Managers. In the event the Board of Managers cannot reach unanimous agreement on any proposed action before them, the disposition of such proposed action shall be determined by a vote of the Members made in accordance with Section 9.1, and the vote of a Majority-in-Interest in connection with such proposed action shall be determinative as to the Company and binding on the Board of Managers.

(b) Except as provided in Sections 8.5(a) (relating to tax matters), the Members may not take part in the management or control of the Company business or bind the Company in their capacity as Members. The Members shall not have the right to vote or otherwise consent or withhold consent to any actions taken by the Board of Managers except with respect to such matters as are expressly stated in this Agreement.

5.2. Resignation, Removal, and Replacement of Managers.

(a) Resignation. Any Manager may resign as a manager of the Company upon notice to all Members, which resignation shall be effective immediately upon delivery of such notice. A Manager is deemed to have resigned as a manager of the Company effectively immediately upon the following events:

MR.627

(i) any event specified in Section 153.155(a)(4) or Section 153.155(a)(5) of the Code (relating to bankruptcy or insolvency proceedings with respect to a general partner), applied as if the Manager were a general partner;

(ii) if the Manager is an individual, the Manager's death, the appointment of a guardian or general conservator for the Manager, or a judicial determination that the Manager is incapable of performing the Manager's duties under the Agreement; or

(iii) if the Manager is an entity, the termination of the Manager's existence or suspension of the Manager's right to do business.

A resignation pursuant to paragraph (ii) is not a violation of this Section 5.2(a), provided the estate or personal representative or other authorized person provides notice of the deemed resignation within 90 days after the event giving rise to the deemed resignation.

(b) Removal.

(i) Removal for Cause. Any Manager may be removed as manager of the Company upon the affirmative vote of one or more Members owning collectively at least 75% of the Percentage Interests if there is cause for removal as specified in Section 5.2(b)(ii) and the Company has received a written opinion of counsel that:

(A) cause for removal as specified in Section 5.2(b)(ii) exists; and

(B) the removal of the Manager is not prohibited under any loan agreements, contracts, or other applicable legal requirements.

(ii) Definition of Cause. Cause for removal exists only if one or more of the following conditions has occurred:

(A) there has been a change in Control of the Manager;

(B) the Manager has engaged in wrongful conduct described in Section 6.3(a) that adversely and materially affected the Company business or the Members;

(C) except as permitted by this Agreement, the Manager has engaged in conduct relating to the Company business that has made it not reasonably practicable to carry on the Company business with the Manager;

(D) the Manager or an Affiliate of the Manager has been convicted of a felony; or

(E) a final judgment of a court of competent jurisdiction has been entered that the Manager's removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal or state agency or judicial authority or contained in any federal or state statute; or

(F) the Manager commits a material breach of any provision of this Agreement, which breach is not cured within 30 days of notice thereof.

MR.628

5.3.    Election of Replacement Manager. If the Manager resigns or is removed as the manager of the Company, within 90 days following such resignation or removal a Majority-in-Interest may elect a replacement Manager of the Company effective as of the date of the former Manager's resignation or removal. The replacement Manager shall file any required amendments to this Agreement to reflect the resignation or removal of the former Manager and the election of the replacement Manager. If the Members fail to elect a replacement Manager within 90 days following the resignation or removal of the former Manager, the Company shall be wound-up according to Article XIII.

5.4.    Actions of the Board of Managers.

(a)    Except as set forth herein, meetings of the Board of Managers shall be held in any manner allowed by the Act, including by means of conference telephone or similar communication equipment if each Manager participating in the meeting can hear and be heard by all other Managers participating in the meeting.

(b)    For purposes of establishing a quorum at any such meeting of the Board of Managers, it is necessary that all Managers appointed by the Members be present.

(c)    Approval by the unanimous vote or written consent of the Managers shall be required to approve any action by the Board of Managers. In the event an action is approved by the Board of Managers, the Managers, individually or collectively, shall be authorized to carry out such action on behalf of the Company.

(d)    Any action of the Board of Managers to be taken by written consent must be signed by all of the Managers to be effective.

5.5.    Limitations on Board of Managers' Authority. The Board of Managers may not do any of the following acts without the approval of all Members:

(a)    knowingly do any act in contravention of this Agreement or, when acting on behalf of the Company, engage in, or cause or permit the Company to engage in, any activity that is not consistent with the purposes of the Company;

(b)    except as otherwise provided in this Agreement, knowingly do any act that would make it impossible to carry on the Company business; or

(c)    cause the Company to (i) not be taxable as a partnership for federal income tax purposes, or (ii) take a position inconsistent with such treatment.

(d)    cause the Company to (i) make a general assignment for the benefit of creditors, (ii) file a voluntary bankruptcy petition, or (iii) seek an order for relief or declaration of insolvency in a federal or state bankruptcy or insolvency proceeding;

(e)    file a pleading seeking for the Company, or admitting or failing to contest the material allegations of a petition filed by any other person seeking for the Company, a proceeding of the type described by subparagraph (d) immediately above;

(f)    except as provided in Article XIII, seek, consent to, or acquiesce in the appointment of a trustee, receiver, or liquidator of the Company or of all or a substantial part of the Company's properties;

MR.629

(g)     cause the Company to issue any Membership Interest or admit any Member other than pursuant to Section 2.8 or Article XI;

(h)     cause the Company to acquire any equity or debt securities of any Member or any Affiliate of a Member, or otherwise make loans to any Member or any Affiliate of a Member;

(i)     cause the Company to acquire from any person any equity or debt securities or assets of any corporation, limited liability company, partnership, association, business, or business division, whether by stock purchase, asset purchase, contribution, or other business combination (excluding investments and asset acquisitions in the ordinary course of the Company's business and transactions contemplated by this Agreement);

(j)     cause the Company to participate in any merger, consolidation, transfer, continuance, or conversion of the Company with or into any other person;

(k)     cause the Company to participate in any reorganization in which Membership Interests are exchanged for or converted into cash, securities of any other person, or other property; or

(l)     sell or otherwise dispose of all or substantially all of the Company property, except in connection with winding up the Company as permitted in this Agreement.

5.6.    Delegation of Authority; Officers.

(a)     The Board of Managers may cause the Company to hire such employees and agents as the Board of Managers deems appropriate for the conduct of the Company's business.

(b)     The Board of Managers may establish offices and appoint officers of the Company, and may delegate to such officers any of its authority hereunder, as the Board of Managers deems appropriate. The officers may be appointed for such terms and may exercise such powers and authority and perform such duties as determined by the Board of Manager. An officer need not be a Member of the Company. Any two or more offices may be held by the same person. An officer may be removed, with or without cause, at any time by the Board of Managers. Each officer will hold office until his successor is chosen and is qualified in his stead, or until his death, resignation, or removal from office. Any vacancy in an office because of death, resignation, removal, or otherwise may be filled by a person appointed by the Board of Managers. An officer is subject to the same standards of conduct as apply to a Manager as described in Section 5.9.

5.7.    Reliance. Persons dealing with the Company may rely conclusively on the authority of the Board of Managers as set forth in this Agreement. Every document executed by any Manager with respect to any business or property of the Company is conclusive evidence in favor of any person relying on the document that (a) at the time of the execution and delivery of the document this Agreement was effective, (b) the document was executed in accordance with this Agreement and is binding on the Company, and (c) the Manager was authorized to execute and deliver the document on behalf of the Company.

5.8.    Compensation and Expenses of Members and Managers. Members and Managers are not entitled to any salary, fee, or other remuneration (other than distributions with respect to the Member's Membership Interest) for providing property or services or other consideration to or for the benefit of the Company in their capacity as a Member or Manager, except that each Manager is entitled to

MR.630

reimbursement from the Company for reasonable out-of-pocket expenses paid or incurred on behalf of the Company, including reasonable charges for services provided by employees of the Manager and overhead expenses. The Company shall pay all out-of-pocket costs incurred in organizing the Company. This Section 5.8 does not limit or enlarge a Manager's or a Member's rights to liability protection or indemnification under Article VI, and does not limit the Company's ability to enter into transactions with Members in their capacities other than as Members in accordance with Section 5.9(iii).

5.9. Standards of Manager and Member Conduct.

(a) In General. The Board of Managers shall manage and conduct the Company's business in good faith and in a manner the Managers reasonably believe to be in the Company's best interest. A Manager does not violate this Section 5.8(a) unless the Manager engages in conduct described in Section 6.3(a) (relating to improper conduct).

(b) Outside Activities of Manager and Members; Noncompetition Covenants.

(i) Each Manager shall devote to the Company's affairs only such time and resources as the Manager deems necessary for the conduct and winding up of the Company business.

(ii) Except as provided herein, the Managers and Members or their Assignees may engage in or have an interest in other business ventures of every nature and description, independently or with others, including the ownership and operation of businesses similar to or in competition with, directly or indirectly, the Company, and neither the Company nor any Member or Assignee has, solely as a result of such person's interest in the Company, any right to acquire any rights in or to any such other business venture or to the income or profits derived from any such other business venture. A Manager or Member or Assignee has no duty to disclose any such similar or competing business venture to the Company or any Member or Assignee, or to offer to the Company or any Member or Assignee any prior opportunity to acquire an interest in such other business venture.

(iii) Related Party Transactions. Except as otherwise provided in this Agreement, the Board of Managers, when acting on behalf of the Company, may purchase property from, sell property to, or otherwise deal with any Manager, Member, or Assignee, acting on its own behalf, or any Affiliate of any Manager, Member, or Assignee, but any such transaction shall be on terms that are no less favorable to the Company than if the transaction had been entered into with an independent third party. No provision of this Agreement requires disclosure of any transaction to, and approval of the transaction by, any disinterested governing persons of the Company or the Members as provided in Section 101.255 of the Code.

## ARTICLE VI
## LIABILITY AND INDEMNIFICATION

6.1. Limitation of Liability. No Member or Manager is liable for any debts, obligations, or liabilities of the Company. Subject to Section 6.3, an Indemnified Person is not liable to the Company or any other Indemnified Person for any Damages arising from any Proceeding relating to the conduct of the Company's business or relating to any act or omission by the Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course

MR.631

of the Company's business, or for any misconduct or negligence on the part of any other person who is an employee or agent of the Company.

6.2.    Indemnification by Company.  To the fullest extent permitted by applicable law and subject to Section 6.3, the Company indemnifies and holds harmless each Indemnified Person from and against any Damages arising from any Proceeding relating to the conduct of the Company's business or to any act or omission by such Indemnified Person, including any act or omission constituting negligence, within the scope of the Indemnified Person's authority in the course of the Company's business or for any misconduct or negligence on the part of any other person that is an employee or agent of the Company. An Indemnified Person's expenses paid or incurred in defending itself against any Proceeding shall be reimbursed as paid or incurred. The right to indemnification conferred in this Article VI is not exclusive of any other right that any person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

6.3.    Conduct Not Protected.

(a)    This Article VI does not operate to limit liability or to indemnify a person to the extent the person is found liable pursuant to a final judgment of a court of competent jurisdiction for:

(i)    an act or omission that involves gross negligence, intentional misconduct, or a knowing violation of law;

(ii)    a transfer or attempted transfer of all or a portion of a Membership Interest in a Prohibited Transfer, a Manager's resignation in violation of Section 5.2(a), or a Member ceasing to be a Member in violation of Section 12.1(a);

(iii)    a willful or reckless material breach of this Agreement or any other agreement relating to the Company's business; or

(iv)    an act or omission for which indemnification is prohibited by law.

(b)    No provision of this Agreement requires the Company to pay or incur any amount for which indemnification is not permitted under this Article VI.

(c)    Any payments made to or on behalf of a person who is later determined not to be entitled to such payments shall be repaid by the person to the Company. The Company may require, as a condition to the payment of any amounts pursuant to Section 6.2, that the Indemnified Person provide to the Company (i) a written affirmation by the Indemnified Person of the person's good faith belief that the person has met the standard of conduct necessary for indemnification under this Section; and (ii) a written undertaking by or on behalf of the Indemnified Person to repay the amount paid or reimbursed if the person has not met that standard or if indemnification is otherwise prohibited by law.

6.4.    Insurance.  The Company may maintain insurance to protect any person against any expense, liability, or loss, whether or not the Company would have the power to indemnify such person against such expense, liability, or loss under the Code.

6.5.    Survival.  The indemnities provided for in this Agreement survive the transfer of an Indemnified Person's Membership Interest, the termination of the person's status as a Member or other status giving rise to classification as an Indemnified Person, and the termination of this Agreement and the Company.

MR.632

## ARTICLE VII
## BOOKS AND RECORDS; REPORTS

7.1.    Maintenance of and Access to Books and Records. The Company shall maintain such books and records regarding the Company's business and properties as is reasonable, including all books and records required under the Code. Each Member shall have access thereto during ordinary business hours to the extent and under the conditions provided in the Code.

7.2.    Fiscal Year. The Company shall adopt the calendar year as its fiscal year for financial and tax accounting purposes (such fiscal year of the Company being referred to as the "Fiscal Year").

7.3.    Financial and Operating Reports. As soon as practicable after the end of each Fiscal Year, but in any event not later than 90 days after the end of the Fiscal Year, the Board of Managers shall deliver to each Member an annual report containing the following:

(a)    a Company balance sheet as of the end of such Fiscal Year, and Company statements of income, cash flows, and changes in Members' equity for such Fiscal Year, each in reasonable detail and prepared according to United States generally accepted accounting principles;

(b)    a general description of the Company's activities during such Fiscal Year, including a description of the amount and circumstances of any indemnification payments paid or requested pursuant to Section 6.2, a description of any material insurance claims or recoveries during the fiscal quarter, and a description of any Proceedings involving the Company; and

(c)    a statement of changes in the Member's Capital Account (showing the balance in the Member's Capital Account as of the beginning of the Fiscal Year, contributions or distributions during the year, allocations of profits and losses during the year, any other adjustments to the Capital Account balances during the year, and the balance in the Capital Account as of the end of the year).

7.4.    Tax Reports.

(a)    Not later than the date (including extensions) for filing the Company's tax return with the Internal Revenue Service (Form 1065), the Board of Managers shall deliver to each person who was a Member or Assignee at any time during the period covered by the return all information necessary for the preparation of such person's United States federal income tax returns, including a Form 1065 Schedule K-1 (if applicable).

(b)    Upon the written request of any Member or Assignee, the Board of Managers shall deliver to such person information necessary for the preparation of any tax returns that must be filed by such person, including information necessary for estimating and paying estimated taxes.

7.5.    Transmission of Communications. Each person who holds a Membership Interest on behalf of, or for the benefit of, another person or persons shall be responsible for conveying any report, notice, or other communication received concerning the Company's affairs to such other person or persons.

MR.633

# ARTICLE VIII
# TAX MATTERS

8.1.    Tax Classification. The Members intend that the Company be classified as a partnership for federal income tax purposes. The Board of Managers shall take all actions reasonably necessary or appropriate to ensure the Company is so classified (including the filing of elections or tax returns). No Manager, officer, or Member shall take any action inconsistent with the classification of the Company as a partnership for federal income tax purposes.

8.2.    Company Returns. The Board of Managers shall cause the Company to file such tax returns as may be required by law.

8.3.    Tax Elections.

(a)    General. Except as otherwise provided in this Agreement, the Board of Managers shall cause the Company to timely make or revoke all elections, and take all tax reporting positions, necessary or desirable for the Company as determined by the Board of Managers. No election shall be made to have the Company excluded from the application of any provision of Subchapter K of the I.R.C. or any equivalent tax provision in any other tax jurisdiction. The Company shall make the election referred to in I.R.C. Section 754 upon the request of any Member in connection with a transfer of the Member's Membership Interest in accordance with this Agreement.

(b)    Safe Harbor Election for Compensatory Membership Interests. If Proposed Treasury Regulation 1.83-3(l) is adopted as a temporary or final regulation, the Company shall make the safe harbor election described in such regulations, and the Company and each Member (including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the safe harbor with respect to all Membership Interests transferred in connection with the performance of services while the election remains effective. The Board of Managers shall prepare, execute, and file any required documentation to cause the election to be effective. The Board of Managers may terminate the safe harbor election at any time if it determines in good faith that it is in the best interests of the Company and the Members to do so.

8.4.    Consistent Reporting. Each Member shall, on the Member's tax returns, treat each partnership item (as defined in I.R.C. Section 6231(a)(3)) in a manner consistent with the treatment of the item on the Company's return in all respects, including the amount, timing, and character of the item. No Member shall file a request for an administrative adjustment of partnership items under I.R.C. Section 6227(a) if such request would cause the Member's treatment of the item to be inconsistent with the treatment of the item on the Company's return.

8.5.    Tax Proceedings.

(a)    The Manager shall be the Company's tax matters partner as defined in I.R.C. Section 6231, and shall take such actions as are required to be designated the tax matters partner under applicable Treasury Regulations. The tax matters partner shall represent the Company in connection with all proceedings with any tax authority related to the Company's tax returns and taxes payable, including administrative examinations and appeals and judicial proceedings. Subject to Section 8.5(c), the tax matters partner has the exclusive right to conduct such proceedings and to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest adjustments proposed or imposed by any tax authority. The tax matters partner shall keep the Members

MR.634

informed on a timely basis of all material developments with respect to any such Proceeding. Each Member shall cooperate with the tax matters partner and do or refrain from doing all things reasonably requested by the tax matters partner with respect to the conduct of any Company tax Proceeding.

(b)     The tax matters partner may not bind any other Member to a settlement agreement relating to taxes without obtaining the written concurrence of such Member.

(c)     Any deficiency for taxes imposed on a Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member and, if paid or required to be paid by the Company, is recoverable from such Member pursuant to Section 4.3 or by other legal means.

8.6.     Information and Documents to Company.  Each Member shall timely provide to the Company all information and documents that such Member is required to provide by applicable tax requirements, and shall also provide to the Company upon request such additional information and documents as the Board of Managers may reasonably request in connection with the Company's compliance with applicable tax requirements or filing of any permitted tax elections.

8.7.     Survival.  This Article VIII shall survive the termination of the Company and the termination of any Member's interest in the Company and remain binding for such period of time as is necessary to resolve all tax matters with applicable taxing authorities.

## ARTICLE IX
## MEETINGS AND VOTING OF MEMBERS

9.1.     Meetings.

(a)     Meetings of the Members may be called at any time by the Board of Managers, or by one or more Members holding at least 25% of the Percentage Interest held by the Members. Meetings shall be held at the Company's principal place of business or at such other reasonable place set forth in the notice of the meeting.

(b)     Any action that may be taken at a Members' meeting may be taken without holding a meeting if Members having at least the minimum Percentage Interest that would be necessary to take the action at a meeting, in which each Member entitled to vote on the action is present and votes, sign a written consent or consents stating the action taken.

(c)     Except as otherwise provided in this Agreement, meeting notices and procedures, including procedures for obtaining written consents in lieu of a meeting, shall be in conformity with Chapters 6 and 101(H) of the Code. Sections 101.353 through 101.356 of the Code (relating to quorum and minimum voting requirements) shall not apply to the extent such provisions are inconsistent with this Agreement. The Board of Managers is solely responsible for convening and conducting meetings of the Members, conducting the solicitation of consents, determining the validity and effect of responses to any solicitation of consents, and determining other matters regarding meetings, voting, and consents.

(d)     Notice of the results of any vote taken at a meeting, or the results of any solicitation of consents in lieu of a meeting, shall be given to the Members not later than with the delivery of the next following report of financial information given pursuant to Section 7.3.

MR.635

9.2. Voting. A Member may vote at a meeting in person, or by a proxy executed in writing by the Member and received by the Board of Managers prior to the time when the votes of Members are to be counted. The provisions of the Code pertaining to the validity and use of proxies by shareholders of a corporation govern the validity and use of proxies given by Members. Only Members of record on the date of the meeting (or if the vote is conducted without a meeting then on the date of the notice soliciting the Member consents) may vote.

## ARTICLE X
## TRANSFER OF MEMBERSHIP INTERESTS

10.1. Limitation on Transfers.

(a) The term "transfer," when used in this Agreement in reference to a transfer of a Membership Interest, means an assignment (whether voluntarily, involuntarily, or by operation of law and whether or not effective under this Agreement) of all or any portion of a Member's or Assignee's Membership Interest, or any interest therein, to another person, and includes a sale, assignment, conveyance, gift, exchange, abandonment, or other disposition, a transfer by merger or other business combination, a transfer pursuant to bankruptcy, insolvency, incapacity, divorce, or death, and any pledge, hypothecation, or other encumbrance.

(b) No Member may transfer all or any portion of its Membership Interest unless the transfer is a Permitted Transfer. A transfer of a Membership Interest that is not a Permitted Transfer is a Prohibited Transfer.

10.2. Permitted Transfer of Membership Interest.

(a) A transfer of a Membership Interest is a Permitted Transfer only if the transfer satisfies the conditions set forth in Section 10.4 and is described in one of more of the following paragraphs of this Section:

(i) the transfer is approved by the other Members;

(ii) the transfer occurs in accordance with the procedures set forth in Section 10.3;

(iii) if the Member is a corporation, the transfer is to a member of the Member's affiliated group (as defined in I.R.C. Section 1504(a));

(iv) if the Member is a trustee of one or more employee benefit plans, the transfer is to a co-trustee or a successor trustee to such plans; or

(v) if the Member is an individual, the transfer is of a community property or other interest from the Member's spouse or former spouse to the Member pursuant to the death of the Member's spouse or termination of the marital relationship of the Member and the spouse.

(b) Upon a Permitted Transfer by a Member of all of its Membership Interest, the Member ceases to be a Member as of the effective date of the transfer determined according to Section 10.5.

MR.636

10.3. Right of First Refusal; Tag-Along Rights; Triggering Events.

(a)     In the event a Member desires to sell all or any portion of its Membership Interest to another Person, the selling Member shall first offer to sell such interest to the other Members on the terms on which it is prepared to sell such interest to such Person by sending written notice to each other Member describing the offer and its terms. Additionally, upon receipt of an offer from a third party to purchase all or any portion of a Member's interest in the Company, which such Member desires to accept, such Member shall promptly deliver a copy of the third party offer to each other Member. Each other Member will have 15 business days from the date of receipt of notice of the proposed sale of a Member's Membership Interest or the third party offer, as the case may be, to notify the selling Member in writing that such other Member elects to (i) purchase the selling Member's Membership Interest upon the terms and conditions of the proposed sale or third party offer, or (ii) sell in the contemplated transfer, at the same price in the same form of consideration and on the same terms (including if the transfer is made to another Member making an election under clause (i), Membership Interests representing a Percentage Interest in the Company equal to the product of (A) the quotient determined by dividing the Percentage Interest owned by such party by the aggregate Percentage Interests owned by all parties participating in such transfer, and (B) the aggregate Percentage Interests to be sold in the contemplated transfer, as the case may be. If the other Members fail to give notification within 15 business days of an election to purchase the selling Member's Membership Interest or participate in the contemplated transfer, then the selling Member shall be permitted, for a period of 90 days, to sell all of its Membership Interest to the third party upon the terms and conditions of the proposed sale or third party offer, as the case may be.

(b)     If more than one Member makes an election to purchase the selling Member's Membership Interest under Section 10.3(a)(i), each of the purchasing Members shall purchase a portion of the selling Member's Membership Interest that is proportional to that Member's Percentage Interest.

(c)     (i) Upon the occurrence of a Triggering Event with respect to any Member (the "Offering Member"), Company shall have the right but not the obligation to purchase all of the Offering Member's Membership Interest in the Company at the time of the Triggering Event (the "Redemption Option"). Within 60 days after the Company receives written notice of the occurrence of (and date of) the Triggering Event, the Company shall provide written notice of its election of the Redemption Option to the Offering Member or the Offering Member's successor in interest, as applicable (the "Redemption Notice"). In the event the Company elects to exercise the Redemption Option, the Company shall purchase, and the Offering Member or the Offering Member's successor interest, as applicable, shall sell, all of the Membership Interest owned by the Offering Member at the time of the Triggering Event at a price equal to the Triggering Event Purchase Price.

(ii)     A closing (a "Triggering Event Closing") shall be held 60 days after the later of the date of the Redemption Notice or the date that the Triggering Event Purchase Price has been established.

(iii)     At the Triggering Event Closing, the Offering Member or Offering Member's successor in interest, as applicable, shall deliver to the Company an assignment of Membership Interest owned by the Offering Member, duly endorsed for transfer to the Company.

(iv)     At the Triggering Event Closing, the Company shall pay the Triggering Event Purchase Price to the Offering Member or the Offering Member's successor in interest, as

MR.637

applicable, in immediately available funds (by wire, certified or bank cashier's check or other means acceptable) and the parties shall execute such documentation as may be necessary or desirable, as determined by the Company, in the Company's sole discretion, to effectuate the transfer of such Offering Member's or Offering Member successor in interest's Membership Interest.

10.4. Conditions to Permitted Transfers of Membership Interests. A transfer shall not be a Permitted Transfer unless the Board of Managers determines that all of the following conditions are satisfied:

(a) The transfer complies with all applicable laws, including any applicable securities laws.

(b) The transfer will not cause the Company to be treated as other than a partnership for United States federal income tax purposes.

(c) The transfer will not cause the Company to be subject to regulation under the Investment Company Act of 1940.

(d) The transfer will not cause any assets of the Company to be deemed "plan assets" under the Employee Retirement Income Security Act of 1974.

(e) The transfer will not result in a termination of the Company under I.R.C. Section 708, unless the Board of Managers determines that such termination will not have an adverse impact on the Members.

(f) The transfer will not cause the application of the tax-exempt use property rules of I.R.C. Sections 168(g)(1)(B) and 168(h) to the Company or its Members, unless the Board of Managers determines that such rules will not have an adverse impact on the Members.

(g) The transferor and transferee have delivered to the Company any documents that the Board of Managers requests to confirm that the transfer satisfies the requirements of this Agreement, to give effect to the transfer, and to confirm the transferee's agreement to be bound by this Agreement as an Assignee.

(h) If requested by the Board of Managers, the Company has received a transfer fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with such transfer.

10.5. Effective Date; Distributions.

(a) A Permitted Transfer of a Membership Interest is effective as of the first day of the calendar month following the calendar month during which the Board of Managers receives notice of such transfer (in such form and manner as the Board of Managers may require) unless the Board of Managers determines that the transfer should be effective as of an earlier or later date (for example, on any date the transfer is effective as a matter of state law, or where the notice of transfer specifies that the transfer is to be effective on a future date).

MR.638

(b) Distributions with respect to a transferred Membership Interest that are made before the effective date of the transfer shall be paid to the transferor, and distributions made after such date shall be paid to the Assignee.

(c) Effective as of the effective date of a transfer of a Membership Interest, the Board of Managers shall amend Exhibit A to reflect the reduction in the transferor's Percentage Interest and to reflect the Assignee's Percentage Interest.

(d) Neither the Company nor the Board of Managers has any liability for making allocations and distributions to the Members determined in accordance with this Section 10.5, whether or not the Board of Managers or the Company has knowledge of any transfer of any Membership Interest.

10.6. Transferor's Obligations. The transferor of a Membership Interest who ceases to be a Member continues to be obligated with respect to its Membership Interest or its status as a former Member as provided in the Code and applicable law.

10.7. Assignee's Rights and Obligations. Unless an Assignee becomes a Member pursuant to Article XI, such Assignee shall not be entitled to any of the rights granted to a Member (other than as required by the Code), and shall have no right to participate in the management of the business of the Company or to become a Member, unless the Members specifically approve the admission of such Assignee as a Member or such assignment or transfer is accomplished in accordance with the permissive provisions of this Agreement. An Assignee not admitted as a Member hereunder shall have no membership rights and shall not be a Member with regard to the Membership Interests transferred to such Assignee (other than as required by the Code).

10.8. Effect and Consequences of Prohibited Transfer.

(a) Except as otherwise required by law, the Company and the Board of Managers shall treat a Prohibited Transfer as void and shall recognize the transferor as continuing to be the owner of the Membership Interest purported to be transferred. If the Company is required by law to recognize a Prohibited Transfer, the transferee shall be treated as an Assignee with respect to the Membership Interest transferred and may not be treated as a Member with respect to the Membership Interest transferred unless admitted as a Member in accordance with Article XI.

(b) The Company may remove the transferor and Assignee with respect to a Prohibited Transfer as provided in Article XII.

(c) The transferor and transferee with respect to a Prohibited Transfer shall be jointly and severally liable to the Company for, and shall indemnify and hold the Company harmless against, any expense, liability, or loss incurred by the Company (including reasonable legal fees and expenses) as a result of such transfer, their removal and liquidation of their Membership Interests (if applicable), and the efforts to enforce the indemnity granted in this Section 10.8(c).

MR.639

## ARTICLE XI
## ADMISSION OF NEW MEMBERS

11.1. Substituted Members. An Assignee of a Membership Interest shall be admitted as a Substituted Member with respect to such Membership Interest on the date on which all of the following conditions are satisfied:

(a) The Board of Managers has approved in writing the admission of the Substituted Member.

(b) The Assignee has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm such Assignee as a Member in the Company and such Assignee's agreement to be bound by this Agreement as a Member.

(c) If requested by the Board of Managers, the Company has received an admission fee in an amount determined by the Board of Managers to be sufficient to reimburse the Company for the estimated expenses likely to be incurred by the Company in connection with the admission of the Assignee as a Substituted Member.

11.2. Additional Members. The Board of Managers shall admit a person as an Additional Member upon satisfaction of all of the following conditions.

(a) A Majority-in-Interest has approved the admission of the Additional Member after notice to all Members of (i) the Initial Capital Contribution to be made by the proposed Additional Member, (ii) the effect of the admission on each Member's Percentage Interest, and (iii) other material information relevant to the proposed admission.

(b) The admission of the proposed Additional Member satisfies the applicable conditions of Section 10.4.

(c) The proposed Additional Member has delivered to the Company any agreements and other documents that the Board of Managers requests to confirm the person as a Member in the Company and the person's agreement to be bound by this Agreement as a Member.

11.3. No Required Capital Contributions. A person may be admitted as a Member, including as the sole Member, and may acquire a Membership Interest without making a contribution to the Company or assuming an obligation to make a contribution to the Company.

## ARTICLE XII
## WITHDRAWAL OR REMOVAL OF MEMBERS

12.1. Withdrawal of Members.

(a) No Member may withdraw from the Company or otherwise cease to be a Member except upon the following events:

(i) a transfer of all of the Member's Membership Interest in a Permitted Transfer; or

MR.640

(ii)     removal of the Member as a Member as provided in Section 12.2 of this Agreement.

(b)     A Member shall be deemed to withdraw from the Company upon the occurrence of an event specified in Section 12.1(a).

12.2.   Removal of Members.

(a)     A Member may be removed as a Member by the Board of Managers under the following circumstances:

(i)     the Member has transferred or attempted to transfer all or any portion of its Membership Interest in a Prohibited Transfer;

(ii)     the Member has materially breached the terms of this Agreement; ; or

(iii)     the Board of Managers determines that removal is necessary to comply with any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any United States federal or state agency or judicial authority or contained in any United States federal or state statute.

(b)     If the Board of Managers proposes to remove a Member pursuant to this Section, the Board of Managers shall notify the Member in writing of the proposed removal, and if applicable shall provide such Member a reasonable opportunity to cure the event giving rise to removal. The removal of the Member is effective at such time as determined by the Board of Managers in accordance with applicable law and taking into account the Member's opportunity to cure the event giving rise to removal.

12.3.   Status of Former Member.  A Member who withdraws or has been removed from the Company or otherwise ceases to be a Member has the status of an Assignee with respect to any Membership Interest held by such former Member. Except as provided in Section 10.3(c) (relating to optional redemption of a Member's Membership Interest upon the occurrence of a Triggering Event) or Article XIII (relating to winding up and termination), such former Member is not entitled to receive any payments under Section 101.205 of the Code.

## ARTICLE XIII
## WINDING UP AND TERMINATION

13.1.   Events Requiring Winding Up.  The Company shall commence winding up procedures in accordance with this Agreement and the Code upon the first to occur of the following events:

(a)     the Members unanimously vote to wind up and terminate the Company;

(b)     a decree by a court requiring the winding up of the Company;

(c)     the termination of membership of the last remaining Member; or

(d)     the resignation or removal of all Managers if the Members fail to appoint any replacement Manager as provided in Section 5.3.

MR.641

13.2. <u>Winding Up Procedures</u>.

(a)     On the occurrence of an event requiring winding up of the Company, unless there is an action to continue the Company without winding up in accordance with <u>Section 13.3</u>, the Board of Managers (or other Liquidator as provided below) shall, as soon as reasonably practicable, wind up the Company's business and affairs (including disposing of the Company's assets and applying the proceeds as provided in <u>Section 13.4</u>) and terminate the Company in accordance with this Agreement and the Code. The Company shall cease to carry on its business (except to the extent necessary to wind up its business), collect and sell its property to the extent the property is not to be transferred or distributed in kind, and perform any other act required to wind up its business and affairs.

(b)     If the Board of Managers has wrongfully caused the winding up of the Company or if there is no Manager, (i) a Majority-in-Interest may vote to elect a person or persons to accomplish the winding up of the Company, or (ii) if the Members fail to elect a person to accomplish winding up the Company, then any Member or Assignee may petition a court to wind up the Company as provided in Section 11.054 of the Code. The person or persons winding up the Company, whether the Board of Managers or an elected or court appointed person or persons, is referred to in this Agreement as the "<u>Liquidator</u>."

(c)     The Liquidator may determine the time, manner, and terms of any sale or sales of Company property pursuant to such winding up. The Liquidator (if not the Board of Managers) is entitled to receive reasonable compensation for its services; may exercise all of the powers conferred upon the Board of Managers under this Agreement to the extent necessary or desirable in the good faith judgment of the Liquidator to perform its duties; and with respect to acts taken or omitted while acting in such capacity on behalf of the Company, is entitled to the limitation of liability and indemnification rights set forth in <u>Article VI</u>.

(d)     The Liquidator shall provide quarterly reports to the Members and Assignees during the winding up procedure showing the assets and liabilities of the Company, providing information and documents required by the Members and Assignees to comply with their tax reporting obligations, and such other information as the Liquidator deems appropriate. Within a reasonable time after completing the winding up, the Liquidator shall give each Member and Assignee a final statement setting forth the assets, liabilities, and reserves of the Company as of the date of completion of winding up.

13.3. <u>Continuation Without Winding Up</u>.

(a)     If there is a decision to wind up and terminate the Company as described in Section 13.1(a), the Company may be continued as provided in Section 101.552 of the Code.

(b)     If there is a termination of the continued membership of the last remaining Member as described in <u>Section 13.1(c)</u>, then prior to completion of the winding up process but not later than 90 days after the event of termination, the Board of Managers may continue the Company by admitting one or more Members effective as of the occurrence of the event of termination. Any Assignee whose Percentage Interest would be diminished by reason of the admission of an Additional Member under the circumstances described in this Section must approve the admission of the Additional Member.

MR.642

13.4.    Liquidation of Assets and Application and Distribution of Proceeds.

(a)    In General.    On winding up the Company, the Liquidator shall dispose of the Company's properties and apply and distribute the proceeds, or transfer the Company properties, in the following order of priority:

(i)    to creditors (including Members who are creditors) in accordance with their relative rights and priorities to satisfy the liabilities of the Company, including expenses associated with the winding up and termination of the Company, but excluding any Company liability for any unpaid Mandatory Distributions;

(ii)    to Members, Assignees, and former Members to satisfy the Company's liability for any unpaid Mandatory Distributions; and

(iii)    to Members and Assignees as provided in Section 4.2(a).

(b)    No Member Deficit Restoration Obligation.    No Member is liable to the Company or any other person for the repayment of any deficit in the Member's Capital Account, except as provided in Section 101.206 of the Code.

(c)    Reserves.    In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made pursuant to Section 13.4(a)(ii) and (iii) may be withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and future expenses, including a reasonable reserve for any claims for indemnification under Article VI and for any future expenses associated with any tax audit or other Proceeding that is pending or may arise.

(d)    Payments and Distributions to Members in Kind.    The Liquidator may not make any payments or distributions to Members or Assignees pursuant to Section 13.4(a)(ii) or (iii) other than in cash unless all Members and Assignees receiving the property approve the transfer in kind. The Liquidator shall determine the Fair Market Value of any property transferred to Members or Assignees in kind according to the valuation procedures set forth in Article XIV.

(e)    Character of Liquidating Distributions.    Except as otherwise required by the I.R.C., amounts paid to Members pursuant to this Section 13.4 shall be treated as made in exchange for the interest of the Member in Company property pursuant to I.R.C. Section 736(b)(1), including the interest of such Member in Company goodwill.

13.5.    Certificate of Termination.    The Liquidator shall file a Certificate of Termination of a Domestic Entity on the completion of the winding up of the Company.

13.6.    Reinstatement.    If the Company is terminated, it may be reinstated in the manner provided in the Code.

## ARTICLE XIV
## VALUATION

14.1.    Fair Value of Company Property.    The Fair Value of property contributed to the Company by a Member as part of such Member's Initial Capital Contribution is the amount of such Member's Initial Capital Contribution, as set forth on Exhibit A, minus the amount of any cash contributed to the Company as part of such Member's Initial Capital Contribution. In all other cases, the

MR.643

Fair Value of an asset as of any date is its fair market value as determined by the Board of Managers in good faith using any reasonable valuation method. If any affected Member does not agree with the valuation set by the Board of Managers, the Fair Value shall be determined using procedures similar to those set forth in Section 14.2, and the cost of any such determination shall be borne entirely by the affected Member unless the Board of Managers or a Majority-in-Interest of all Members other than the affected Member approves an alternative allocation of such costs.

14.2. Purchase Price of Membership Interest.

(a) For purposes of any redemption of a Membership Interest pursuant to Section 10.3(c), the purchase price shall be the Triggering Event Purchase Price.

(b) If the Offering Member and the Company cannot cooperatively designate an appraiser within 15 days following the date of the Redemption Notice, then the Offering Member and the Company shall each select an appraiser, and such two (2) appraisers shall select a third appraiser who shall select the appraiser to perform such appraisal. The cost of each appraisal shall be shared equally by the Company and the Offering Member.

14.3. Valuation of Membership Interests. For all purposes of this Agreement other than the valuation of Membership Interests in connection with a Triggering Event, the fair market value of the Membership Interests shall be determined by the Managers pursuant to an independent third party appraisal of the assets of the Company. The Board of Managers shall no less than annually cause the assets of the Company to be appraised by an independent third party.

## ARTICLE XV
## GENERAL PROVISIONS

15.1. Amendments.

(a) In General. Subject to the following exceptions and limitations, this Agreement may be amended only with the written approval of all Members.

(b) Exceptions and Limitations. The Board of Managers may amend Exhibit A from time to time to reflect the admission and withdrawal of Members, and changes to any Member's Percentage Interest, in accordance with this Agreement. No amendment of Article VI (relating to liability and indemnification) may adversely affect the rights or obligations of any Indemnified Person without the Indemnified Person's prior written approval.

15.2. Notice. Any notice, report, or other communication required or permitted to be made to any person by this Agreement shall be in writing and is deemed given when (a) delivered to the person by hand, (b) the third business day after delivery to the United States Postal Service (or other designated delivery service as defined in I.R.C. Section 7502(f)), postage prepaid, in an envelope properly addressed to the person at the person's address set forth in the Company's records as of the date of delivery, or (c) successfully transmitted by facsimile or electronic message to the person's facsimile phone number or e-mail address (as applicable) set forth in the Company's records as of the date of transmission. Any communication to the Board of Managers or the Company may be delivered to the Company's registered office designated pursuant to Section 2.3.

MR.644

15.3.　Governing Law; Consent to Jurisdiction. This Agreement is governed by and shall be construed under the laws of the State of Texas without regard to legal requirements that would require the application of the law of any other jurisdiction. Any Proceeding arising out of or relating to this Agreement or the Company's activities or properties may be brought in the state courts of Dallas County, Texas or, if it has or can acquire jurisdiction, in the United States District Court located in Dallas County, Texas. Each Member and Assignee irrevocably submits to the exclusive jurisdiction of each such court in any such Proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the Proceeding shall be heard and determined only in any such court and agrees not to bring any such Proceeding in any other court. The Company or any Member or Assignee may file a copy of this Agreement with any court as written evidence of the agreement between the parties irrevocably to waive any objections to venue or to convenience of forum. Process in any Proceeding referred to in the second sentence of this Section may be served on any party anywhere in the world.

15.4.　Waiver. Any failure by a party to insist upon the strict performance of any covenant or condition of this Agreement, or to exercise any right or remedy upon a breach of any such covenant or condition, does not constitute waiver of any such covenant or condition or any breach thereof. A party will not be deemed to have waived any right or remedy under this Agreement unless that party has signed a written document to that effect, and any such waiver is applicable only with respect to the specific provision and instance for which it is given.

15.5.　Entire Agreement. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the agreement between the parties with respect to its subject matter.

15.6.　Successors and Assigns. No Member or Assignee may assign any of its rights or delegate any of its obligations under this Agreement except as expressly permitted in this Agreement.

15.7.　Third-Parties. Other than as provided in Section 5.7 (relating to reliance on authority of the Board of Managers) and Article VI (relating to rights of Indemnified Persons), none of the provisions of this Agreement are for the benefit of or enforceable by any creditors of the Company or other persons not a party to this Agreement, except such benefits as inure to a successor or permitted assign in accordance with Section 15.6.

15.8.　Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

15.9.　Construction. The language in this Agreement is to be construed according to its fair meaning and is not to be strictly construed for or against any party. Nothing in this Agreement is to be construed as authorizing or requiring any action that is prohibited by the Code or other applicable law, or as prohibiting any action that is required by the Code or other applicable law.

15.10.　Execution of Agreement. This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which together constitute one agreement. Any signature to this Agreement evidenced by a facsimile or other electronic transmission of such signature shall be binding on the parties to the same extent as if such signature were an original.

MR.645

15.11. <u>Further Assurances</u>. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**[This Space Left Blank Intentionally. Signature Page Follows.]**

MR.646

Executed as of the Effective Date set forth above, by and among the persons signing below.

MEMBERS:

CENTURION LOGISTICS LLC

By: _____
    Marc Marrocco
Title:  Manager

STAMPEDE ENERGY, LLC

By: _____

Name: _James Hoik_

Title: _President_

MANAGERS:

CENTURION LOGISTICS LLC

By: _____
    Marc Marrocco
Title:  Manager

STAMPEDE ENERGY, LLC

By: _____

Name: _James Hoik_

Title: _President_

MR.647

# FIRST AMENDED AND RESTATED
## COMPANY AGREEMENT
## OF
## CENTURION PECOS TERMINAL LLC

## EXHIBIT A
## MEMBERS' CONTRIBUTIONS AND PERCENTAGE INTERESTS

### Effective as of the Effective Date

| MEMBER NAME AND ADDRESS | Initial Capital Contribution | Initial Percentage Interest |
|---|---|---|
| Centurion Logistics LLC<br>17950 Preston Road<br>Suite 1080<br>Dallas, Texas 75252 | $400.00 | 40.00% |
| Stampede Energy, LLC<br>800 Spring Street<br>Suite 205<br>Shreveport, Louisiana 71101 | $600.00 | 60.00% |

MR.648

# FIRST AMENDED AND RESTATED
## COMPANY AGREEMENT
## OF
## CENTURION PECOS TERMINAL LLC

## APPENDIX A
## PRINCIPLES OF ALLOCATION

A.1    Introduction.  This Appendix sets forth principles under which items of income, gain, loss, deduction and credit shall be allocated among the Members.  This Appendix also provides for the determination and maintenance of Capital Accounts, generally in accordance with Treasury Regulations promulgated under I.R.C. Section 704(b), for purposes of determining such allocations.  For purposes of this Appendix, an Assignee shall be treated in the same manner as a Member.

A.2    Definitions.  Capitalized terms used in this Appendix have the meanings set forth below or in the Agreement.

"Adjusted Capital Account Deficit" means any deficit balance in a Member's Capital Account as of the end of a taxable year, after giving effect to the following adjustments:

(i)    Credit to the Capital Account any amounts the Member is obligated to restore pursuant to the Agreement or is deemed to be obligated to restore pursuant to (a) Treasury Regulations Section 1.704-1(b)(2)(ii)(c) (relating to obligations to pay partner promissory notes and other obligations to make contributions to the Company), or (b) the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) (relating to partnership minimum gain) and 1.704-2(i)(5) (relating to partner nonrecourse debt minimum gain); and

(ii)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition is intended to comply with Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Capital Account" has the meaning set forth in Section A.3.

"Depreciation" means, for each taxable year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such taxable year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such taxable year, Depreciation is an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such taxable year bears to such beginning adjusted tax basis.  If the adjusted basis for federal income tax purposes of an asset at the beginning of such taxable year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"Gross Asset Value" means an asset's adjusted basis for federal income tax purposes, except as follows:

MR.649

(i)    The initial Gross Asset Value of an asset contributed by a Member to the Company is the gross Fair Value of such asset, as determined by the contributing Member and the Board of Managers and as set forth on Exhibit A.

(ii)    The Gross Asset Values of Company assets shall be adjusted to equal their respective gross Fair Values (taking I.R.C. § 7701(g) into account), as determined by the Board of Managers, as of the following times: (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (B) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) in connection with the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by a Member acting in a member capacity or in anticipation of being a Member. Adjustments pursuant to clauses (A), (B), and (D) above are required only if the Board of Managers determines that such adjustments are necessary to accurately reflect the relative economic interests of the Members in the Company.

(iii)    The Gross Asset Value of a Company asset distributed to a Member shall be adjusted to equal the gross Fair Value (taking I.R.C. § 7701(g) into account) of such asset on the date of distribution as determined by the distributee and the Board of Managers.

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m). Gross Asset Values shall not be adjusted pursuant to this paragraph (iv) to the extent that an adjustment is required pursuant to paragraph (ii).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) of this definition, the asset's Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profit and Net Loss.

"Net Profit" and "Net Loss" mean, for each taxable year or other relevant period, an amount equal to the Company's taxable income or loss for such taxable year or other relevant period, determined in accordance with I.R.C. Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to I.R.C. Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss shall be added to such taxable income or loss.

(ii)    Any expenditures of the Company described in I.R.C. Section 705(a)(2)(B) or treated as I.R.C. Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss, shall be subtracted from such taxable income or loss.

MR.650

(iii)    If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) or (iii) of the Section A.2 definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from disposition of the asset for purposes of computing Net Profit and Net Loss.

(iv)    Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of (unreduced by any liabilities attributable thereto), notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation computed in accordance with the definition of Depreciation in Section A.2.

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profit or Net Loss.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1) and shall be determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"Partner Nonrecourse Debt" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(1) and shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(2).

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(2) and shall be determined in accordance with Treasury Regulations Section 1.704-2(d).

A.3    Capital Accounts.    The Company shall determine and maintain Capital Accounts. "Capital Account" means an account of each Member determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Treasury Regulations Section 1.704-1(b)(2)(iv). Without limiting the generality of the foregoing, the following rules apply:

(a)    The Capital Account of each Member shall be credited with (i) an amount equal to such Member's Capital Contributions and the Fair Value of property contributed (if permitted hereunder) to the Company by such Member, (ii) such Member's share of the Company's Net Profit,

MR.651

and (iii) the amount of any Company liabilities assumed by such Member or that are secured by property distributed to such Member.

(b)    The Capital Account of each Member shall be debited by (i) the amount of cash and the Fair Value of property distributed to such Member, (ii) such Member's share of the Company's Net Loss, and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)    Upon the transfer by a Member of all or part of an interest in the Company after the Effective Date, the Capital Account of the transferor that is attributable to the transferred interest carries over to the transferee and the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(d)    In determining the amount of any liability for purposes of Sections A.3(a) and A.3(b), I.R.C. Section 752(c) and any other applicable provisions of the I.R.C. and the Treasury Regulations shall be taken into account.

(e)    Except as otherwise required by Treasury Regulations Section 1.704-1(b)(2)(iv), adjustment to Capital Accounts in respect of Company income, gain, loss, deduction, and I.R.C. Section 705(a)(2)(B) expenditures (or items thereof) shall be made with reference to the federal tax treatment of such items (and, in the case of book items, with reference to the federal tax treatment of the corresponding tax items) at the Company level, without regard to any mandatory or elective tax treatment of such items at the Member level.

(f)    The provisions of this Appendix and of the Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributions or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Treasury Regulations, the Board of Managers may make such modification if it is not likely to have a material effect on the amounts distributed or to be distributed to any Member pursuant to the Agreement. The Board of Managers shall make any adjustments that are necessary or appropriate (i) to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) if unanticipated events (for example, the acquisition by the Company of oil or gas properties) might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

(g)    The provisions of the proposed Treasury Regulations published on January 22, 2003 (68 Fed. Reg. 2930), as they may subsequently be modified or adopted as temporary or final Treasury Regulations, shall apply with respect to any noncompensatory options issued by the Company.

A.4    Allocations of Net Profit and Net Loss

A.4.1    In General

After giving effect to the special allocations set forth in Sections A.4.2 and A.4.3 hereof, Net Profit and Net Loss (and to the extent necessary, individual items of income, gain, loss, or deduction) for

MR.652

any period shall be allocated to the Members in such amounts as may be necessary to cause each Member's Capital Account (as adjusted through the end of such period) to equal, as nearly as possible, the sum (which may be either a positive or negative amount) of (i) the amount such Member would receive if all Company assets on hand at the end of such period were sold for cash at their Gross Asset Values, all Company liabilities were satisfied in cash according to their terms (limited in the case of any Nonrecourse Liability and Partner Nonrecourse Debt to the Gross Asset Value of the property securing such liabilities), all obligations (if any) of Members to contribute additional capital to the Company were satisfied, and any remaining cash was distributed to the Members under Section 4.2 as of the last day of such period, minus (ii) the Member's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain computed immediately prior to such deemed sale of assets.

A.4.2   Regulatory Allocations. The following special allocations shall be applied in the order in which they are listed. Such ordering is intended to comply with the ordering rules in Treasury Regulations Section 1.704-2(j) and shall be applied consistently therewith.

(a)   Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(f), anything to the contrary in this Section A.4 notwithstanding, if there is a net decrease in Partnership Minimum Gain during any taxable year, each Member shall be allocated items of income and gain for that taxable year (and, if necessary, subsequent taxable years) equal to that Member's share of the net decrease in Partnership Minimum Gain determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section A.4.2(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for requesting a waiver described in Treasury Regulations Section 1.704-2(f)(4) are met or the requirements for any other exception prescribed by or pursuant to Treasury Regulations Section 1.704-2(f) are met.

(b)   Partner Nonrecourse Debt Minimum Gain Chargeback. Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), anything to the contrary in this Section notwithstanding, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year, then, in addition to the amounts, if any, allocated pursuant to paragraph 4.2(a), any Member with a share of that Partner Nonrecourse Debt Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the taxable year shall be allocated items of Company income and gain for that taxable year (and, if necessary, for subsequent taxable years) equal to that Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section A.4.2(b) is intended to comply with the chargeback of partner nonrecourse debt minimum gain required by Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith, including that no chargeback shall be required to the extent the requirements for any exceptions provided in Treasury Regulation Section 1.704-2(i)(4) are met.

(c)   Qualified Income Offset. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible. An allocation pursuant to the foregoing sentence shall be made only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in Section A.4 have been tentatively made as if this Section A.4.2(c) were not in this Appendix. This allocation is intended to constitute a "qualified income

MR.653

offset" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed in accordance with the requirements thereof.

(d)    Gross Income Allocation. If a Member has an Adjusted Capital Account Deficit at the end of any taxable year, each such Member shall be specially allocated items of Company income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this clause shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section A.4 have been made as if this Section A.4.2(d) were not in this Appendix.

(e)    Nonrecourse Deductions. Nonrecourse Deductions for any taxable year shall be allocated among the Members in accordance with their Percentage Interests.

(f)    Partner Nonrecourse Deductions.    Partner Nonrecourse Deductions for any taxable year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)    Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to I.R.C. Section 734(b) or I.R.C. Section 743(b) is required under Treasury Regulations Section 1.704-1(b)(2)(iv)(m) to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

A.4.3    Curative Allocations.  The allocations set forth in Section A.4.2 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.    The Members intend that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section A.4.3.  Therefore, any other provisions of this Section A.4 (other than the Regulatory Allocations) notwithstanding, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Board of Managers determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section A.4.1.  In exercising its discretion under this Section A.4.3, the Board of Managers shall take into account future Regulatory Allocations under Sections A.4.2(a) and A.4.2(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections A.4.2(e) and A.4.2(f).

A.4.4    Other Allocation Rules

(a)    Net Profit, Net Loss, and other items shall be allocated to the Members pursuant to this Appendix A as of the last day of each taxable year, and at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value.

(b)    If during any taxable year any Member's Percentage Interest changes, each Member's share of Net Profit, Net Loss, and other items for such taxable year shall be determined

MR.654

according to their varying interests and I.R.C. Section 706(d), using any conventions permitted by law and selected by the Board of Managers.

(c)     For purposes of determining a Member's share of Company "excess nonrecourse liabilities" within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Members' shares of Company profits shall be deemed to be in proportion to their respective Percentage Interests.

(d)     To the extent permitted by Treasury Regulations Section 1.704-2(h)(3), the Board of Managers may treat any distribution of the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt (that would otherwise be allocable to an increase in Partnership Minimum Gain) as a distribution that is not allocable to an increase in Partnership Minimum Gain to the extent the distribution does not cause or increase an Adjusted Capital Account Deficit for any Member.

A.5     Tax Allocations

(a)     In General.  Except as otherwise provided in this Section A.5, each item of income, gain, loss, and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such items are allocated for book purposes under the Agreement and this Appendix.

(b)     Contributed or Revalued Property.  In accordance with I.R.C. Section 704(c) and the related Treasury Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value.  If the Gross Asset Value of any Company asset is adjusted pursuant to subparagraph (ii) of the definition of Gross Asset Value in Section A.2 hereof, subsequent allocations of income, gain, loss, and deductions with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under I.R.C. Section 704(c) and the related Treasury Regulations.  Any elections or other decisions relating to allocations pursuant to this Section A.5 shall be made by the Board of Managers in any manner that reasonably reflects the purpose and intention of this Appendix and the Agreement.

(c)     Credits.  Except as otherwise required by Treasury Regulations Section 1.704-1(b)(4)(ii), items of tax credit and tax credit recapture shall be allocated among the Members in accordance with their Percentage Interests.

(d)     Effect of Tax Allocations.  Allocations pursuant to this Section A.5 are solely for purposes of U.S. federal, state, and local taxes and shall not affect any Member's Capital Account or share of Net Profit, Net Loss, or other items or distributions pursuant to any provision of this Appendix and the Agreement.

MR.655

## SCHEDULE A
## CERTIFICATE OF FAIR MARKET VALUE

In accordance with the provisions of the definition of "Triggering Event Purchase Price" set forth in the First Amended and Restated Company Agreement of Centurion Pecos Terminal LLC (the "Company") effective as of November ___, 2014, the liquidating value of the Membership Interests (as defined in such company agreement) is as follows:

| | | |
|---|---|---|
| 1 | Estimated fair market value of Company assets | $ |
| 2 | Less: estimated selling expenses | $ |
| 3 | Less: liabilities | $ |
| 4 | Less: reserves | $ |
| 5 | Equals: total distributable proceeds (sum of lines 1 -4) | $ |
| 6 | Less: Stampede Preferred Return Balance | $ |
| 7 | Less: Stampede Capital Contribution Balance | |
| | | $ |
| 8 | Equals: residual distribution amount (sum of lines 5 – 7) | |
| | | $ |
| 9 | Residual distribution amount per percentage point of Percentage Interest (line 8 ÷ 100) | $ |
| 10 | **Liquidating Value of Stampede Membership Interest** | |
| 11 | Stampede Preferred Return Balance (line 6) | $ |
| 12 | Stampede Capital Contribution Balance (line 7) | $ |
| 13 | Stampede Percentage Interest (line 9 x 60.00%) | $ |
| 14 | Total (sum of lines 11 – 13) | $ |
| 15 | **Liquidating Value of Centurion Membership Interest** | |
| 16 | Centurion Percentage Interest (line 9 x 40.00%) | |

**[This Space Left Blank Intentionally. Signature Page Follows.]**

IN WITNESS WHEREOF, the Members have executed this Certificate of Fair Market Value as of the date first written above.

MEMBERS:

CENTURION LOGISTICS LLC

By:_____

Name:_____

Title:_____

STAMPEDE ENERGY, LLC

By:_____

Name:_____

Title:_____

# Exhibit "O"

MR.658

This is a legally binding contract, if not understood, consult an attorney.

## REAL ESTATE PURCHASE AND SALE CONTRACT

**1.  PARTIES:** This contract ("Contract") is made by and between **ZANE KIEHNE**, an individual ("SELLER") and **MARROCCO VENTURES, LLC**, a Texas limited liability company, or its assigns, ("BUYER"). The "Effective Date" of this Contract shall be the date the Escrow Agent, hereinafter defined, acknowledges, in writing, receipt of the Earnest Money Deposit.

**2.  PROPERTY:** Seller agrees to sell to Buyer and Buyer agrees to purchase approximately three hundred (300) acres land located in Reeves County, Texas as depicted on the site plan attached hereto as Exhibit "A" and incorporated herein by reference (the "Property") which land is included in those certain parcels of land described in the official tax records of Reeves County, Texas as:

a.  BLK 00004, Tract 76, AB 5776 BLK 4 SEC 76 H&GNNE/PART, containing approximately 109.580 acres of land;

b.  BLK 0004, Tract 73, AB 417 BLK 4 SEC 73 H&GN S/2, containing approximately 86.600 acres of land; and

c.  BLK 4, Tract 73, AB 417 BLK 4 SEC 73 H&GNNW/4, containing approximately 160.000 acres of land.

Two (2) tracts consisting of approximately fifty-three (53) acres located within the above-described land as described below will be retained by Seller (collectively, the "Seller Property") and such tracts shall not be part of the Property. The Seller Tracts are described as follows for purposes of this Contract:

(i)  South Tract of Seller Property - the southernmost tract of the Seller Tracts consists of approximately thirty-three (33) acres and is located in the southeast corner of the above described land in Section 2(b) containing 86.600 acres. This land contains water wells and a water sales facility.

(ii)  North Tract of Seller Property - The northernmost tract of the Seller Tracts consists of approximately twenty (20) acres and is located on the western edge of the above described land in Section 2(c) containing 160.000 acres. This land contains a new irrigation well.

The exact size, acreage and boundary lines of the Property, and a legal description accurately describing the Property, shall be provided through the performance of a survey during and prior to the expiration of the Inspection Period, hereinafter defined. Seller shall cause the survey to be performed in accordance with Section 11 of this Contract at its sole cost and expense. **The Property shall be deemed to include:** (A) the land; (B) all improvements located thereon, including any buildings, structures, rails, fixtures and any other improvements of every kind and nature in, on, under or about the land, excluding any steel fence posts; (C) all rights, titles and interests of Seller in and to any roads, rights-of-way, strips, or gores of land adjoining the Property and abutting properties; (D) rights of ingress or egress; (E) all tangible personal property and fixtures of any kind owned by Seller and attached to or located on the Property; and (F) to the extent assignable by Seller and to the extent Buyer, in its sole discretion, elects to accept assignment thereof, Seller's rights, warranties, income and benefits under, by and through any and all agreements effecting and relating to the operation of the Property and any business and improvements thereon. **The Property shall be deemed to exclude oil, gas and other mineral substances and commercial water rights, as further described in Section 3 below, all of which shall be reserved and described in detail in that certain deed transferring fee simple title of the Property from Seller to Buyer at Closing as described in Section 14 ("Seller's Deed").**

MR.659

3. **RIGHTS AND RESTRICTIONS FOR PARTIES**: Seller is a water seller with established business operations and constructed water depots, wells and a sales facility for such business located on the Seller Property described above and depicted on Exhibit "A" to this Contract. Seller shall reserve and describe in the Seller's Deed all of the commercial water rights appurtenant to the surface estate of the Property and shall also reserve and establish such other reasonable and necessary rights, easements and restrictions on the Property in the Seller's Deed, or thereafter as agreed to by Buyer and Seller pursuant to a separate written agreement, which rights, easements and restrictions shall exist solely in relation to and for the purposes of Seller's exercise of commercial water rights and operations of its water sales or farming business (collectively, "Seller Water Rights and Restrictions"), and shall include the following:

    a.    Water Line Easement – Seller shall have the right to reserve an easement on, over, under and across the Property for the construction, installation, repair, maintenance, replacement and removal, including ingress and egress to, one (1) underground water line for the sole purpose of transporting water between the North Tract and South Tract of the Seller Property, the specifications of which water line, including without limitation the location, size, width and depth, and points of access ("Water Line Specs"), shall be in compliance with all applicable federal and state laws, ordinances, rules and standards of any governmental agency, including without limitation the Natural Resource Conservation Service practice standards (NRCS) or similar standards as may be required by the United States Department of Agriculture (USDA), and which Water Line Specs, and any future replacement of the water line and future specs, must be approved by Buyer prior to the construction and installation thereof, which approval shall not be unreasonably withheld by Buyer; and which Water Line Easement, Buyer shall have the right to relocate, as may be necessary, prior to installation and for which easement Seller shall have the duty to maintain, perform repairs to, keep clean and at all times safeguard those portions of the Property surrounding such easement;

    Seller shall be obligated, at all times during the ownership and exercise of its commercial water rights and use of the water line and the Water Line Easement on the Property, to use, maintain, repair and operate the water line in compliance with any and all applicable federal and state laws, statutes, ordinances, codes, regulations, rules and requirements applicable thereto, and the water being transported thereby, including obtaining any and all permits as may be necessary and required, and to comply with any rules developed, adopted and promulgated by any ground water conservation district established in or applicable to Reeves County, Texas.

    b.    Electric Power Line Easement - Seller shall have the right to reserve an easement for access to and use of an existing overhead electric line, and the power generated therefrom, located on the Property, the location of which must be approved by Buyer prior to establishing the easement, which approval shall not be unreasonably withheld by Buyer; and which easement Buyer shall have the right to relocate, as may be necessary; and for which easement Seller shall have the duty to maintain, perform repairs to, keep clean and at all times safeguard those portions of the Property surrounding the easement.

    c.    Road Access Easement - Seller shall have the right to reserve an easement to construct and lay, and thereafter use, maintain, repair and replace, a road for the purposes of providing Seller access to and from certain Seller Property, the location of which easement and road must be approved by Buyer prior to establishing the easement and constructing the road, which approval shall not be unreasonably withheld by Buyer; and which easement Buyer shall have the right to relocate, as may be necessary, prior to the road being constructed; and for which easement Seller shall have the duty to maintain, perform repairs to, keep clean and at all times safeguard those portions of the Property surrounding the easement.

    d.    Buyer Prohibitions - Buyer shall be prohibited from constructing any water depot (s) on the Property for the purpose of engaging in the private sale of water. Buyer shall be prohibited from engaging in the sale of water from the Property to any persons outside of the Property and from transporting water off the Property for the purpose of selling it. Buyer shall be prohibited from competing with Seller in any manner for the private sale of water.

MR.660

e.    Buyer Rights; Seller Restrictions - Buyer and Buyer's heirs, assigns, successors, partners, tenants and tenant employees, and other users, operators and commercial occupants on the Property (collectively, "Buyer Parties") shall have unrestricted access to and use of water in, on and under the Property for domestic use and use for business operations on the Property free and clear of any claim of Seller or its assigns pursuant to Seller's commercial water rights. Subject to Seller Water Rights and Restrictions, Seller, in exercising its commercial water rights, shall not prohibit, unreasonably restrict or adversely or materially affect, Buyer or Buyer Parties' ability to consume, use, access, drill wells for, and construct facilities to distribute water on the Property. Seller shall include in the Seller's Deed, language in which Seller indemnifies, saves and holds Buyer and Buyer Parties harmless from all claims, demands and causes of action arising out of, in connection with or stemming from Seller's use of the commercial water rights, the water line and Water Line Easement on the Property, and its negligence in connection therewith.

Seller shall deliver a copy of the Seller's Deed to Buyer for Buyer's review and approval, which approval may not be unreasonably withheld, prior to Closing as set forth in Section 14 of this Contract. The provisions set forth in this Section 3 shall survive Closing to the extent any of the foregoing requirements are not expressly set forth in Seller's Deed at Closing.

4.    **EXCEPTIONS & 1031 EXCHANGE RIGHT**: The Property shall be subject to the Permitted Exceptions (as defined in Section 10 of this Contract), zoning ordinances, federal, state and local laws and other matters of record or as otherwise may be determined during the Review Period and Inspection Period, hereinafter described.

Buyer hereby acknowledges that Seller has the option to qualify the sale of the Property as part of a tax deferred exchange under section 1031 of the Internal Revenue Code. Buyer agrees that Seller may take any actions with regard to this Contract and the sale of the Property as may be reasonably necessary for the sole purpose of and to facilitate the contemplated exchange so long as such actions will not cause or result in: (a) any harm to Buyer's performance of this Contract, (b) the incurrence of any costs and expenses to Buyer, or (c) any delay in Closing or other default under this Contract. Buyer agrees to cooperate with Seller to the extent necessary in order for Seller to complete the 1031 exchange.

5.    **EARNEST MONEY & PURCHASE PRICE**: The "Purchase Price" of the Property shall be **One Million Five Hundred Thousand and NO/100 Dollars ($1,500,000.00)**. Within five (5) business days after this Contract is fully executed by both Buyer and Seller, Buyer shall deposit Ten Thousand Dollars and NO/100 ($10,000.00) (the "Earnest Money Deposit") with **Republic Title** located at 2626 Howell Street, 10th Floor, Dallas, Texas 75204 ("Title Company") under the direction of Anne Gross ("Escrow Agent"). In the event the Buyer purchases the Property, the Earnest Money shall be applied towards the Purchase Price. Except as otherwise set forth herein, the Earnest Money shall be refundable to Buyer if the Buyer terminates this Contract pursuant to the terms herein.

6.    **INDEPENDENT CONTRACT CONSIDERATION**: Contemporaneously with the final execution and delivery of this Contract, Buyer shall deliver to Seller and Seller hereby acknowledges the receipt of a check in the amount of One Hundred and NO/100 Dollars ($100.00), which amount the parties bargained for and agreed to as consideration for Seller's grant to Buyer of Buyer's exclusive right to purchase the Property pursuant to the terms hereof and for Seller's execution, delivery and performance of this Contract. Such consideration is in addition to and independent of any other consideration or payment provided in this Contract, is non-refundable under any circumstances, and shall be retained by Seller notwithstanding any other provisions of this Contract.

7.    **CLOSING DATE**: Subject to all the provisions of this Contract, the closing of this Contract (the "Closing") shall take place at the offices of the Escrow Agent within thirty (30) days after the expiration of the

MR.661

Inspection Period, which shall in no event occur later than March 15, 2015, unless otherwise agreed to by both Buyer and Seller in writing (the "Closing Date").

Notwithstanding the foregoing, this Contract will automatically terminate if Closing does not occur by 8:00 p.m. Central Standard Time on March 15, 2015; provided however, no such automatic termination will occur where a delay to Closing was not the fault of Buyer or Seller, both parties are diligently performing their obligations to close the purchase transaction contemplated hereunder, the delay to Closing was caused by or the result of an unforeseen event or circumstance over which Buyer or Seller had no influence or control, and in which event Buyer and Seller shall agree in writing to a reasonable extension to the Closing Date.

8. **EXISTING FINANCING & LIENS:** Unless otherwise provided in this Contract, Seller shall make all payments required on existing mortgages, notes or deeds of trust applicable to the Property until Closing and upon Closing all such debts upon the Property shall be discharged by Seller or from Seller's proceeds and a release of lien executed by the applicable mortgagee, lender or trustee shall be provided and filed of record on or before the Closing of the Property.

Seller shall furnish to Buyer, in a form acceptable to Buyer or to any lender of Buyer, as may be applicable, on the Closing Date an affidavit attesting to the absence, unless otherwise provided for herein, of any financing statements, claims of lien, or potential liens about which Seller is actually aware and further attesting that, to Seller's knowledge, there has been no work performed or improvements constructed on the Property on behalf of Seller or any tenant for which a lien could be filed on the Property for ninety (90) days immediately following the Closing Date. If the Property has had work performed or improvements constructed on it for which a lien may be filed, Seller shall deliver releases or waivers of any such liens including but not limited to releases or waivers of any applicable mechanic's liens executed by all general contractors, subcontractors, suppliers, and materialmen, in addition to Seller's (and tenants') lien affidavit setting forth the names of all such general contractors, subcontractors, suppliers, and materialmen and further reciting that in fact all bills for work performed on or to the Property or any improvement thereon which could serve as a basis for a mechanic's lien or a claim for damages have been paid or will be paid by the Closing Date.

9. **PRORATIONS:** Any applicable rents, income and expenses from the Property shall be prorated between Seller and Buyer at Closing. Seller shall pay, in full, all tax liens, special assessments, and material and/or workman liens against the Property upon the date of Closing, whether or not any such liens or special assessments are payable in installments. Seller shall be responsible for payment of any additional ad valorem taxes assessed against the Property for tax years prior to and including the Closing Date due to change in use of the Property, assuming such change occurred on the Closing Date. At Closing, Buyer shall be entitled to a credit against the Purchase Price in an amount equal to the estimated amount of the rollback taxes for which Seller is responsible. For purposes of the determination of the credit against the Purchase Price, the estimated rollback taxes shall be determined by the tax service providing the tax certificate to the Title Company, or, if applicable, from the taxing districts in which the Property is located. Taxes and any other costs or impositions applicable to the Property shall be prorated through the Closing Date. Taxes shall be prorated based on the current year's tax with due allowance made for maximum allowable amounts of any exemptions, if allowed for said year. If the Closing Date occurs on a date when the current year's taxes are not yet determined or fixed, taxes will be prorated based upon the prior year's taxes. Any tax prorations based on an estimate may at the request of either the Buyer or the Seller be subsequently readjusted upon receipt of a tax bill for the Property on the condition that a statement to that effect by both parties is set forth in the closing statement, or in a written document delivered to the Title Company on or before the Closing Date. These covenants shall not merge with the Deed to be delivered from Seller to Buyer and shall survive the Closing.

10. **TITLE INSURANCE:** Seller shall deliver and pay for an owner's title insurance policy insuring marketable fee simple title in Buyer in the amount of the Purchase Price as of the time and date of recordation of Seller's General Warranty Deed, subject only to the Permitted Exceptions defined below. Seller shall, as soon as

MR.662

possible and not later than thirty (30) days after the Effective Date of this Contract, cause to be furnished to Buyer a current title commitment to issue the policy (the "Title Commitment"), issued through the Title Company. Buyer shall have thirty (30) days after receipt of the Title Commitment to review such commitment (the "Review Period") and to notify Seller in writing of any objections Buyer has to any matters shown or referred to in the Title Commitment. Any matters which are set forth in the Title Commitment and to which Buyer does not object within the Review Period shall be deemed to be permitted exceptions to the status of Seller's title (the "Permitted Exceptions"). With regard to items to which Buyer does object within the Review Period, Seller shall have thirty (30) days, or such additional time as may be agreed to in writing by Seller and Buyer, to satisfy such objections. All expenses to clear title defects which Seller elects to cure shall be paid by the Seller. If Seller does not cure the objections within the time specified in this Section 10, Buyer will have ten (10) day to either: (a) terminate this Contract by written notice to Seller and Escrow Agent, in which event the Earnest Money Deposit shall be promptly delivered directly to Buyer, and neither of the parties hereto shall have any further rights or obligations under this Contract, except for obligations that expressly survive termination of this Contract; or (b) accept title to the Property and proceed to Closing upon the terms and conditions of this Contract.

11. INSPECTIONS: Within ten (10) days of the Effective Date, and to the extent Seller has any of the following documentation in his possession or may reasonably obtain it within the ten (10) day period, Seller shall deliver to Buyer any plats, plans, specifications, diagrams, permits, certificates of occupancy, licenses, contracts, leases, updated rent rolls, all agreements affecting and relating to the operation of the Property and improvements thereon, including all agreements with any governmental authority related to the Property and access to and use of any property adjacent to the Property, most recent survey, environmental reports, soil reports, utilities, utility capacities, all prescriptive rights that have been acquired in, or have commenced to run against the Property or any part thereof and easements or claims of easements that exist on or against the Property or any part thereof which are not reflected on the title documents or survey provided by Seller and any other information or documentation that Buyer may reasonably request from Seller related to the Property and any amendments of the foregoing (the "Inspection Documents").

Upon Buyer's receipt of the Inspection Documents and continuing for a period of one hundred and twenty (120) days thereafter Property (the "Inspection Period"), Seller shall grant Buyer reasonable access to the Property allowing Buyer and its agents to inspect the Property and perform and/or obtain any tests, surveys, studies and assessments, including, but not limited to, a Phase I and Phase II Environmental Assessment involving soil and ground water borings and/or excavations as determined necessary by Buyer, at Buyer's sole cost and expense. Buyer agrees to repair any damage to the Property arising from these tests, assessments and inspections.

During the Inspection Period, Seller, at its sole cost and expense, shall cause a surveyor acceptable to Buyer, to perform a survey on the Property which survey shall accurately depict the boundaries of the Property and which surveyor will generate a legal description of the Property. The survey and legal description must be completed and delivered to Buyer at least ten (10) business days prior to the expiration of the Inspection Period. The Purchase Price shall be increased or decreased in an amount equal to five thousand and no/100 dollars ($5,000.00) per acre based upon the total number of acres included in the Property which is determined by the survey.

After review of the Inspection Documents and Property, during the Inspection Period, Buyer determines in its sole and absolute discretion that the Property is not suitable for Buyer's intended use, Buyer may elect to terminate this Contract by written notice to Seller and Escrow Agent, in which event the Earnest Money Deposit shall be promptly delivered to Buyer, and neither of the parties hereto shall have any further rights or obligations under this Contract, except for obligations that expressly survive termination of this Contract. In the absence of a termination notice delivered by Buyer to Seller on or before the expiration of the Inspection Period, the condition for Buyer's inspection of the Property shall be deemed satisfied. Seller acknowledges and agrees that there are numerous material contingencies to Buyer's acquisition of the Property, including, but not limited to, obtaining necessary entity or governmental approvals and permits, access rights, zoning, availability of utilities, and

MR.663

Buyer's determination of the economic feasibility and general suitability of the Property for Buyer's proposed use. Seller agrees to reasonably cooperate with Buyer, at no cost or expense to Seller, regarding Buyer's inspection of the Property, including, but not limited to, executing any disposal manifests or other documents related to the environmental testing performed by Buyer.

12. **SELLER REPRESENTATIONS & WARRANTIES**: Seller makes the following representations which are true and correct as of the date of the Effective Date and shall be true and correct up and to the Closing Date. Unless indicated otherwise herein, the representations contained in this Contract shall survive the Closing and shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of Seller.

a. Seller possesses the absolute authority to enter into this Contract and to perform the obligations hereunder from and after the Effective Date.

b. Seller is not a foreign person as described in the Foreign Investment in Real Property Tax Act and agrees to deliver a certificate at Closing to that effect which shall contain Seller's tax identification number.

c. To Seller's actual knowledge, no fact or condition exists which would result in the termination of current access from the Property to any presently existing highways and roads adjoining or abutting the Property.

d. Seller owns fee simple title to the Property, free and clear of all liens, delinquent taxes, encumbrances, and restrictions, except for those restrictions appearing of record, and taxes for the year of the Closing Date and encumbrances that will be cleared by the Closing Date, if not otherwise accepted by Buyer pursuant to this Contract.

e. To Seller's actual knowledge, there are no adverse or other parties in possession of the Property, and no person or entity has been granted any license, easement, lease or other right to use any portion of the surface of the Property or any improvement thereon for the purpose of operating a business or storing, drilling, exploring, extracting, mining, excavating, developing, managing, or possessing the Property, or any portion thereof including areas on, over, under, beneath or through the Property for any purpose whatsoever.

f. To Seller's actual knowledge, there are no pending or threatened lawsuits, claims, judicial or administrative proceedings, condemnations or similar proceedings affecting any part of, title to, use or condition of the Property for Buyer's intended use or otherwise.

g. Seller has no actual knowledge of any condition existing with respect to the Property or any part thereof which violates any law, rule, regulation, ordinance, code, order, decree or ruling of any Governmental Authority, hereinafter defined, having jurisdiction over the Property which remains uncured or unaddressed, including, but not limited to, any restrictions or restrictive covenants relating to use of the Property (collectively, "Legal Requirements"); Seller has not received notice from any Governmental Authority requiring the correction of any conditions with respect to the Property or any part thereof, by reason of a violation of any Legal Requirement; Seller has not received notice of any pending or contemplated condemnation with respect to the Property or any part thereof. As used herein "Governmental Authority "means the United States of America, the State of Texas, Reeves County, Pecos, and any agency, department, commission, board, bureau or instrumentality of any of them.

h. Seller has made no commitments to any Governmental Authority, entity or person relating to the Property which would impose an obligation upon Buyer or its successors or assigns to make any contribution or dedication of money or land or to construct, install or maintain any improvements of a public or private nature on or off the Property as a condition to the development or use of the Property or otherwise.

MR.664

i.     To Seller's actual knowledge, Seller nor any other  person performing work for or providing services to Seller used, generated, stored or disposed of any hazardous, toxic or dangerous waste, substance or material defined as such under the Comprehensive Environmental Response, Compensation Liability Act, as may be amended, or any other federal, state or local law, ordinance, rule or code relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance, or material, in violation of Legal Requirement of a Governmental Authority;

j.     Seller has not claimed an agricultural use or open space ad valorum tax exemption with respect to the Property, or any portion thereof, which will cause subsequent assessments against the Option Property for prior years due to a change in use or ownership;

k.     To Seller's actual knowledge, there are no leases on the Property, no pending sales on or any service contracts or agreements relating to the operation, maintenance, or security of the Property under which the Seller is bound and which will survive the Closing.

l.     Seller is not subject to any commitment, obligation, or agreement, including but not limited to, any right of first refusal or option to purchase, granted to a third party which would or could prevent the Seller from completing the sale of the Property.

m.     Seller has sole and exclusive possession of the Property and Seller will be able to deliver possession of the Property free of all liens on the Closing Date.

n.     To the extent Seller has knowledge, Seller will disclose all taxes, levies or assessments presently due for public improvements (including, without limitation, for rights of way or utilities) being constructed on or adjacent to the Property for which Seller is responsible.

From and after the Effective Date and during the term of this Contract, Seller will not (i) enter into any contract, deed restriction or other instrument that will affect title to the Property or create an obligation affecting Buyer or the Property subsequent to the Closing; (ii) alter the zoning of the Property; (iii) alter or amend any preliminary or final plat covering any portion of the Property; or (iv) alter any rights obtained by Seller related to the Property or any adjacent property.  Seller will (i) operate, maintain and manage the Property in the same manner as it is presently operated and (ii) continue in effect all insurance coverages.

The obligations of the Buyer to close on the Property are subject to all representations and warranties of the Seller being true and correct as of the Closing Date.  Seller shall provide written confirmation at Closing confirming same.  In the event that any of said conditions are not fulfilled on or as of the Closing Date or not waived by Buyer prior to the Closing Date, and notwithstanding anything to the contrary in this Contract, the Buyer shall have the right to terminate this Contract by written notice to Seller and Escrow Agent, in which event the Earnest Money Deposit shall be promptly delivered directly to Buyer, and neither of the parties hereto shall have any further rights or obligations under this Contract, except for obligations that expressly survive termination of this Contract.

13.     INSURANCE; MAINTENANCE; CASUALTY; CONDEMNATION; CHANGE OF CONDITION:  Risk of loss to the Property shall be upon Seller until Closing or transfer of possession, whichever occurs last.  Seller agrees to maintain Seller's current fire and extended coverage insurance, if any, on the Property until Closing.  Seller shall do ordinary and necessary maintenance, upkeep and repair to the Property through Closing.  If, before Closing, all or any part of the Property is taken by eminent domain, or if a condemnation proceeding has been filed or is threatened against the Property or any part thereof, or if all or any part of the Property is destroyed or materially damaged after the Inspection Period, Seller shall promptly provide written notice to Buyer of any such event.  Upon notice of such occurrence, Buyer may re-inspect the Property and may, by written notice to Seller within ten (10) days after receiving Seller's notice, terminate this Contract. Unless this Contract is so terminated, it shall remain in full force and effect, and Seller shall at Closing assign and

MR.665

transfer to Buyer all of Seller's right, title and interest in and to any awards that may be made for any taking and any insurance proceeds payable on account of casualty. The provisions of this Section 13 shall survive Closing.

14. **CLOSING DOCUMENTS & DISBURSEMENT OF PROCEEDS**: At the Closing, Buyer, at Buyer's sole cost and expense, shall deliver in escrow to the Title Company the following:

a. the Purchase Price, less the Earnest Money Deposit applied to the Purchase Price, plus or minus applicable prorations, in immediate, same-day federal funds wired for credit into the Title Company's escrow account;

b. such other documents as Seller may timely and reasonably request prior to the Closing if not set forth in this Contract;

c. such other documents the Title Company may reasonably require in the consummation of the purchase transaction.

At the Closing, prior to as may be indicated below, Seller, at Seller's sole cost and expense (unless otherwise indicated below), shall deliver in escrow to the Title Company the following:

(i) such other documents as Buyer may timely and reasonably request prior to the Closing if not set forth in this Contract;

(ii) **At least seven (7) business days prior to Closing, Seller shall deliver** to Buyer the Seller's Deed which shall be a General Warranty Deed conveying the Property to Buyer free and clear of any liens or encumbrances, except the Permitted Encumbrances, which shall include the Seller Water Rights and Restrictions, and other easements, restrictions and rights, as may be applicable pursuant to Section 3 of this Contract; which deed Buyer shall review and approve, or otherwise request changes as may be necessary to comply with Section 3 of this Contract;

(iii) evidence of existence, organization and authority of Seller and the authority of the person executing documents on behalf of Seller, reasonably satisfactory to Buyer and the Title Company;

(iv) an affidavit as to Seller's non-foreign status as permitted by Section 1445(b)(2) of the Internal Revenue Code, as amended;

(v) a certificate executed by Seller certifying that Seller's representations and warranties in this Contract remain true and correct at Closing;

(vi) Owner's Policy of Title Insurance in the amount of the Purchase Price insuring the Buyer is the owner in fee simple title of the Option Property; and

(vii) such other documents or corrective instruments as Buyer may timely and reasonably request prior to Closing if not set forth in this Contract or the Title Company may reasonably require in the consummation of this purchase transaction.

On the Closing Date, Seller and Buyer shall deposit with the Title Company duly executed closing statements consistent with this Contract in the form required by the Title Company. The Title Company's escrow fee shall be divided equally between and paid by Seller and Buyer. Seller shall deliver possession of the Property to Buyer at the Closing, subject only to the Permitted Encumbrances, hereinafter defined, and other matters of title approved by Buyer. h. Seller shall pay the cost of the owner's title policy and recording corrective instruments. The Buyer shall pay the cost of recording the deed. All other costs of Closing not otherwise described herein shall be allocated to Buyer and Seller as is customary unless otherwise mutually agreed to by Buyer and Seller. No broker commissions will be paid at Closing or otherwise for the purchase of the Option

MR.666

Property. Upon satisfaction or completion of the foregoing conditions and deliveries, and in accordance with written instructions to the Title Company by Buyer and Seller (not inconsistent with this Contract), the Title Company shall immediately record, when applicable, and deliver the documents in this Section 14 to the appropriate parties and make disbursements according to the closing statements executed by Seller and Buyer.

**15.**     **DEFAULT AND REMEDIES**: Seller or Buyer shall be in default under this Contract if either fails to comply with any material covenant, agreement or obligation within any time limits required by this Contract. Following default by either Seller or Buyer under this Contract, and upon giving proper notice in accordance with Section 17 below, if required, the parties shall have following remedies:

a.     If Seller defaults, Buyer may (i) specifically enforce this Contract and recover damages suffered by Buyer as a result of the delay in the acquisition of the Property; or (ii) terminate this Contract by written notice to Seller and Escrow Agent, in which event the Earnest Money Deposit shall be promptly delivered directly to Buyer, and, at Buyer's option, pursue any remedy and damages available at law or in equity.

b.     If Buyer defaults, Seller may terminate this Contract by written notice to Buyer and Escrow Agent, in which event the Earnest Money Deposit shall be promptly delivered directly to Seller as liquidated damages as Seller's sole and exclusive remedy for such default. Buyer and Seller hereby acknowledge that it would be extremely difficult to ascertain the extent of actual damages caused by Buyer's breach and that the Earnest Money Deposit represents a fair approximation of such actual damages.

If, as a result of a default under this Contract, either Seller or Buyer employs an attorney to enforce its rights, the defaulting party shall, unless prohibited by law, reimburse the non-defaulting party for all reasonable attorney's fees, court costs and other legal expenses incurred by the non-defaulting party in connection with the default.

**16.**     **ENTIRE AGREEMENT AND MANNER OF MODIFICATION**: This Contract, and any attachments or addendum hereto, constitutes the complete agreement of the parties concerning the Property, and supersedes all other agreements. No amendments, modifications or changes to this Contract shall be valid or binding upon the parties unless in writing and executed by all parties.

**17.**     **NOTICES**: All notices required under this Contract shall be deemed to be properly served if reduced to writing and sent by (i) certified or registered mail; (ii) Federal Express or similar overnight carrier; or (iii) personal delivery by courier and the date of such notice will be deemed to have been the date on which such notice is delivered or attempted to be delivered as shown by the certified mail return receipt, overnight carrier receipt or courier delivery receipt.

Notwithstanding the foregoing and *in addition to* the other forms of delivery for notice set forth in this Section 17, all notices required in this Contract may be sent by email to the email address for Buyer and Seller as provided by such parties. Notices sent by email shall be deemed delivered on the date on which the email is sent to the recipient for which the sender of the email has confirmation of delivery of such email to the intended recipient. All notices shall be addressed and emailed to the following addresses:

SELLER:                                         BUYER:
ZANE KIEHNE                              MARROCCO VENTURES, LLC
1501 Mary                                      Attn: Marc Marrocco
Pecos, Texas  79772                     1875 Laws Street
Email: tkay682002@yahoo.com    Dallas, Texas 75202
                                                      Email: mmarrocco@mgretailpartners.com

MR.667

Each party to this Contract shall have the right to change its addresses provided hereunder, or to provide the address of any assignee permitted hereunder, to any other location within the continental United States or its email address by giving notice thereof in the manner set forth herein to the other party at least five (5) days' prior to the occurrence of such address change.

**18.    TIME AND EXACT PERFORMANCE ARE OF THE ESSENCE UNDER THIS CONTRACT.** Buyer and Seller hereby agree to perform each and every obligation hereunder in a prompt and timely manner; provided, however, that if the date for the performance of any action or obligation, or any time period specified hereunder occurs on a Saturday, Sunday or United States bank holiday, then such date or time period shall be extended until the next business day.

**19.    ADDITIONAL TERMS:**

a.    FURTHER ASSURANCES.    Buyer and Seller agree to execute and deliver any additional documents and instruments and to perform any additional acts necessary and appropriate to perform the terms, provisions and conditions of this Contract and transactions contemplated by this Contract. Seller shall cooperate with Buyer in filing and pursuing governmental approvals and in seeking and making application for zoning, licenses and permits as determined necessary by Buyer, provided such cooperation is at no cost or expense to Seller. It is understood that Buyer will be expending considerable time, effort and/or money in conducting the foregoing inspections, which shall constitute independent consideration to Seller for removing the Property from the market.

b.    ENVIRONMENTAL HAZARDS.    In the event underground storage tanks, hazardous substances or hazardous waste, as defined by any federal, state or local statute, law, ordinance, or regulation are discovered on the Property prior to Closing, whether installed, placed or disposed of by Seller or a previous owner, Buyer may elect (i) to terminate this Contract, or (ii) for Buyer to be responsible for any costs and expenses related to the removal of such underground storage tanks, hazardous substances or hazardous waste, including any required remediation or monitoring, in compliance with any federal, state or local environmental regulations (the "Environmental Matters"). In the event Buyer elects to be responsible for the Environmental Matters, Seller agrees to cooperate with Buyer and execute any documents, applications, or permits regarding the Environmental Matters.  Seller's agreement to cooperate with Buyer as referenced in this Section 19(b) shall survive Closing.

c.    ASSIGNMENT:  Buyer may assign this Contract, provided the assignee assumes, in writing, all obligations and liabilities of Buyer under the Contract.  Buyer shall be relieved of any liability hereunder.

d.    CHOICE OF LAW.  This Option Contract shall be construed under the laws of the State of Texas, without regard to choice-of-law rules for any jurisdiction.  Venue is in Reeves County, Texas.

e.    COUNTERPARTS.  This Contract may be executed in two or more identical counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Seller and Buyer execute this Contract on the date(s), and at the time(s), indicated below their respective signatures and this Contract shall become effective on the Effective Date as defined on Section 1 of the Contract.

MR.668

SELLER:

ZANE KIEHNE,
an individual

By: _____
       Zane Kiehne

Date: _____10-16-14_____

BUYER:

MARROCCO VENTURES, LLC,
a Texas limited liability company

By: _____
       Marc Marrocco

Title: Manager

Date: _____10/17/14_____

MR.669

## EXHIBIT "A"

### Site Plan of Property and Proposed Easement Location for Water Line

(The area outlined below in this Site Plan generally depicts the Property and an easement which shall be reserved by deed by Seller; however, the actual boundaries of the Property and actual location of such easement and the boundaries of the Property are subject to change after a survey is performed on the Property, and/or per any agreements entered into by both Buyer and Seller in accordance with the Contract.)



Exhibit A - Ziehne/Marrocco Ventures Real Estate Purchase and Sale Contract (Reeves County, Texas)

MR.670

Exhibit "P"

MR.671

DEED OF TRUST

RECORDATION REQUESTED BY:
Texas Capital Bank, National Association
Premier Office, Commercial Banking
5910 N. Central Expressway, Suite 150
Dallas, TX 75206

WHEN RECORDED MAIL TO:
Texas Capital Bank, National Association
Attn : Loan Operations
2350 Lakeside Blvd, Suite 800
Richardson, TX 75082

SEND TAX NOTICES TO:
Centurion Pecos Terminal LLC
17950 Preston Road, Ste. 1080
Dallas, TX 75252

RETURN TO: CRO
Republic Title of Texas, Inc.
2626 Howell St., 10th Floor
Dallas, TX 75204

1002-133505

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

THIS DEED OF TRUST is dated January 6, 2015, among Centurion Pecos Terminal LLC, whose address is 17950 Preston Road, Ste. 1080, Dallas, TX 75252 ("Grantor"); Texas Capital Bank, National Association, whose address is Premier Office, Commercial Banking, 5910 N. Central Expressway, Suite 150, Dallas, TX 75206 (referred to below sometimes as "Beneficiary"); and John Hudgens, whose address is 2000 McKinney Avenue, Suite 700, Dallas, TX 75201 (referred to below as "Trustee").

CONVEYANCE AND GRANT. For valuable consideration, Grantor conveys to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; and all easements, rights of way, and appurtenances; all water and water rights; and all other rights, royalties, and profits relating to the real property, including without limitation such rights as Grantor may have in all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Reeves County, State of Texas:

See Exhibit "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

The Real Property or its address is commonly known as CR 408, Pecos, TX 79772.

CROSS-COLLATERALIZATION. In addition to the Note, this Deed of Trust secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise. However, this Deed of Trust shall not secure, and the "Indebtedness" shall not include, any obligations arising under Subchapters E and F of Chapter 342 of the Texas Finance Code, as amended.

REVOLVING LINE OF CREDIT. This Deed of Trust secures the indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower so long as Borrower complies with all the terms of the Note.

Grantor hereby absolutely assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S REPRESENTATIONS AND WARRANTIES. Grantor warrants that: (a) this Deed of Trust is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; (c) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

GRANTOR'S WAIVERS. Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Deed of Trust, Borrower and Grantor shall pay to Lender all Indebtedness secured by this Deed of Trust as it becomes due, and Borrower and Grantor shall strictly perform all their respective obligations under the Note, this Deed of Trust, and the Related Documents.

VENDOR'S LIEN. The debt evidenced by the Note is in part or total payment of the purchase price of the Property; the debt is secured by both this Deed of Trust and by a vendor's lien on the Property, which is expressly retained in the deed of the Property to Grantor. This Deed of Trust does not waive the vendor's lien, and the two liens and the rights created by this instrument shall be cumulative. Lender may elect to foreclose under either of the liens without waiving the other or may foreclose under both. The deed wherein the vendor's lien is retained is incorporated into this Deed of Trust.

PURPOSE OF LOAN. The Note in the amount of $750,000.00 represents, in part or in whole, cash or other financial accommodations advanced or committed by Lender to Borrower on January 6, 2015 at Grantor's request, of which Grantor hereby acknowledges receipt.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property, and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless

MR.672

Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent. This restriction will not apply to rights and easements (such as gas and oil) not owned by Grantor and of which Grantor has informed Lender in writing prior to Grantor's signing of this Deed of Trust.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Texas law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust.

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and Lender's reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a fair value basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender, with losses made payable to Lender. GRANTOR MAY FURNISH THE REQUIRED INSURANCE WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT INSURANCE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN THE STATE OF TEXAS. If Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may, but shall not be required to, do so at Grantor's expense, and the cost of the insurance will be added to the Indebtedness. If any such insurance is procured by Lender, Grantor will be so notified, and Grantor will have the option of furnishing equivalent insurance through any insurer authorized to transact business in Texas. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Deed of Trust, to the extent compliance with the terms of this Deed of Trust would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Deed of Trust for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

VOL 1138 PG 0098

MR.673

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's failure to comply with any obligation to maintain Existing Indebtedness in good standing as required below, or to discharge or pay when due any amounts Grantor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Grantor. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Deed of Trust:

**Existing Lien.** The lien of this Deed of Trust securing the Indebtedness shall be subordinate to the lien securing payment of an existing obligation with an account number of 748699 to Texas Capital Bank, National Association described as: Filed as Instrument number 14-09181 in the Deed of Trust Records of Reeves County, Texas on September 30, 2014. The existing obligation has a current principal balance of approximately $1,500,000.00 and is in the original principal amount of $1,500,000.00. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Deed of Trust by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION, JUDGMENTS AND AWARDS.** The following provisions relating to condemnation proceedings, judgments, decrees and awards for injury to the Property are a part of this Deed of Trust:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** To the extent permitted by applicable law, all judgments, decrees and awards for injury or damage to the Property, or any part of the Property, and awards pursuant to proceedings for condemnation of the Property, are hereby absolutely assigned to Lender, and if all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award, judgment or decree shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, and Grantor otherwise performs all the obligations imposed upon Grantor under this Deed of Trust, Lender shall execute and deliver to Grantor a release of this Deed of Trust lien and suitable statements of

VOL 1138 PG 0099

MR.674

termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. However, it is agreed that the payment of all the indebtedness and performance of such obligations shall not terminate this Deed of Trust unless the liens and interests created hereby are released by Lender by a proper recordable instrument. Any filing fees required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Grantor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Deed of Trust or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Borrower's or Grantor's existence as a going business or the death of any member, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any Indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Existing Indebtedness.** The payment of any installment of principal or any interest on the Existing Indebtedness is not made within the time required by the promissory note evidencing such indebtedness, or a default occurs under the instrument securing such indebtedness and is not cured during any applicable grace period in such instrument, or any suit or other action is commenced to foreclose any existing lien on the Property.

**Right to Cure.** If any default, other than a default in payment is curable, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Deed of Trust, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Accelerate Indebtedness.** Lender may declare the unpaid principal balance of the Indebtedness due and payable. In no event will Borrower or Grantor be required to pay any unearned interest.

**Foreclosure.** If Lender invokes the power of sale, Trustee, at the request of Lender, may sell all or any portion of the Property at public auction to the highest bidder for cash at the location within the courthouse designated by the County Commissioners Court, or if no such area has been designated, at the area designated in the notice of sale within the courthouse, between the hours of 10:00 A.M. and 4:00 P.M. on the first Tuesday of any month, after the Trustee or its agent has given notice of the time and place of sale and of the property to be sold as required by the Texas Property Code, as then amended.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** As additional security for the payment of the Indebtedness, Grantor hereby assigns to Lender all Rents as defined in the Definitions section of this Deed of Trust. Lender shall have the right at any time, and even though no Event of Default shall have occurred under this Deed of Trust, to collect and receive the Rents. Lender shall provide any notice required by applicable law with regard to such enforcement of its right to collect and receive the Rents. In addition, if the Property is vacant, Lender may rent or lease the Property. Lender shall not be liable for its failure to rent the Property, to collect any Rents, or to exercise diligence in any matter relating to the Rents; Lender shall be accountable only for Rents actually received. Lender neither has nor assumes any obligation as lessor or landlord with respect to any occupant of the Property. Rents so received shall be applied first to the remaining unpaid balance of the Indebtedness, in such order or manner as Lender shall elect, and the residue, if any, shall be paid to the person or persons legally entitled to the residue.

**Trustee's Powers.** Grantor hereby jointly and severally authorizes and empowers Trustee to sell all or any portion of the Property together or in lots or parcels, as Trustee may deem expedient, and to execute and deliver to the purchaser or purchasers of such Property good and sufficient deeds of conveyance of fee simple title, or of lesser estates, and bills of sale and assignments, with covenants of general warranty made on Grantor's behalf. In no event shall Trustee be required to exhibit, present or display at any such sale any of the Property to be sold at such sale. The Trustee making such sale shall receive the proceeds of the sale and shall apply the same as provided below. Payment of the purchase price to Trustee shall satisfy the liability of the purchaser at any such sale of the Property, and such person shall not be bound to look after the application of the proceeds.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise

MR.675

becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, (2) vacate the Property immediately upon the demand of Lender, or (3) if such tenants refuse to surrender possession of the Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property. Trustee may convey all or any part of the Property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty. Grantor waives all requirements of appraisement, if any. The affidavit of any person having knowledge of the facts to the effect that proper notice as required by the Texas Property Code was given shall be prima facie evidence of the fact that such notice was in fact given. Recitals and statements of fact in any notice or in any conveyance to the purchaser or purchasers of the Property in any foreclosure sale under this Deed of Trust shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed. Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, Grantor's heirs, successors, assigns and legal representatives.

**Proceeds.** Trustee shall pay the proceeds of any sale of the Property (a) first, to the expenses of foreclosure, including reasonable fees or charges paid to the Trustee, including but not limited to fees for enforcing the lien, posting for sale, selling, or releasing the Property, (b) then to Lender the full amount of the Indebtedness, (c) then to any amount required by law to be paid before payment to Grantor, and (d) the balance, if any, to Grantor.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as Lender's attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law. In the event of foreclosure of this Deed of Trust, Lender shall be entitled to recover from Borrower or Grantor Lender's reasonable attorneys' fees and actual disbursements that Lender necessarily incurs in pursuing such foreclosure.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other lienholder of the Property of the commencement of a foreclosure proceeding or of the commencement of any other action to which Lender may avail itself as a remedy, except to the extent required by applicable law or by written agreement.

**Trustee.** In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Substitute Trustee.** Lender, at Lender's option, from time to time, and more than once, may appoint in writing a successor or substitute trustee, with or without cause, including the resignation, absence, death, inability, refusal or failure to act of the Trustee. The successor or substitute trustee may be appointed without ever requiring the resignation of the former trustee and without any formality except for the execution and acknowledgment of the appointment by the beneficiary of this Deed of Trust. The successor or substitute trustee shall then succeed to all rights, obligations, and duties of the Trustee. This appointment may be made on Lender's behalf by the President, any Vice President, Secretary, or Cashier of Lender.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of Texas.**

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be

VOL
1138

PG

0101

granted or withheld in the sole discretion of Lender.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Deed of Trust or any provision of any Related Document, Grantor does not agree or intend to pay, and Lender does not agree or intend to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Indebtedness which would in any way or event (including demand, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Indebtedness than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee will, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Indebtedness, and when the principal has been paid in full, be refunded to Grantor.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means Texas Capital Bank, National Association, and its successors and assigns.

**Borrower.** The word "Borrower" means BALLENGEE INTERESTS, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Deed of Trust.

**Grantor.** The word "Grantor" means Centurion Pecos Terminal LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Deed of Trust.

**Lender.** The word "Lender" means Texas Capital Bank, National Association, its successors and assigns.

**Note.** The word "Note" means the promissory note dated January 6, 2015, **in the original principal amount of $750,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property. The word "Rents" shall also mean all "Rents" as defined in Chapter 64 of the Texas Property Code.

**Trustee.** The word "Trustee" means John Hudgens, whose address is 2000 McKinney Avenue, Suite 700, Dallas, TX 75201 and any substitute or successor trustees.

MR.677

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

CENTURION PECOS TERMINAL LLC

By: _____
John V. Calce, Manager of Centurion Pecos
Terminal LLC

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF ___TX___ )
                    ) SS
COUNTY OF ___Dallas___ )

This instrument was acknowledged before me on __January 6__, 20_16_ by John V. Calce, Manager of Centurion Pecos Terminal LLC, a member on behalf of Centurion Pecos Terminal LLC, a limited liability company.

SANDRA T JOHNSON
My Commission Expires
September 22, 2018

_____
Notary Public, State of Texas

LaserPro, Ver. 14.4.10.012  Copr. D+H USA Corporation 1997, 2015  All Rights Reserved.  - TX  M:\CFI\LPL\G01.FC  TR-17442

VOL 1138 PG 0103

MR.678

## EXHIBIT "A"

Being a tract of land located in Section 76, Block 4, H&GN Survey Reeves County, Texas, and being a part of a called 496.76 grid (496.87 surface) acre tract of land as described in a deed recorded in Volume 905, Page 155, Official Public Records, Reeves County, Texas (O.P.R.R.C.T.), and being more particularly described as follows:

Beginning at a 5/8" iron rod set with cap stamped "Trans Texas Surveying" for the Northwest corner of said Section 76, the Southwest corner of said Section 75, the Northeast corner of Section 77 and the Southeast corner of Section 78, said 5/8" iron rod set also being in the intersection of County Road No. 408 and County Road No. 404;

Thence N 58° 03' 46" E, with the common line of said section 76 and Section 75, a distance of 2639.85 feet to a point in the East line of said 496.76 acre tract from which a 1/2" iron rod found with cap stamped "5358 Trujillo" bears S 58° 03' 46" W, a distance of 0.63 feet, also from which a 1/2" iron rod found at the Northeast corner of said Section 76, Block 4, bears N 58° 03' 46" E, a distance of 2639.85 feet;

Thence S 32° 08' 23" E, with the East line of said 496.76 acre tract, a distance of 3187.68 feet to a 5/8" iron rod set with cap stamped "Trans Texas Surveying" for the Southeast corner of said 496.76 acre tract being 100' North of the centerline of the Texas & Pacific Railroad;

Thence S 69° 42' 22" W, with the South line of said 496.76 acre tract and 100' North of and parallel with the centerline of said Texas & Pacific Railroad, a distance of 2697.40 feet to a point in said County Road No. 408, the West line of said Section 76 and the East line of Section 77, Block 4, from which a 60D nail found bears S 69° 42' 22" W, a distance of 0.37 feet, also from which a 1/2" iron rod found for the Southwest corner of said section 76, Block 4, bears S 32° 08' 13" E, a distance of 2657.42 feet;

Thence N 32° 08' 13" W, with the West line of said 496.76 acre tract and with the common line of said Section 76 and the said Section 77, a distance of 2643.29 feet to the Place of Beginning and containing 176.659 acres of land. This description is based on the Land Title Survey and Plat made by Robert L Young, registered professional land surveyor No. 5400 on June 20, 2014. All bearings recited herein are correlated to the Texas State Plane coordinate system, Central Zone (4203), NAD83 (NA2011).

Note: The Company is prohibited from insuring the area or quantity of the land described herein. Any statement in the above legal description of the area or quantity of land is not a representation that such area or quantity is correct, but is made only for informational and/or identification purposes and does not override Item 2 of Schedule B hereof.

V
O
L

1
1
3
8

P
G

0
1
0
4

Inst No. 15-00433
DIANNE O. FLOREZ
COUNTY CLERK
2015 Jan 14 at 04:09 PM
REEVES COUNTY, TEXAS
By: ER⁓⁓⁓⁓⁓DEPUTY

MR.679

Exhibit "Q"

MR.680

15-07672
FILED FOR RECORD
REEVES COUNTY, TEXAS
Aug 26, 2015 at 01:25:00 PM

**RECORDATION REQUESTED BY:**
Texas Capital Bank, National Association
Premier Office, Commercial Banking
5910 N. Central Expressway, Suite 150
Dallas, TX 75206

**WHEN RECORDED MAIL TO:**
Texas Capital Bank, National Association
Attn : Loan Operations
2350 Lakeside Blvd, Suite 800
Richardson, TX 75082

**SEND TAX NOTICES TO:**
Centurion Pecos Terminal LLC
17950 Preston Road, Ste. 1080
Dallas, TX 75252

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

THIS DEED OF TRUST is dated August 17, 2015, among Centurion Pecos Terminal LLC, whose address is 17950 Preston Road, Ste. 1080, Dallas, TX 75252 ("Grantor"); Texas Capital Bank, National Association, whose address is Premier Office, Commercial Banking, 5910 N. Central Expressway, Suite 150, Dallas, TX 75206 (referred to below sometimes as "Beneficiary"); and John Hudgens, whose address is 2000 McKinney Avenue, Suite 700, Dallas, TX 75201 (referred to below as "Trustee").

**CONVEYANCE AND GRANT.** For valuable consideration, Grantor conveys to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary, the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water and water rights, and all other rights, royalties, and profits relating to the real property, including without limitation such rights as Grantor may have in all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Reeves County, State of Texas:

See See Exhibit "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.

The Real Property or its address is commonly known as Tract of land located in Sections 73 and 76, Block 4, Pecos, TX.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Deed of Trust secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise. However, this Deed of Trust shall not secure, and the "Indebtedness" shall not include, any obligations arising under Subchapters E and F of Chapter 342 of the Texas Finance Code, as amended.

Grantor hereby absolutely assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Deed of Trust is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; (c) the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Deed of Trust, Borrower and Grantor shall pay to Lender all indebtedness secured by this Deed of Trust as it becomes due, and Borrower and Grantor shall strictly perform all their respective obligations under the Note, this Deed of Trust, and the Related Documents.

**VENDOR'S LIEN.** The debt evidenced by the Note is in part or total payment of the purchase price of the Property; the debt is secured by both this Deed of Trust and by a vendor's lien on the Property which is expressly retained in the deed of the Property to Grantor. This Deed of Trust does not waive the vendor's lien, and the two liens and the rights created by this instrument shall be cumulative. Lender may elect to foreclose under either of the liens without waiving the other or may foreclose under both. The deed wherein the vendor's lien is retained is incorporated into this Deed of Trust.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters, and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Deed of Trust. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Deed of Trust or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or

VOL 1190 PG 0763

MR.681

BALLENGEE00002076

should have been known to Grantor. The provisions of this section of the Deed of Trust, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Deed of Trust and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent. This restriction will not apply to rights and easements (such as gas and oil) not owned by Grantor and of which Grantor has informed Lender in writing prior to Grantor's signing of this Deed of Trust.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Texas law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and Lender's reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a fair value basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender, with losses made payable to Lender. GRANTOR MAY FURNISH THE REQUIRED INSURANCE WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY GRANTOR OR THROUGH EQUIVALENT INSURANCE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN THE STATE OF TEXAS. If Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may, but shall not be required to, do so at Grantor's expense, and the cost of the insurance will be added to the Indebtedness. If any such insurance is procured by Lender, Grantor will be so notified, and Grantor will have the option of furnishing equivalent insurance through any insurer authorized to transact business in Texas. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Grantor's failure to discharge or

VOL 1190 PG 0764

MR.682

BALLENGEE00002076.02

pay when due any amounts Grantor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Grantor. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

Title. Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Grantor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

Defense of Title. Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Trustee or Lender under this Deed of Trust, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

Compliance With Laws. Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances and regulations of governmental authorities.

Survival of Representations and Warranties. All representations, warranties, and agreements made by Grantor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION, JUDGMENTS AND AWARDS.** The following provisions relating to condemnation proceedings, judgments, decrees and awards for injury to the Property are a part of this Deed of Trust:

Proceedings. If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

Application of Net Proceeds. To the extent permitted by applicable law, all judgments, decrees and awards for injury or damage to the Property, or any part of the Property, and awards pursuant to proceedings for condemnation of the Property, are hereby absolutely assigned to Lender, and if all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award, judgment or decree shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

Security Agreement. This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

Security Interest. Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Deed of Trust in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Deed of Trust as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

Addresses. The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

Further Assurances. At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

Attorney-in-Fact. If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, and Grantor otherwise performs all the obligations imposed upon Grantor under this Deed of Trust, Lender shall execute and deliver to Grantor a release of this Deed of Trust lien and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. However, it is agreed that the payment of all the Indebtedness and performance of such obligations shall not terminate this Deed of Trust unless the liens and interests created hereby are released by Lender by a proper recordable instrument. Any filing fees required by law shall be paid by Grantor, if permitted by applicable law.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

Payment Default. Borrower fails to make any payment when due under the Indebtedness.

Other Defaults. Borrower or Grantor fails to comply with or to perform any other obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

Compliance Default. Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

Default on Other Payments. Failure of Grantor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

Default in Favor of Third Parties. Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Deed of Trust or any of the Related Documents.

VOL 1190 PG 0765

MR.683
BALLENGEE00002076.03

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Borrower's or Grantor's existence as a going business or the death of any member, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Deed of Trust, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Accelerate Indebtedness.** Lender may declare the unpaid principal balance of the Indebtedness due and payable. In no event will Borrower or Grantor be required to pay any unearned interest.

**Foreclosure.** If Lender invokes the power of sale, Trustee, at the request of Lender, may sell all or any portion of the Property at public auction to the highest bidder for cash at the location within the courthouse designated by the County Commissioners Court, or if no such area has been designated, at the area designated in the notice of sale within the courthouse, between the hours of 10:00 A.M. and 4:00 P.M. on the first Tuesday of any month, after the Trustee or its agent has given notice of the time and place of sale and of the property to be sold as required by the Texas Property Code, as then amended.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** As additional security for the payment of the Indebtedness, Grantor hereby assigns to Lender all Rents as defined in the Definitions section of this Deed of Trust. Lender shall have the right at any time, and even though no Event of Default shall have occurred under this Deed of Trust, to collect and receive the Rents. Lender shall provide any notice required by applicable law with regard to such enforcement of its right to collect and receive the Rents. In addition, if the Property is vacant, Lender may rent or lease the Property. Lender shall not be liable for its failure to rent the Property, to collect any Rents, or to exercise diligence in any matter relating to the Rents. Lender shall be accountable only for Rents actually received. Lender neither has nor assumes any obligation as lessor or landlord with respect to any occupant of the Property. Rents so received shall be applied by Lender first to the remaining unpaid balance of the Indebtedness, in such order or manner as Lender shall elect, and the residue, if any, shall be paid to the person or persons legally entitled to the residue.

**Trustee's Powers.** Grantor hereby jointly and severally authorizes and empowers Trustee to sell all or any portion of the Property together or in lots or parcels, as Trustee may deem expedient, and to execute and deliver to the purchaser or purchasers of such Property good and sufficient deeds of conveyance of fee simple title, or of lesser estates, and bills of sale and assignments, with covenants of general warranty made on Grantor's behalf. In no event shall Trustee be required to exhibit, present or display at any such sale any of the Property to be sold at such sale. The Trustee making such sale shall receive the proceeds of the sale and shall apply the same as provided below. Payment of the purchase price to Trustee shall satisfy the liability of the purchaser at any such sale of the Property, and such person shall not be bound to look after the application of the proceeds.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rent for the use of the Property, (2) vacate the Property immediately upon the demand of Lender, or (3) if such tenants refuse to surrender possession of the Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property. Trustee may convey all or any part of the Property to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to other exceptions to conveyance and warranty. Grantor waives all requirements of appraisement, if any. The affidavit of any person having knowledge of the facts to the effect that proper notice as required by the Texas Property Code was given shall be prima facie evidence of the fact that such notice was in fact given. Recitals and statements of fact in any notice or in any conveyance to the purchaser or purchasers of the Property in any foreclosure sale under this Deed of Trust shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed. Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, Grantor's heirs, successors, assigns and legal representatives.

**Proceeds.** Trustee shall pay the proceeds of any sale of the Property (a) first, to the expenses of foreclosure, including reasonable fees or charges paid to the Trustee, including but not limited to fees for enforcing the lien, posting for sale, selling, or releasing the Property, (b) then to Lender the full amount of the Indebtedness, (c) then to any amount required by law to be paid before payment to Grantor, and (d) the balance, if any, to Grantor.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as Lender's attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include,

VOL 1190 PG 0766

BALLENGEE00002076.04

MR.684

without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law. In the event of foreclosure of this Deed of Trust, Lender shall be entitled to recover from Borrower or Grantor Lender's reasonable attorneys' fees and actual disbursements that Lender necessarily incurs in pursuing such foreclosure.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Grantor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other lienholder of the Property of the commencement of a foreclosure proceeding or of the commencement of any other action to which Lender may avail itself as a remedy, except to the extent required by applicable law or by written agreement.

**Trustee.** In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Substitute Trustee.** Lender, at Lender's option, from time to time, and more than once, may appoint in writing a successor or substitute trustee, with or without cause, including the resignation, absence, death, inability, refusal or failure to act of the Trustee. The successor or substitute trustee may be appointed without ever requiring the resignation of the former trustee and without any formality except for the execution and acknowledgment of the appointment by the beneficiary of this Deed of Trust. The successor or substitute trustee shall then succeed to all rights, obligations, and duties of the Trustee. This appointment may be made on Lender's behalf by the President, any Vice President, Secretary, or Cashier of Lender.

**NOTICES.** Any notice required to be given under this Deed of Trust, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law.** This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of Texas.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Deed of Trust or any provision of any Related Document, Grantor does not agree or intend to pay, and Lender does not agree or intend to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Indebtedness which would in any way or event (including demand, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Indebtedness than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee will, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Indebtedness, and when the principal has been paid in full, be refunded to Grantor.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code.

**Beneficiary.** The word "Beneficiary" means Texas Capital Bank, National Association, and its successors and assigns.

**Borrower.** The word "Borrower" means BALLENGEE INTERESTS, LLC and includes all co-signers and co-makers signing the Note and all

VOL 1190 PG 0767

MR.685

BALLENGEE00002076.05

their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Grantor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Grantor.** The word "Grantor" means Centurion Pecos Terminal LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Trustee or Lender to enforce Grantor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Deed of Trust.

**Lender.** The word "Lender" means Texas Capital Bank, National Association, its successors and assigns.

**Note.** The word "Note" means the promissory note dated August 17, 2015, **in the original principal amount of $1,500,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property. The word "Rents" shall also mean all "Rents" as defined in Chapter 64 of the Texas Property Code.

**Trustee.** The word "Trustee" means John Hudgens, whose address is 2000 McKinney Avenue, Suite 700, Dallas, TX 75201 and any substitute or successor trustees.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

CENTURION PECOS TERMINAL LLC

By: _____
John V. Calce, Manager of Centurion Pecos
Terminal LLC

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF _Texas_ )
                  ) SS
COUNTY OF _Dallas_ )

This instrument was acknowledged before me on _August 19th_, 20 _15_ by John V. Calce, Manager of Centurion Pecos Terminal LLC, a member on behalf of Centurion Pecos Terminal LLC, a limited liability company.

KRYSTEN MARIE DAVIS
Notary Public
State of Texas
Comm. Expires 12/17/2016

_____
Notary Public, State of Texas

LaserPro, Ver. 15.2.0.024 Copr. D+H USA Corporation 1997, 2015. All Rights Reserved. - TX C:\CFI\LPL\G01.FC TR-17951

VOL 1190 PG 0768

MR.686

BALLENGEE00002076.06

VOL 1190 PG 0769

Inst No. 15-07672
DIANNE O. FLOREZ
COUNTY CLERK
2015 Aug 26 at 01:25 PM
REEVES COUNTY, TEXAS
By: NJ _____, DEPUTY

BALLENGEE00002076.07

MR 687

Exhibit "R"

MR.688

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## GENERAL WARRANTY DEED

THE STATE OF TEXAS §
§
COUNTY OF REEVES §

For a valuable consideration, the receipt of which is hereby acknowledged, ZANE KIEHNE, TANYA KIEHNE, and Z&T CATTLE COMPANY, LLC, a Texas limited liability company, (collectively, "Grantors") have granted, sold and conveyed and by these presents do grant, sell and convey unto CENTURION PECOS TERMINAL LLC, a Texas limited liability company, ("Grantee"), whose address is 17950 Preston Road, Suite 1080, Dallas Texas 75252, all of Grantors' right, title and interest in and to the property described in Exhibit A attached hereto and made a part hereof (the "Subject Lands"), together with all buildings, structures, and improvements of every kind and nature in, on, or under the Subject Lands; all of Grantors' rights, titles and interests in all rights, tenements, hereditaments, easements, licenses, privileges, rights of ingress and egress applicable to the Subject Lands, and appurtenances pertaining thereto; and all rights, titles and interests of Grantors in and to any roads, rights-of-way, strips, or gores of land adjoining the Subject Lands and abutting properties, save and except for the rights, easements and appurtenances reserved herein.

A.     There is reserved unto Grantors, and Grantors' heirs and assigns forever, the following:

1     Oil, Gas and Other Minerals:  All oil, gas and other minerals in and under and that may be produced from the Subject Property, together with all present or future rights appurtenant or belonging to the oil, gas and other minerals, including, without limitation, all of Grantor's (i) rights of ingress egress and possession to explore for oil, gas and other minerals and to produce, treat, process, store, transport, market and remove all or any of them from the Subject Lands, subject to any limitations of Grantors to surface use of the Subject Lands as may be further described in this General Warranty Deed and Term Conveyance; (ii) rights under each valid and subsisting oil, gas and other mineral lease to which the oil, gas and other minerals are subject, including, but not limited to, all bonuses, delay rentals royalties, shut-in and minimum royalties; (iii) rights to any and all sums payable by any lessee, operator, purchaser or seller of production, governmental agency, tribunal or other party with respect to oil, gas and/or other minerals production attributable to any of the oil, gas and other minerals, including without limitation all revenues, payments, accounts, suspended funds, refunds and interest on overdue payments; (iv) rights, claims and causes of action with respect to the sums described in item (iii),

GENERAL WARRANTY DEED - Kiehne/Z&T Cattle Company, LLC and Centurion Pecos Terminal, LLC

MR 689
BALLENGEE00002078

including without limitation claims for the underpayment of royalties; and, (v) any other claims, demands, suits, causes of action, obligations, damages, proceeds, settlements and distributions of whatsoever kind or character, known or unknown, relating or attributable to the oil, gas and other minerals.

This General Warranty Deed is made and accepted subject to that certain Oil and Gas Lease and Surface Use, Damage Schedule and Right of Way Agreement (collectively hereinafter referred to as the "Lease") dated October 23, 2014 by and between Zane Kiehne and Tanya Kiehne, collectively as Lessor, and KEW Drilling, as Lessee, a memorandum of which Lease was recorded in Volume 1125, Page 564, of the Official Public Records of Reeves County, Texas, as amended by that certain Amendment to the Lease dated January 26, 2015 (the "Lease Amendment"), a memorandum of which Lease Amendment was recorded on February 20, 2015 in Volume 1146, Page 306, of the Official Public Records of Reeves County, Texas.

Subject to the terms and conditions set forth in the Lease and Lease Amendment, Grantors and Grantors' heirs, successors and assigns, for a term of five (5) consecutive years from the date of this General Warranty Deed and hereby grant, sell and convey to Grantee all rights of ingress and egress that the Grantors may possess or own, if any, to enter upon or use the surface of the Subject Lands for the purposes contemplated by Section A(1)(i) of this General Warranty Deed or any other purpose incident thereto. Nothing herein shall be construed to prevent Grantors or Grantors' heirs, successors or assigns from exploring for, developing and/or producing oil, gas and other minerals by pooling or by directional drilling under the Subject Lands from well sites located on property outside of the Subject Lands. Upon the expiration of five (5) years, Grantors shall resume ownership of rights of ingress and egress to the Subject Lands herein conveyed to Grantee, and all of such rights shall revert to Grantors.

2.    Commercial Water Rights and Water Rights Appurtenant to the Surface Estate: All of the commercial water and water rights appurtenant to the surface estate of the Subject Lands, including, without limitation, water running or lying in streams or rivers, water contained in near surface aquifers, and water in lakes, sloughs, ponds or playa lakes (collectively, "Commercial Water Rights ").

3.    Water Line Easement: An easement on, over, under and across the Subject Lands for the construction, installation, repair, maintenance, replacement and removal, including ingress and egress to one (1) underground water line, which shall be located on that portion of the Subject Lands depicted on Exhibit B attached hereto and made a part hereof, for the sole purpose of transporting water between the Grantors' property adjacent to the Subject Lands and shown on Exhibit B. The specifications of the water line, including without limitation the location, size, width and depth, and points of access

BALLENGEE00002078.02



MR 690

including without limitation the location, size, width and depth, and points of access (collectively, the "Water Line Specs"), shall be and remain in compliance with all applicable federal and state laws, ordinances, rules and standards of any governmental agency, including without limitation the Natural Resource Conservation Service practice standards (NRCS) or similar standards as may be required by the United States Department of Agriculture (USDA), and which Water Line Specs, and any future replacement of the water line and future specs, must be approved by Grantee prior to the construction and installation thereof, which approval shall not be unreasonably withheld by Grantee. Grantee shall have the right to relocate the Water Line Easement, as may be necessary, prior to installation of the water line by Grantors, and Grantors shall have the duty to maintain, perform repairs to, keep clean and at all times safeguard those portions of the Subject Lands surrounding the Water Line Easement.

Grantors shall be obligated, at all times during the ownership and exercise of its Commercial Water Rights and use of the water line and the Water Line Easement on the Subject Lands, to use, maintain, repair and operate the water line in compliance with any and all applicable federal and state laws, statutes, ordinances, codes, regulations, rules and requirements applicable thereto, and the water being transported thereby, including obtaining any and all permits as may be necessary and required, and to comply with any rules developed, adopted and promulgated by any ground water conservation district established in or applicable to Reeves County, Texas.

4.    Electric Power Line Easement: Grantors hereby reserve an exclusive Power Line Easement over, on and across that certain portion of the Subject Lands, the current general location of which is depicted on Exhibit C attached hereto and made a part hereof, for purposes of access to and use of the overhead power line also shown on Exhibit C which runs vertically along the west boundary of that certain tract of land identified on Exhibit C as Tract B. Grantee shall have the unrestricted right to relocate the Power Line Easement at any time and from time to time so long as Grantee provides reasonable notice to Grantors of the new location, relocation of the easement does not unreasonably interfere with Grantors' ability to access and use the overhead power line, and Grantee pays for all reasonable costs incurred by Grantors, if any, resulting from Grantee's relocation of the Power Line Easement. Grantors shall have the duty to maintain, perform repairs to, keep clean and at all times safeguard those portions of the Subject Lands surrounding the Power Line Easement.

B.    Grantee's interest is subject expressly to all zoning laws, ordinances, covenants, conditions, restrictions, rights-of-way, easements and rights now existing under any oil and gas leases and all royalties, overriding royalties and other burdens presently of record covering and affecting the interests herein conveyed, including, without limitation, the easements, restrictions, and rights-of-way described on the survey in Exhibit C, and Grantee's interest shall also be subject to the following rights and restrictions:

1.    Grantee Rights, Grantors' Restrictions: Grantee and Grantee's heirs, assigns, successors, partners, tenants and tenant employees, and other users, operators and commercial occupants on the Subject Lands (collectively, "Grantee Parties") shall have

VOL 1190 PG 0772

BALLENGEE00002078.03


MR.691

and business operations conducted on the Subject Lands free and clear of any claim of Grantors or their successors and assigns pursuant to Grantors' Commercial Water Rights. Grantors, in exercising their Commercial Water Rights, shall not prohibit, unreasonably restrict or adversely or materially affect, Grantee or Grantee Parties' ability to consume, use, access, drill wells for, and construct facilities to distribute water on the Subject Lands for the purposes authorized herein.

2. Grantee and Grantee Parties' Restrictions: Grantee and Grantee Parties shall be prohibited from constructing any water depot(s) on the Subject Lands for the purpose of engaging in the private sale of water. Grantee and Grantee Parties shall be prohibited from engaging in the sale of water from Grantee and/or Grantee Parties to any persons or entities outside of the Subject Lands and from transporting water off the Subject Lands for the purpose of selling it. Grantee and Grantee Parties shall be prohibited from competing with Grantors and their successors and assigns in any manner for the private sale of water. Grantee and Grantee Parties shall have no commercial water rights in the Subject Lands.

This conveyance is made and accepted subject to all matters of record for the Subject Lands. Grantors, for the consideration recited above and subject to the prior liens and the reservations from and exceptions to conveyance and warranty, grant, sell, and convey the Subject Lands to the Grantee, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and to hold to the Grantee, and its successors and assigns forever. Grantors bind Grantors and Grantors' successors and assigns to warrant and forever defend all and singular the Subject Lands to Grantee and Grantee's successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof.

*[Remainder of page intentionally left blank. Signature page to follow.]*

BALLENGEE00002078.04

EXECUTED this 17th day of August, 2015, to be effective as of the 17th day of August, 2015.

**GRANTORS:**

_Zane Kiehne_ (signature)
Zane Kiehne

_Tanya Kiehne_ (signature)
Tanya Kiehne

**Z&T CATTLE COMPANY, LLC**
a Texas limited liability company

By: _Zane Kiehne_ (signature)
Zane Kiehne, Manager

VOL 1190 PG 0778

BALLENGEE00002078.05    MR.693

EXECUTED this _____ day of August, 2015, to be effective as of the _____ day of August, 2015.

GRANTORS:

_____
Zane Kiehne


_____
Tanya Kiehne


Z&T CATTLE COMPANY, LLC
a Texas limited liability company


By: _____
    Zane Kiehne, Manager

GRANTEE:

CENTURION PECOS TERMINAL LLC
a Texas limited liability company

    By: Centurion Logistics, LLC,
        a Texas limited liability company,
        its Manager

    By: _____

    Name: _Marc Marrocco_

    Title: Manager

VOL 1190 PG 0775

BALLENGEE00002078.06    MR.694

STATE OF TEXAS                                  §
       REEVES                                  §
COUNTY OF ~~MIDLAND~~                            §

       This foregoing instrument was acknowledged before me this __17__ day of August, 2015 by Zane Kiehne, individually, and on behalf of Z&T Cattle Company, as its Manager.

Notary Seal:



_Kathy Kelton_
Notary Public, the State of Texas

STATE OF TEXAS                                  §
       REEVES                                  §
COUNTY OF ~~MIDLAND~~                            §

       This foregoing instrument was acknowledged before me this __17__ day of August, 2015 by Tanya Kiehne.

Notary Seal:



_Kathy Kelton_
Notary Public, the State of Texas

STATE OF TEXAS                                  §
                                               §
COUNTY OF DALLAS                                §

       This foregoing instrument was acknowledged before me this __19th__ day of August, 2015 by _Marc Moraco_ on behalf of Centurion Pecos Terminal, LLC, a Texas limited liability company, as its Manager.

Notary Seal:



Notary Public, the State of Texas

GENERAL WARRANTY DEED - Kiehne/Z&T Cattle Company, LLC and Centurion Pecos Terminal, LLC   6

BALLENGEE00002078.07   MR.695

PROPERTY DESCRIPTION
299.325 ACRES

BEING A TRACT OF LAND LOCATED IN SECTIONS 73 AND 76, BLOCK 4, H&GN RAILROAD COMPANY SURVEY, REEVES COUNTY, TEXAS, AND BEING COMPOSED OF THE FOLLOWING: A PART OF A CALLED 84.2 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 860, PAGE 82, OFFICIAL PUBLIC RECORDS, REEVES COUNTY, TEXAS (O.P.R.R.C.T.); A PART OF THE NORTHWEST QUARTER OF SAID SECTION 73 AS DESCRIBED IN A DEED RECORDED IN VOLUME 825, PAGE 784 OF SAID O.P.R.R.C.T.; AND ALL OF A CALLED 109.58 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN VOLUME 1080, PAGE 17 OF SAID O.P.R.R.C.T., AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A 5/8" IRON ROD FOUND WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE NORTH LINE OF THE T&P RAILROAD COMPANY RIGHT-OF-WAY AT THE SOUTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THAT 176.659 ACRE TRACT OF LAND AS DESCRIBED IN A DEED RECORDED IN INST. No. 14-03664 OF SAID O.P.R.R.C.T. FOR THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 32°08'23" W, WITH THE WEST LINE OF THE SAID 109.58 ACRE TRACT AND THE EAST LINE OF THE SAID 176.659 ACRE TRACT, A DISTANCE OF 1537.04 FEET TO A POINT FOR THE NORTHWEST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHWEST CORNER OF THAT 100.00 ACRE TRACT OF LAND DESCRIBED AS A SAVE AND EXCEPT TRACT IN A DEED RECORDED IN VOLUME 1006, PAGE 1 OF SAID O.P.R.R.C.T. FOR THE MOST SOUTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT FROM WHICH A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358" BEARS S 58°03'30" W A DISTANCE OF 0.91 FEET;

THENCE N 58°03'30" E, WITH THE NORTH LINE OF THE SAID 109.58 ACRE TRACT AND THE SOUTH OF THE SAID 100.00 ACRE TRACT, AT A DISTANCE OF 2639.42 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", IN ALL A TOTAL DISTANCE OF 2639.92 FEET TO A POINT IN THE COMMON LINE OF SAID SECTION 76 AND SAID SECTION 73 FOR THE NORTHEAST CORNER OF THE SAID 109.58 ACRE TRACT AND THE SOUTHEAST CORNER OF THE SAID 100.00 ACRE TRACT, BEING ALSO THE SOUTHWEST CORNER OF A 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED;

THENCE CROSSING THE NORTHWEST QUARTER OF SAID SECTION 73 WITH THE SOUTH AND EAST LINE OF THE SAID 20.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

N 58°03'30" E, A DISTANCE OF 527.87 FEET TO A 5/8" IRON ROD SET WITH CAP

BALLENGEE00002078.08

MR.696

STAMPED "TRANS TEXAS SURVEYING" FOR THE SOUTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

N 32°08'32" W, A DISTANCE OF 1650.40 FEET TO A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE COMMON LINE OF SAID SECTION 73 AND SECTION 74 OF SAID BLOCK 4, H&GN RAILROAD COMPANY SURVEY AND THE SOUTH LINE OF COUNTY ROAD NO. 404 FOR THE NORTHEAST CORNER OF THE SAID 20.000 ACRE TRACT AND THE MOST NORTHERLY NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE N 58°03'46" E, WITH THE COMMON LINE OF SAID SECTION 73 AND SAID SECTION 74 AND THE SOUTH LINE OF SAID COUNTY ROAD NO. 404, PASSING AT A DISTANCE OF 2034.62 FEET A 5/8" IRON ROD SET WITH CAP STAMPED "TRANS TEXAS SURVEYING" IN THE WEST RIGHT-OF-WAY LINE OF F.M. HIGHWAY NO. 2119, IN ALL A TOTAL DISTANCE OF 2117.21 FEET TO A POINT FOR THE NORTHEAST CORNER OF SAID NORTHWEST QUARTER AND THE NORTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 73 AND FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, FROM WHICH A 1/2" IRON ROD FOUND WITH CAP AT THE NORTHEAST CORNER OF SAID SECTION 73 BEARS N 58°03'46" E, A DISTANCE OF 2645.08 FEET;

THENCE S 32°08'42" E, WITH THE EAST LINE OF THE SAID NORTHWEST QUARTER AND THE WEST LINE OF THE SAID NORTHEAST QUARTER OF SAID SECTION 73, A DISTANCE OF 2645.36 FEET TO A POINT FOR THE FOR THE SOUTHEAST CORNER OF THE SAID NORTHWEST QUARTER AND THE SOUTHWEST CORNER OF THE SAID SOUTHEAST QUARTER OF SAID SECTION 73 AND BEING IN THE NORTH LINE OF THE SOUTH HALF OF SAID SECTION 73 AND THE NORTH LINE OF A CALLED 120 ACRE TRACT OF LAND DESCRIBED IN A DEED RECORDED IN VOLUME 122, PAGE 521, DEED RECORDS OF REEVES COUNTY, TEXAS FOR THE MOST NORTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 58°01'36" W, WITH THE SOUTH LINE OF THE SAID NORTHWEST QUARTER AND THE NORTH LINE OF THE SAID 120 ACRE TRACT, A DISTANCE OF 13.20 FEET TO A POINT FOR THE NORTHEAST CORNER OF THE SAID 84.2 ACRE TRACT AND THE NORTHWEST CORNER OF THE SAID 120 ACRE TRACT FOR AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE S 32°08'32" E, WITH THE EAST LINE OF THE SAID 84.2 ACRE TRACT AND THE WEST LINE OF THE SAID 120 ACRE TRACT A DISTANCE OF 1.61 FEET TO A POINT FOR THE NORTHEAST CORNER OF A 33.000 ACRE TRACT THIS DATE SURVEYED AND A SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE CROSSING THE SAID 84.2 ACRE TRACT WITH THE NORTH AND WEST LINE OF THE SAID 33.000 ACRE TRACT OF LAND THIS DATE SURVEYED, THE FOLLOWING BEARING AND DISTANCES:

S 58°03'32" W, AT A DISTANCE OF 61.35 FEET PASSING A 1/2" IRON ROD FOUND WITH CAP STAMPED "TRUJILLO RPLS 5358", AT A DISTANCE OF 61.51 FEET PASSING THE WEST RIGHT-OF-WAY LINE OF SAID F.M. HIGHWAY NO. 2119, IN ALL A TOTAL


BALLENGEE00002078.09

MR.697

DISTANCE OF 933.83 FEET TO A 5/8' IRON ROD SET FOR THE NORTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

S 31°43'00" E, A DISTANCE OF 1432.68 FEET TO A 5/8" IRON ROD SET IN THE NORTH LINE OF THE SAID T&P RAILROAD RIGHT-OF-WAY FOR THE SOUTHWEST CORNER OF THE SAID 33.000 ACRE TRACT AND THE MOST SOUTHERLY SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

**THENCE** S 69°42'07" W, WITH THE NORTH LINE OF THE SAID T&P RAILROAD COMPANY RIGHT-OF-WAY, A DISTANCE OF 4421.63 FEET TO THE **PLACE OF BEGINNING AND CONTAINING 299.325 ACRES OF LAND.** THIS DESCRIPTION IS BASED ON THE LAND TITLE SURVEY AND PLAT MADE BY ROBERT L. YOUNG, REGISTERED PROFESSIONAL LAND SURVEYOR NO. 5400 ON DECEMBER 15, 2014. ALL BEARINGS RECITED HEREIN ARE CORRELATED TO THE TEXAS STATE PLANE COORDINATE SYSTEM, CENTRAL ZONE (4203), NAD83 (NA2011). SEE THE ACCOMPANYING SURVEY MAP ATTACHED HERETO AND MADE A PART HEREOF.



EXHIBIT A to GENERAL WARRANTY DEED
Kiehne/Z&T Cattle Co., LLC and Centurion Pecos Terminal, LLC

BALLENGEE00002078.10

MR.698

# EXHIBIT B

to

### General Warranty Deed
(From Zane Kiehne, Tanya Kiehne and Z &T Cattle Company, LLC to Centurion Pecos Terminal, LLC)

## WATER LINE EASEMENT

[Attached hereto]

VOL 1190 PG 0780

EXHIBIT B to GENERAL WARRANTY DEED
Kiehne/Z&T Cattle Co., LLC and Centurion Pecos Terminal, LLC



MR.699
BALLENGEE00002078.11



EXHIBIT B

- CONCEPTUAL -
FOR REVIEW/DISCUSSION

SCALE IN FEET

400    0    400    800

CB 404

CB 408

SELLER-RETAINED
TRACT
134 ACRES

WATER LINE EASEMENT
15' WIDE

SELLER-RETAINED
TRACT
30 ACRES

INTERSTATE 20

VA RAIL
LOGISTICS, LLC

WARNING !
FIBER OPTIC CABLE
ON RAILROAD R-O-W

CENTURION LOGISTICS

PROPERTY EXHIBIT

General Warranty Deed - Page 10 of 11

MR.700

## EXHIBIT C
### to
### General Warranty Deed
(From Zane Kiehne, Tanya Kiehne and Z &T Cattle Company, LLC to Centurion Pecos Terminal, LLC)

## POWER LINE EASEMENT

[Attached hereto]

VOL 1490 PG 0782

BALLENGEE00002078.13

MR.701

EXHIBIT C

General Warranty Deed - Page 10 of 10


BALLENGEE00002078.14

MR 702

Exhibit "S"

MR.703

**UNSECURED PROMISSORY NOTE**
(the "Note")

$1,500,000.00                                                                                                            August 17, 2015

FOR VALUE RECEIVED, Centurion Pecos Terminal, LLC, a Texas limited liability company ("*Maker*"), promises to pay to the order of Ballengee Interests, LLC (and together with its successors or assigns, "*Payee*"), in lawful money of the United States of America, the principal sum of One Million Five Hundred Thousand Dollars ($1,500,000.00), together with interest on the unpaid principal balance at an annual rate equal to eight percent (8.0%), in the manner provided below. Interest shall be calculated on the basis of a year of 365 or 366 days, as applicable, and charged for the actual number of days elapsed on the unpaid principal balance.

1.      PAYMENTS

1.1     PRINCIPAL AND INTEREST

The outstanding principal balance of this Note, and all accrued but unpaid interest thereon, shall be due and payable in full on September 1, 2017 or upon the earlier maturity hereof, whether by acceleration or otherwise. If the principal amount of the Note is not paid in full on or before such date, then the Note shall thereafter commence to accrue interest on the unpaid principal balance at the annual rate of interest specified above plus ten percent (10.0%).

1.2     MANNER OF PAYMENT

All payments of principal and interest on this Note shall be made by wire transfer or direct deposit of immediately available funds to an account specified in writing by Payee, or in such other manner as specified in writing by Payee. If any payment of principal or interest on this Note is due on a day that is not a Business Day, such payment shall be due on the next succeeding Business Day, and such extension of time shall be taken into account in calculating the amount of interest payable under this Note. "*Business Day*" means any day other than a Saturday, Sunday or legal holiday on which banking institutions in the State of Texas are authorized or required by law to be closed. All payments by the Maker under this Note shall be made without set-off, defense or counterclaim and be free and clear and without any deduction or withholding for any taxes or fees of any nature whatsoever, unless the obligation to make such deduction or withholding is imposed by law.

1.3     APPLICATION

Unless Payee, in its sole discretion, elects to apply payments differently, all payments on this capital end note shall be applied in the following order of priority: (a) the payment or reimbursement of any expenses, costs or obligations (other than the outstanding principal balance hereof and interest hereon) for which either Maker shall be obligated or Payee shall be entitled pursuant to the provisions of this Note, (b) the payment of accrued but unpaid interest hereon, and (c) the payment of all or any portion of the principal balance hereof then outstanding hereunder, in the direct order of maturity.

1.4     PREPAYMENT

Maker may, without fee, premium or penalty, at any time and from time to time, prepay all or any portion of the outstanding principal balance due under this Note, provided that each such prepayment is accompanied by accrued interest on the amount of principal prepaid calculated to the date of such prepayment. Any partial prepayments shall be applied to installments of principal in inverse order of their maturity. Payments shall be first applied to accrued and unpaid interest accrued at the time of such payment and then to principal.

2.      DEFAULTS

2.1     EVENTS OF DEFAULT

The occurrence, at any time and from time to time, of any one or more of the following events with respect to Maker shall constitute an event of default hereunder ("*Event of Default*"):

(a)     If Maker shall fail to pay the full principal balance of the Note, together with all accrued interest thereon, on or before September 1, 2017, Maker shall fail to perform any covenant, obligation, undertaking or agreement under this Note, or any



EXHIBIT
4

representation or warranty made by Maker in this Note, or made by Maker in any statement or certificate furnished by Maker, is untrue in any material respect as of the date of the issuance or making thereof.

(b)    If, pursuant to or within the meaning of the United States Bankruptcy Code or any other federal or state law relating to insolvency, creditors' rights or relief of debtors (a "*Bankruptcy Law*"), Maker shall (i) be adjudicated bankrupt or insolvent or commence a voluntary case or proceeding; (ii) consent to the entry of an order for relief against it in an involuntary case; (iii) apply for or consent to the appointment of a trustee, receiver, assignee, liquidator or similar official, or file a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any Bankruptcy Law; (iv) make an assignment for the benefit of its creditors; (v) admit in writing its inability to pay its debts as they become due; or (vi) file an answer admitting the material allegations of, or consent to, or default in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding, or take corporate action for the purpose of effecting any of the foregoing.

(c)    If a court of competent jurisdiction or other competent authority enters an order, judgment or decree under any Bankruptcy Law that (i) is for relief against Maker in an involuntary case; (ii) appoints a trustee, receiver, assignee, liquidator or similar official for Maker or substantially all of Maker's properties; or (iii) orders the liquidation of Maker, and in each case the order, judgment or decree is not dismissed within sixty (60) days.

(d)    A breach of any covenant in Section 3 hereof by Maker.

Maker shall notify Payee in writing promptly upon becoming aware of the occurrence of any Event of Default.

## 2.2    DEFAULT RATE; LATE CHARGE

Upon the occurrence (and during the continuation) of any Event of Default, at the option of Payee and without notice to Maker, all accrued and unpaid interest, if any, shall be added to the principal balance under the Note, and the entire principal balance, as so adjusted, shall bear interest thereafter until paid at an annual rate equal to the lesser of (i) the per annum rate that is ten percent (10%) in excess of the above-specified interest rate, or (ii) the maximum rate of interest allowed to be charged under applicable law, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein. All such interest shall be paid at the time of, and as a condition precedent to, the curing of any such Event of Default.

If any payment required to be made under this Note is received by Payee more than five (5) days after the date when due, Maker agrees that a late charge equal to five per cent (5%) of such late payment shall be immediately due and payable by Maker to Payee, and that such amount is reasonably estimated to compensate Payee for the additional administrative expense, cost and other damages to be incurred by Payee in the administration and processing of this Note.

## 2.3    REMEDIES

Upon the occurrence of an Event of Default, Payee may, at its option, (i) declare the entire unpaid principal balance of this Note, together with all accrued interest thereon and all other amounts payable hereunder, to be immediately due and payable regardless of any prior forbearance, without presentment, demand, protest notice of intent to accelerate, notice of acceleration, or any other notice of any kind, **ALL OF WHICH ARE HEREBY EXPRESSLY WAIVED, ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING**; and (ii) exercise any and all rights and remedies available to it under applicable law, either by suit in equity or by action at law, or both. Maker shall pay all costs and expenses incurred by or on behalf of Payee in connection with this Note, including, without limitation, all costs and expenses arising in connection with Payee's exercise or enforcement of any or all of its rights and remedies under this Note, including reasonable attorneys' fees.

## 3.    COVENANTS

Except with the prior written consent of Payee, from and after the date hereof and continuing so long as any amount remains unpaid on the Note, the Maker covenants and agrees with Payee that (a) Maker shall comply with all laws, ordinances or governmental rules and regulations to which it is subject, (b) Maker shall from time to time execute and deliver to Payee such documents or instruments as Payee at any time may reasonably request in connection with the Note, (c) Maker shall keep proper books of record and account in accordance with generally accepted accounting principles, (d) Maker shall pay any interest due on any note guaranteed by Payee to secure funding of this Note to any third party as directed by Payee (e) Maker shall enter into a deed of trust, deed in lieu of foreclosure or any other instrument requested by Payee to secure Payee's guarantee(s) relating to any assets or real property acquired by Payee with the proceeds of this Note.



4.    CONFIDENTIALITY

The parties each covenant and agree that, except as consented to by the parties, neither they nor any of their respective officers, directors, employees, agents or representatives, will disclose the existence or terms of this Note or any of the other party's confidential information to any third party, except (i) as required by law or regulation (including securities regulations), or (ii) to a party's accountants, lawyers, employees, advisors and representatives in connection with evaluating the transactions contemplated herein or (iii) unless already in the receiving party's possession when such confidential information is disclosed or otherwise independently developed by such receiving party without the use of such confidential information.

6.    MISCELLANEOUS

6.1    WAIVER

The rights and remedies of Payee under this Note shall be cumulative and not alternative. To the maximum extent permitted by applicable law, (a) no claim or right of Payee arising out of this Note can be discharged by Payee, in whole or in part, by a waiver or renunciation of the claim or right unless in a writing signed by Payee; (b) no waiver that may be given by Payee will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on Maker will be deemed to be a waiver of any obligation of Maker or of the right of Payee to take further action without notice or demand as provided in this Note. Maker and each surety, endorser, guarantor and other party ever liable for payment of any sums of money payable upon this Note, jointly and severally, waive presentment, demand, protest, notice of protest and non-payment or other notice of default, notice of acceleration and intention to accelerate or other notice of any kind, and agree that their liability under this Note shall not be affected by any renewal or extension in the time of payment hereof, or in any indulgences, or by any release or change in any security for the payment of this Note, and hereby consent to any and all renewals, extensions, indulgences, releases or changes, regardless of the number of such renewals, extensions, indulgences, releases or changes. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, modification, or change is sought.

**MAKER AND PAYEE HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM THAT RELATES TO OR ARISES OUT OF THIS NOTE OR THE ACTS OR FAILURE TO ACT OF OR BY PAYEE IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS NOTE.**

6.2    NOTICES

All notices, waivers and other communications required or permitted by this Note shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment; or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties):

Payee:

Ballengee Interests, LLC
3838 Oak Lawn Avenue, Suite 1120
Dallas, Texas 75219

Maker:

Centurion Pecos Terminal, LLC
17950 Preston Road, Suite 1080
Dallas, Texas 75252

